**IN THE SUPREME COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| OFFICE OF DISCIPLINARY COUNSEL, | : | No. 3063 Disciplinary Docket No. 3 |
| | : | |
| Petitioner | : | No. 80 DB 2022 |
| | : | |
| v. | : | Attorney Registration No. 208824 |
| | : | |
| JOSEPH D. LENTO | : | (Philadelphia) |
| | : | |
| Respondent | : | |

**ORDER**

**PER CURIAM**

**AND NOW,** this 19th day of November, 2024, upon consideration of the Report and Recommendations of the Disciplinary Board, Respondent's Petition for Review and Application for Relief, the Application for Relief is denied, and Joseph D. Lento is suspended from the Bar of this Commonwealth for five years. Respondent shall comply with the provisions of Pa.R.D.E. 217 and pay costs to the Disciplinary Board pursuant to Pa.R.D.E. 208(8).

A True Copy Nicole Traini
As Of 11/19/2024

Attest: _Nicole Traini_
Chief Clerk
Supreme Court of Pennsylvania

BEFORE THE DISCIPLINARY BOARD OF THE
SUPREME COURT OF PENNSYLVANIA

OFFICE OF DISCIPLINARY COUNSEL     :     No. 80 DB 2022
              Petitioner          :
                           :
      v.                     :     Attorney Registration No. 208824
                           :
JOSEPH D. LENTO              :
              Respondent     :     (Philadelphia)

REPORT AND RECOMMENDATIONS OF
THE DISCIPLINARY BOARD OF THE
SUPREME COURT OF PENNSYLVANIA

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES
OF THE SUPREME COURT OF PENNSYLVANIA:

Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania ("Board") herewith submits its findings and recommendations to your Honorable Court with respect to the above-captioned Petition for Discipline.

I.         FINDINGS OF FACT

The Board makes the following factual findings:

Background: Respondent, Respondent's Law Firms, Respondent's Employees

1.       Respondent, Joseph D. Lento, was born in 1977 and was admitted to practice law in the Commonwealth on October 23, 2008. (Stip B)

2.       Pursuant to Pa.R.D.E. 201(a)(1), Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania. (Stip D)

3.     Respondent is the managing attorney of the Lento Law Firm located at 1500 Walnut Street, Suite 500, Philadelphia, PA  19102.

    a.     Respondent is the only employee at Lento Law Firm (NT III, 398); and

    b.     Respondent's 1500 Walnut Street office is a "virtual office" that "you rent by the hour or the day or the month" and use "when you need an office to see somebody, but it's not there on an everyday basis." (NT II, 39-41)

4.     Respondent had a "working relationship" with Keith Altman, Esquire, but Mr. Altman was not an employee of Lento Law Firm. (NT IV, 377)

5.     Respondent does not maintain an electronic case management system at the Lento Law Firm, but maintains email files and paper files. (NT III, 397-398)

6.     Respondent does not take notes when he speaks with clients, but claims he "recollects as needed in a given case to address a matter accordingly." (NT III, 260) That said, Respondent was often unable to recollect conversations with his clients. *See, e.g.*, NT III, 260, 267, 319; NT IV, 59, 139, 160, 343.

7.     Respondent intentionally does not enter his appearance in a case where he has been retained, so that he is "not attached on the case." (NT IV, 245, 246)

8.     Respondent explained that he operates a "pragmatic practice of sorts" (NT IV, 145) and that "in the pragmatic practice of law, certain things may not be done as may be required." (*Id.* at 158)

9.     Respondent is also the managing attorney at Lento Law Group, formerly Optimum Law Group (Stip 26), located at 300 Atrium Way, Suite 200, Mt. Laurel, New Jersey 08054. Respondent explained the purpose of Lento Law Group in that he wanted to expand and wanted to take on a role of overseeing other attorneys where other

attorneys would handle the legal work. (NT IV, 383,384)

    a.    The Lento Law Group is a professional corporation, Respondent is the majority shareholder, and Wayne Pollock, Esquire, is a minority shareholder. (NT V, 60-61)

    b.    All persons who worked for Lento Law Group were independent contractors and received IRS 1099 forms. (NT IV, 377-378).

    c.    Respondent's attorneys would "come and go" and Respondent could not recall the names of prior associates employed in 2019. (NT V, 61)

10.    Respondent was responsible for the conduct of the lawyers who worked for Lento Law Group. (NT IV, 384)

11.    Respondent did not have written policies in place for the filing and service of complaints at Lento Law Group until "possibly the spring of 2020." (NT V, 62-63)

12.    With respect to filings and motions, Respondent was responsible for:

    a.    filing of motions and complaints, checking the filings of motions and complaints, and enforcing the policies and procedures of the firm (NT V, 64, 66); and

    b.    "following the Court Rules and Code of Professional Responsibility [sic], ultimately the conduct of all employees at both the Lento Law Group and the Lento Law Firm." (*Id.* at 67)

13.    John Edward Groff was a paralegal and the office manager at Optimum, Lento Law Group, and the Lento Law Firm. (NT II, 15; NT V, 61)

14.    Mr. Groff had been an office manager at another law firm before becoming Lento Law Group's Office Manager. (Stip 55)

15.    The support staff at Lento Law Group consisted of paralegals and secretaries. (NT II, 30)

3

16. Steven C. Feinstein, Esquire, was an attorney employed by Optimum from April 2019 to November 27, 2019. (NT II, 7-8, 57) Mr. Feinstein was a credible witness.

17. Mr. Feinstein explained that Optimum was a "decentralized office where there was maybe one or two attorneys at a central location and all of the other attorneys affiliated with the firm would work out of whatever offices they worked out of, their homes . . . etc." (NT II, 34)

18. While Mr. Feinstein was employed at Optimum, he:

   a. observed "there was a high turnover with regard to attorneys" (NT II, 22);

   b. did not know where the other attorneys were admitted to practice law (*id*);

   c. received his assignments from Mr. Groff "99 percent of the time" (*id.* at 23);

   d. had "no idea" who reviewed his completed legal work (*id*);

   e. did not know if anyone reviewed his completed legal work (*id*);

   f. received edits from another attorney on his legal work on only one occasion (*id.* at 43-44);

   g. never gave his legal work to Respondent for review (*id* at 23, 137);

   h. had never been asked by Respondent to review Mr. Feinstein's legal work (*id*); and

   i. "[n]o, not once" received feedback from Respondent about Mr. Feinstein's legal work. (*Id.*)

19. While Mr. Feinstein was employed at Optimum:

   a. he would give his legal work to the support staff or Mr. Groff for proofreading and editing before filing (NT II, 30-31);

   b. the support staff was responsible for obtaining the process servers (*id.* at 31);

4

c.     he was not always told when there were changes in the support staff to whom he would give his work, resulting in Mr. Feinstein's sending work to the email address of a secretary who had been terminated (*id.* at 31-32);

d.     there was an online case management system known as CLIO. However, Mr. Feinstein had not received any training on how to use it; attorneys were responsible for uploading documents for their cases; and the support staff would save final documents (*id.* at 33);

e.     there were occasions when documents were not uploaded to CLIO and Mr. Feinstein had to go to court without a file (*id.* at 38); and

f.     Mr. Feinstein had never been to Optimum's New Jersey office and did not know if there were hard copies of files maintained at that office. (*Id.* at 39)

20.    While Mr. Feinstein was employed at Optimum, he alerted Respondent to ethical issues regarding the firm's operation, including:

a.     in **Mitchell v. Wawa**, Mr. Feinstein advised Respondent that Optimum had failed to inform the client (Mitchell) that her case had been referred to Optimum from another attorney and obtain Mitchell's consent to the referral (NT II, 25-27);

b.     in **United States v. Anna Molina**, after Mr. Feinstein discovered that Respondent had been communicating with the Assistant U.S. Attorney about Ms. Molina's case, Mr. Feinstein warned Respondent "that he cannot touch anything in the Eastern District at all" (*id.* at 28); and

c.     concerns about the way "the clients were being represented, the fact that paperwork wasn't being done properly in terms of transferring files. . . and there were very lax, in my opinion, ethical standards." (*Id.* at 125)

21.    Mr. Feinstein was not promised any favorable treatment or perceived he would receive any favorable treatment for his cooperation with Office of Disciplinary Counsel and testimony at Respondent's disciplinary hearing. (NT II, 122)

22.    Joan A. Feinstein, Esquire, a psychologist, and an attorney with a related interest in disability matters (ODC-42/Bates 345, p. 25) (Stip 52), was employed as a

consultant at Optimum/Lento Law Group from approximately late 2018 to December 2021. Mr. Feinstein and Ms. Feinstein are not related.

23.    During Ms. Feinstein's employment, she had some concerns about how the practice was being operated and asked Respondent to meet with outside counsel and express those concerns. (NT II, 222-223)

24.    Ms. Feinstein's concerns included: she "was being asked to do things under pressure"; the "management was by crisis"; she was "getting information on a need-to-know instead of the whole picture"; and Mr. Groff "could get very nasty." (*Id.* at 223)

25.    On May 29, 2020, Ms. Feinstein, Respondent, and Respondent's father had a consultation with outside counsel about the management of Optimum, during which time (NT II, 224):

    a.    Respondent and his father went to the office of outside counsel and first met privately with counsel (*id.*);

    b.    Ms. Feinstein subsequently joined the consult by telephone (*id.*);

    c.    Ms. Feinstein and Respondent did not discuss any specific case (*id.* at 226); and

    d.    there was a discussion concerning how to better manage Respondent's law firm. (*Id.* at 227)

26.    Ms. Feinstein continued to have concerns after the May 29, 2020 meeting about the operation of Respondent's law firm and discussed her continuing concerns with Respondent (NT II, 245), during which time, Respondent said Ms. Feinstein:

    a.    was "repetitive" and he "had things under control" (*id.* at 245); and

    b.    was being a "Girl Scout" and "neurotic." (*Id.*)

27.    By emails to Respondent with a copy to Mr. Altman dated August 22 and

24, 2020 (ODC-137/Bates 951), Ms. Feinstein memorialized her concerns about Respondent's law firm, including:

a.     the expectation that she would sign things without being given an opportunity to discuss whether she was willing to take on a particular matter;

b.     her role at Lento Law Group was unclear;

c.     being ridiculed;

d.     stating she cannot jump and do things hastily if there is a crisis; and

e.     not being paid for her services.

28.     Ms. Feinstein was not promised any favorable treatment or perceived she would receive any favorable treatment for her cooperation with Office of Disciplinary Counsel and testimony at Respondent's disciplinary hearing.

29.     Ms. Feinstein cooperated with Office of Disciplinary Counsel because "[i]t's the right thing to do.  I wanted to come and tell what happened." (NT II, 280)

### Respondent's Misconduct

### John Gardner Matter

30.     On December 21, 2016, John Gardner was arrested and charged with (Stip 1):

a.     Disorderly Conduct, (Summary), 18 Pa.C.S.A. § 5503(a)(4);

b.     Recklessly Endangering Another Person, (M-2), 18 Pa.C.S.A. § 2705;

c.     Marijuana-Small Amount, (M), 35 Pa.C.S.A. § 780-113(a)(31)(i); and

d.     Use/Possession of Drug Paraphernalia, (M), 35 Pa.C.S.A. § 780-113(a)(32).

7

31.    Pursuant to a negotiated guilty plea, on January 25, 2017, Mr. Gardner agreed to plead guilty to Disorderly Conduct and the Luzerne County District Attorney's Office agreed to dismiss the pending misdemeanor charges. (ODC-3/Bates 133, Stip 2)

32.    Mr. Gardner testified that in August 2018, he did a Google search, Respondent's name "popped up," and Mr. Gardner contacted Respondent about expunging his criminal record. (NT I, 125)

33.    During Mr. Gardner's telephone conversation with Respondent, Mr. Gardner told Respondent what had occurred on December 21, 2016, and that he wanted (NT I, 126):

a.    "it expunged";

b.    his criminal "record, everything that happened that day to be gone off [his] record like that day never happened"; and

c.    "all the charges" expunged, including his summary conviction and the misdemeanor charges that were withdrawn as part of his guilty plea.

34.    While Mr. Gardner was on the telephone with Respondent, Respondent reviewed Mr. Gardner's criminal record and read all the charges. (NT I, 127-128)

35.    In response to Mr. Gardner's request for Respondent to expunge Mr. Gardner's entire criminal record, Respondent advised that (NT I, 129):

a.    "Absolutely he could do it, that he could get rid of everything";

b.    It would take "six to nine months on the long-side"; and

c.    "[I]t's something he can handle and he can take care of for" Mr. Gardner.

36.    Title 18 Pa.C.S.A. § 9122(b)(3)(i) provides, in pertinent part, that criminal history record information may be expunged when "an individual who is the subject of the information petitions the court for the expungement of a summary offense and has been free of arrest or prosecution for five years following the conviction for that offense." (ODC-5/Bates138, Stip 5) (The Expungement Statute)

37.    In *Commonwealth v. Lutz*, 788 A.2d 993, 1000 (Pa. Super. 2001), the Superior Court quoting from the trial court, wrote that "where charges are dismissed pursuant to a plea agreement, those charges are not eligible for expungement, as to destroy them would obscure the true circumstances under which the [defendant] has been convicted." *Accord Commonwealth v. Troyer*, 262 A.3d 543 (Pa. Super. 2021); *Commonwealth v. Hanna*, 964 A.2d 923 (Pa. Super. 2009).

38.    When Mr. Gardner finished his conversation with Respondent, it was Mr. Gardner's understanding that Respondent could expunge his entire criminal record. (NT I, 130)

39.    Respondent failed to explain to Mr. Gardner that the Expungement Statute has a five-year waiting period to expunge summary convictions and Mr. Gardner would have to wait until January 2022 to expunge his entire criminal record. (NT I, 129)

40.    Respondent testified that he did not know about *Commonwealth v. Lutz*, (NT III, 284-285, 288)

41.    Thereafter, on August 14, 2018 (Stip 4):

    a.    Respondent gave Mr. Gardner an Engagement Letter for "an expungement of the applicable charges" for a fee of $1,500 plus filing fees and costs (ODC-4/Bates 136);

    b.    Mr. Gardner signed the Engagement Letter; and

9

c.    Respondent received $1,500 for the representation.

42.    Respondent's Engagement Letter failed to define "applicable charges" or state that Mr. Gardner's summary conviction was not an "applicable charge" and could not be expunged. (NT III, 263, 264, 273, 380-381)

43.    Mr. Gardner understood that "applicable charges" in the Engagement Letter referred to "[e]verything that happened that day he [Respondent] was to get rid of" (NT I, 134), including Mr. Gardner's summary conviction. (*Id.* at 135)

44.    Respondent failed to:

a.    act with the competence necessary for the representation as 18 Pa.C.S.A. § 9122(b)(3)(i) provides that Mr. Gardner would not be eligible to apply for expungement of his summary Disorderly Conduct conviction until 2022;

b.    undertake any research to determine whether Mr. Gardner's misdemeanor charges could be expunged as they were withdrawn as part of a guilty plea (NT III, 272);

c.    explain to Mr. Gardner, to the extent necessary for Mr. Gardner to make an informed decision regarding the representation, that Respondent could not expunge Mr. Gardner's summary Disorderly Conduct conviction in 2018 as Pennsylvania's Expungement Statute required an individual to be free of arrest or prosecution for five years following the summary conviction (18 Pa.C.S.A. § 9122(b)(3)(i)) (NT I, 129);

d.    explain to Mr. Gardner that the case law in Pennsylvania prohibited the expungement of charges that were withdrawn as part of a guilty plea agreement prior to five years from the date of conviction associated with the withdrawn charges (NT III, 288); and

e.    act with the diligence necessary for the representation in that Respondent failed to promptly ascertain that since Mr. Gardner was convicted in 2017, Mr. Gardner must wait until 2022 before he would be eligible to have his criminal conviction expunged.

10

45.    Respondent failed to recognize his wrongdoing and blamed "the attorneys at Dilworth that put this unfortunate idea into [Mr. Gardner's] head that we were doing something that could not be done with the summary offense." (NT III, 276)

46.    Had Respondent informed Mr. Gardner at the outset of the representation that the Expungement Statute in fact required Mr. Gardner to wait five years from the date of his conviction, Mr. Gardner testified that he would have:

a.    "absolutely not" retained Respondent (NT I, 129); and

b.    waited until 2022 to expunge his entire criminal record as he had "no choice." (*Id.* at 130).

47.    Respondent was not a credible witness. In the Gardner matter, he testified that Mr. Gardner elected to proceed with the expungement of his three withdrawn misdemeanor charges knowing that his summary disorderly conduct conviction could not be expunged until 2022 (NT III, 255-257). This is not credible.

48.    In Respondent's Answer to the Petition for Discipline (ODC-2, ¶ 9/Bates 77) Respondent falsely stated (NT 1, 133-134):

a.    "Mr. Gardner did not seek to expunge his Disorderly Conduct Charge";

b.    "Mr. Gardner did not seek to expunge his Disorderly Conduct Charge because he knew that he did not qualify"; and

c.    "Mr. Gardner opted to proceed knowing that the underlying summary offense could not be expunged while the underlying misdemeanors could potentially be expunged."

49.    From time to time after Respondent was retained, Mr. Gardner, Mrs. Gardner, and Respondent exchanged emails. (Stip 6)

50.    Respondent informed Mr. Gardner that Respondent was handling his legal matter. (Stip 7)

11

51.    On October 17, 2018, Respondent filed a Petition for Expungement Pursuant to Pa.R.Crim.P. 790 in the Court of Common Pleas of Luzerne County (ODC-6/Bates 141) seeking to expunge Mr. Gardner's arrest on the following charges, all of which had been dismissed:  Recklessly Endangering Another Person; Marijuana-Small Amount; and Use/Possession of Drug Paraphernalia. *Commonwealth v. John E. Gardner*, CP-40-MD-0001427-2018. (ODC-7/Bates 149, Stip 8)

52.    Respondent never filed this Petition for Expungement as Mr. Gardner's attorney, but rather filed it as a Pro Se petition, and further failed to:

a.    have Mr. Gardner review the Expungement Petition before it was filed (NT III, 302);

b.    provide Mr. Gardner with a copy of the Expungement Petition before or after it was filed (NT I, 136; NT III, 300);

c.    obtain Mr. Gardner's permission to sign his name to the Petition (*id.* at 137, NT III, 302); and

d.    enter his appearance in Mr. Gardner's legal matter. (*Id.* at 306)

53.    On December 10, 2018, Deputy District Attorney Chester F. Dudick, Jr., Luzerne County, submitted the Commonwealth's Response to the Expungement Petition, objecting to the expungement "as any dismissal of charges was in consideration for a guilty plea and thus defendant was not entitled to expungement." (ODC-8/Bates 151, Stip 9) (*See Commonwealth v. Lutz*)

54.    By email to Tara Gardner, wife of Mr. Gardner, sent at 5:50 a.m. on December 21, 2018 (ODC-9/Bates 152), Respondent advised that (Stip 10):

a.    the Commonwealth had objected to the Expungement Petition;

b.    Respondent was attaching the Commonwealth's response;

c.   Respondent could challenge the Commonwealth's response by filing a formal motion with the Court and having a contested hearing on the motion; and

d.   Mr. Gardner should let Respondent know how he wished to proceed.

55.   Respondent wrote that the DA's "argument is disingenuous" and "may/most likely can be defeated." (ODC-9; Bates 000152)

56.   Respondent's email was deceitful in that after receiving the DA's objections, Respondent failed to undertake any research to determine the legal basis for the objections and ascertain the likelihood that a contested hearing would be successful. (NT III, 314-315, 328-29, 340)

57.   Mr. Gardner had received the DA's response, "skimmed it," "didn't' read through it," and "didn't really care" (NT I, 139) as he understood that the remedy to challenge the DA's objection was to go to court and have a hearing in front of a judge. (Id. at 140)

58.   By responsive email to Respondent sent the following day at 4:04 p.m., Mr. Gardner wrote that he "would like to proceed" and to let him know the "next step." (ODC-9/Bates 152, Stip 11)

59.   Mr. Gardner promptly replied to Respondent's email with the expectation that Respondent would act promptly on his case. (NT I, 141)

60.   On or before January 21, 2019, Respondent spoke to Mr. Gardner regarding seeking a hearing to challenge the District Attorney's Office's objection to the expungement and Mr. Gardner authorized payment of Respondent's $7,500 fee to handle the expungement. (ODC-10/Bates 153, ODC-11/Bates 155)

61.   During Respondent's conversation with Mr. Gardner about the DA's objection, Respondent failed to explain that he had only sought an expungement of the

13

dismissed misdemeanor charges and had not sought an expungement of Mr. Gardner's summary conviction. (NT I, 139-140)

62. Had Respondent informed Mr. Gardner that he could not expunge his disorderly conduct charge because the expungement statute had a five-year waiting period, Mr. Gardner would not have paid Respondent an additional $7,500 to file an appeal. (NT I, 142-143)

63. By email sent at 8:55 p.m. on March 20, 2019, Respondent contacted Deputy District Attorney Chester F. Dudick, Jr., about Mr. Gardner's "partial expungement/redaction of certain charges." (ODC-12/Bates 155, Stip 13)

64. By emails to Mrs. Gardner sent on March 26 and April 9, 2019, Respondent asked Mr. Gardner to explain "the exact reasons why [Mr. Gardner's] current record is causing issues for you/exact issues caused." (ODC-13/Bates 156, Stip 14)

65. Mr. Gardner testified that he understood his "current record" to be everything that "happened that day," his entire record, both the summary as well as misdemeanors. (NT I, 146-147)

66. Respondent did not explain to Mr. Gardner that he wanted the exact reasons that Mr. Gardner's criminal record was "causing issues" so that Respondent could use these issues in negotiating with the District Attorney's Office. (NT I, 173, 175-176)

67. On April 16, 2019, Mr. Gardner sent an email to Respondent explaining that Mr. Gardner sought expungement because he: (1) wanted to travel to Canada to fish with his children as his father had done with him; (2) would like to buy his son his first hunting rifle as they had both completed the hunter safety course at the Game Commission; and (3) had done nothing wrong. (ODC-15/Bates 160)

14

68. By email to Mrs. Gardner sent at 7:40 p.m. on April 9, 2019 (ODC-13/Bates 156), Respondent attached his Engagement Letter (ODC-14/Bates 158), that due to "oversight," he had omitted from his prior email. (NT III, 380)

69. Respondent's Engagement Letter provided that (Stip 15):

    a. Respondent had agreed to represent Mr. Gardner "in connection with seeking a hearing to request that the applicable charges be expunged from [his] criminal record";

    b. Respondent's fee for legal services was $7,500; and

    c. Mr. Gardner had paid Respondent's fee in full.

70. Respondent's Letter of Engagement failed to define "applicable charges" so that Mr. Gardner could make an informed decision regarding the scope of representation. (NT III, 380)

71. Mr. Gardner thought that "applicable charges" in the Engagement Letter included "[a]ll the charges from that day, everything, [to] make that day go away." (NT I, 145; see also, NT I, 170)

72. Respondent's Engagement Letter failed to explain that Respondent would not be seeking to expunge Mr. Gardner's summary conviction. (ODC-14/Bates 158)

73. In Respondent's email exchanges with Mr. Gardner, Respondent failed to apprise Mr. Gardner that he would not be seeking an expungement of Mr. Gardner's Disorderly Conduct conviction. (NT I, 146)

74. After Respondent did not acknowledge his receipt of Mr. Gardner's two emails providing the reasons for wanting his "current record" expunged (NT I, 149), at 4:23 p.m. on April 24, 2019, Mr. Gardner inquired whether Respondent had received his earlier email. (ODC-15/Bates 160)

15

75.    By responsive email to Mr. Gardner sent at 8:21 p.m. on April 24, 2019, Respondent advised Mr. Gardner that he would "continue to work on things" and to "let [Respondent] know if [Mr. Gardner] has any question or concerns in the meantime." (ODC-15/Bates 160, Stip 17)

76.    Respondent did not undertake any legal research to ascertain why Mr. Gardner's criminal record prevented Mr. Gardner from travelling to Canada and buying a gun for his son. (NT III, 390-391)

77.    Respondent did not communicate further with Mr. Gardner about his legal matter. (Stip 18)

78.    Mr. Gardner became concerned that his expungement matter "wasn't progressing," he "wasn't hearing any news" from Respondent, so he decided it was time to "bring in some help." (NT I, 150)

79.    On or before May 29, 2019, Mr. Gardner contacted Thomas Biemer, Esquire, from the law firm of Dilworth Paxson, to handle his expungement matter. (NT I, 150)

80.    During Mr. Gardner's first conversation with Mr. Biemer about seeking an expungement of his criminal record (NT I, 154):

     a.     Mr. Gardner explained to Mr. Biemer what "had happened" on the day of his arrest, what he "was trying to do," that Mr. Gardner had "hired an attorney" who "was working on it (his expungement)," and Mr. Gardner was concerned "something is wrong" (NT I, 151);

     b.     Mr. Gardner asked Mr. Biemer to "join the team," "check up on" Respondent, and "see what was going on"(id.);

     c.     Mr. Biemer then "got all the charges" against Mr. Gardner and "figured out everything that happened that day" (id.); and

16

       d.     Mr. Biemer advised Mr. Gardner that he would "help" him expunge his criminal record, "but [Mr. Gardner would] have to wait five years." (*Id.* At 151-152)

81.     Mr. Gardner's conversation with Mr. Biemer was the "very first time" that Mr. Gardner learned he would have to wait five years from the date of his summary conviction, until January 2022, to expunge his criminal record. (NT I, 152-153)

82.     After Mr. Gardner learned that Respondent had failed to tell him that he must wait five years from the date of his conviction to expunge his criminal conviction, Mr. Gardner relayed that he was "very mad":

> [b]ecause he felt used, lied to. I felt like he stole my money. I mean it couldn't have been any clearer from the beginning what I wanted and what we agreed to and I paid him a lot of money to do it, and then I come to find out from this other attorney that it can't even be done. I mean it's ridiculous.

(NT I, 152)

83.     Mr. Gardner's criminal trial counsel had never informed Mr. Gardner that he must wait five years after his guilty plea to expunge his criminal record. (NT I, 160)

84.     Mr. Gardner did not retain his criminal trial counsel to file an Expungement Petition because Mr. Gardner wanted to hire someone who specialized in expungements. (NT I, 167)

85.     On May 29, 2019, Mr. Biemer informed Respondent that Mr. Gardner had retained him to handle his expungement matter. (Stip 19)

86.     By email to Mr. Biemer sent at 5:56 p.m. on May 29, 2019, Respondent advised that he was involved in ongoing negotiations with the Luzerne County District Attorney's Office about Mr. Gardner's expungement, attached a copy of the

Commonwealth's December 10, 2018 response to the Expungement Petition, and attached a draft Petition to Redact. (ODC-16/Bates 161, Stip 20)

87.    Respondent's draft Petition to Redact contained numerous mistakes, including incorrect date of guilty plea, charges that were withdrawn, disposition date of charges, and date of draft petition. (Bates 162, 163, 164; NT IV, 12-16)

88.    Although Respondent knew that Mr. Gardner had retained another lawyer to handle his legal matter, Respondent did not promptly refund the unearned portion of his $9,000 legal fee upon Mr. Gardner's termination of Respondent's representation.

89.    On September 24, 2020, Mr. Gardner filed a Statement of Claim with the Pennsylvania Lawyers Fund for Client Security (Fund). (ODC-18/Bates 172, Stip 23)

90.    Mr. Gardner wrote in his Statement of Claim (ODC-18/Bates 172) that:

a.    Respondent "was hired to get my prior conviction expunged, but the conviction was too recent to be expunged, which should have been obvious from my first consultation" (¶ 2); and

b.    "I learned of my loss when my current counsel . . . informed me that I was ineligible for expungement at this point in time, and even a basic amount of research into the issue would have revealed this."

91.    Mr. Gardner explained that he had filed a Claim "[b]ecause it wasn't right. In my opinion, he [Respondent] was not being honest." (NT I, 154)

92.    The Fund notified Respondent of Mr. Gardner's Statement of Claim. (Stip 24)

a.    By letter to Mr. Gardner dated June 28, 2021, Respondent enclosed a check written from the Operating Account of Lento Law LLC and Joseph D. Lento, Esq., to James Gardner, in the amount of $3,500, with the notation "partial refund" in the memorandum portion of the check. (ODC-19/Bates 178, Stip 25)

18

93.    Respondent failed to possess the competence necessary for the representation in that he did not know:

    a.    whether the Pennsylvania expungement statute permits partial expungement or partial redactions (NT III, 231);

    b.    did not know whether he had ever done a partial expungement or redaction in Luzerne County (*id.*);

    c.    did not know until the Luzerne County D.A.'s Office objected to the expungement of Mr. Gardner's criminal record that Mr. Gardner's misdemeanor charges were withdrawn as part of a guilty plea agreement (*id.* At 251);

    d.    was not aware of *Commonwealth v. Lutz*, which prohibits the expungement of charges withdrawn as part of a guilty plea agreement (*id.* At 284, 288); and

    e.    failed to do any legal research to determine whether there was a legal basis for the D.A. Office's objection. (*Id.* At 314, 328, 350-341)

94.    Respondent denied that he mishandled Mr. Gardner's legal matter. (NT III, 34-35)[1]

Conduct Before Judge Robreno

*Red Wine Restaurant* Case

95.    Mr. Eduardo Rosario retained Respondent's law firm to represent him in a claim against Red Wine Restaurant. (NT V, 123)

96.    On or before May 8, 2019, Mr. Groff assigned Mr. Feinstein to handle Mr. Rosario's legal matter and requested that Mr. Feinstein draft a civil complaint on behalf

---

[1] There is no credible evidence to support Respondent's testimony that he "has successfully resolved matters dealing with the expungement in favor of clients in such situations," or that if he had, that it was done lawfully. Respondent had a duty to fully inform his client of the of law as it applied to his case. The evidence is clear that he failed to do so.

of Mr. Rosario under the Americans with Disability Act of 1990, as amended, 42 U.S.C. § 12101 et seq. (ADA). (NT II, 41-42) Mr. Feinstein testified that he was directed to sue the property owner and promoter and was given a sample complaint.

97.    After reviewing the ADA, Mr. Feinstein concluded it was "expansive." (NT II, 42)

98.    Mr. Feinstein drafted a complaint (Stip 29):

    a.    on behalf of Mr. Rosario, who requires a wheelchair at all times;

    b.    against Alex Torres Productions, Inc., a Florida-based promoter that provides entertainers to various venues;

    c.    against La Guira, Inc. d/b/a Red Wine Restaurant, a restaurant that sold Mr. Rosario a ticket to a comedy show promoted by Alex Torres Productions, Inc.; and

    d.    that alleged Defendants failed to make Red Wine Restaurant accessible to a person in a wheelchair.

99.    After drafting the complaint, Mr. Feinstein sent it to Optimum for filing and service. (NT II, 42-43)

100.    Mr. Feinstein did not know whether anyone at Optimum reviewed the complaint after it was drafted. (NT II, 43)

101.    Respondent did not know if Mr. Feinstein conducted any independent research before drafting the complaint and did not review the complaint prior to Optimum filing it. (NT III, 43)

102.    As the managing attorney at Optimum with direct supervisory authority over Mr. Feinstein, Respondent failed to make reasonable efforts to ensure that Mr. Feinstein

had reasonably concluded that there was a legally supportable basis for bringing a claim under the ADA against Alex Torres Production, Inc.

103.   On May 20, 2019, Optimum filed a civil complaint in the EDPA. (*Red Wine Restaurant* case) (ODC-20/Bates 182, Stip 31):

      a.    The EDPA docketed the *Red Wine Restaurant* case at No. 2:19-2222-ER (E.D.PA) (ODC-21/Bates 201); and

      b.    Mr. Feinstein subsequently entered his appearance on behalf of Mr. Rosario.

104.   After the civil complaint was filed, notices from the federal district court in the *Red Wine Restaurant* case were sent to various emails addresses:  Mr. Feinstein at two different email addresses; Mr. Groff at the Optimum Court Notices (Notices) email address; and a secretary employed by the Respondent. (NT II, 45-46)

105.   The Notices mailbox was monitored by Mr. Groff and court notices were placed on the law firm's calendar. (NT V, 125) Respondent also had access to the Notices email. (NT V, 151-152)

106.   Red Wine Restaurant failed to file an answer to the complaint and Alex Torres Productions did not comply with discovery requests. (ODC-22/Bates 205, 23, Stip 33)

107.   On October 31, 2019, the Honorable Eduardo C. Robreno scheduled a pretrial conference in the *Red Wine Restaurant* case for 10:00 a.m. on December 20, 2019. (ODC-24/Bates 207, Stip 34)

108.   The EDPA sent notice of the December 20, 2019 prehearing conference to the email addresses of Optimum and its employees. (Stip 35)

21

109.   Optimum and employees of Optimum received notice from the EDPA of the December 20, 2019 pretrial conference and should have put the pretrial conference on the firm's calendar. (NT V, 126-127)

110.   Although Respondent received notice of the pretrial conference, Respondent failed to put the conference date on his calendar, did not confirm that it was on the firm's calendar (NT V, 152), and does not "know or believe" it was on the firm's calendar. (*Id.* at 154)

111.   By email dated October 31, 2019, Mr. Feinstein forwarded the EDPA's notice to Ms. Jones (ODC-24, p. 2/Bates 208); by email dated November 12, 2019, Mr. Feinstein advised Mr. Groff of the December 20, 2019 pretrial conference. (ODC-31, p. 2/Bates 259)

112.   When Mr. Feinstein received notice of the December 20, 2019 prehearing conference, he did not put it on his personal calendar "[b]ecause [he] knew it was on Optimum's calendar." (NT II, 56)

113.   On November 27, 2019, Mr. Feinstein ceased his employment at Optimum. (NT II, 57)

114.   By email sent by Respondent to Mr. Feinstein at 11:14 a.m. on November 27, 2019 (ODC-25/Bates 209), Respondent instructed (Stip 38):

    a.    Mr. Feinstein "not to act on behalf of Optimum"; and

    b.    Mr. Haislip [at Optimum] to "Suspend all [computer access] credentials until [Mr. Feinstein] meets with us."

115.   After Mr. Feinstein left his employment at Optimum, Mr. Feinstein:

    a.    was locked out of Optimum's calendar, documents, and CLIO system (NT II, 82);

    b.      was blocked from access to his Optimum email account and online case management system, which included Mr. Feinstein's case management calendar with court notices. (Stip 40); and

    c.      was instructed "on two separate occasions, 'do not talk to our clients' and 'do not do any work on any files.'"(NT II, 57)

116.    By reply email from Mr. Feinstein sent at 12:03 p.m. on November 27, 2019, to Respondent and copied to the following at optimumlawgroup.com: tmorphew; dhaislip; and jedwards (ODC-25/Bates 209), Mr. Feinstein wrote (Stip 39/Bates 209):

    a.      "Please remove me from the Optimum website immediately"; and

    b.      "substitute my appearance in any case that is filed in my name. I have changed my credentials for the EDPA and Philadelphia."

117.    Mr. Feinstein reasonably believed that Respondent would substitute Mr. Feinstein's appearance on Optimum's cases, as "[t]hey were their [Optimum's] clients." (NT II, 59)

118.    Mr. Feinstein made "two subsequent requests to [Respondent and Optimum to] substitute" his appearance on all Optimum's cases (NT II, 77-81) -- on December 19, 2019 (ODC-26/Bates 210), and again on December 26, 2019 (ODC-28/Bates 230).

119.    At the time Mr. Feinstein requested that Optimum substitute his appearance, Mr. Feinstein was not aware that Respondent's law firm had no other attorneys admitted to practice in the United States District Court for the Eastern District of Pennsylvania. (NT II, 89)

120.    In Respondent's Answer to the Petition for Discipline, ¶ 88 (ODC-2/Bates 84), Respondent falsely stated:

    a.      "to his knowledge, Mr. Feinstein sent a single notice to Respondent's firm on November 27, 2019 that related to the filing of substitution of counsel," and

23

b. Mr. Feinstein was aware that "Respondent's firm had no attorneys admitted to the United States District Court for the Eastern District of Pennsylvania."

121. Mr. Feinstein did not immediately file a withdrawal of appearance "since they [Optimum] were representing the client and [he] wasn't." (NT II, 65)

122. By email dated December 19, 2019, from Mr. Feinstein to Respondent, JEdwards, and Conrad Benedetto, Esquire, Mr. Feinstein wrote: "Please substitute my appearance in all of the Optimum cases. If I am held accountable on files in which I am no longer representing the clients or have access to the files, I will hold Optimum responsible." (ODC-26/Bates 210, Stip 41)

123. Respondent received Mr. Feinstein's email and knew that Mr. Feinstein requested that Optimum file substitutions of appearance on all of Mr. Feinstein's cases that originated with Optimum. As the managing attorney, it was Respondent's duty, after firing Mr. Feinstein, to ensure that each client matter that Mr. Feinstein was working on was reassigned and that all deadlines and hearings would be covered. Respondent's DB-7 Answer (ODC-111, ¶16/Bates 791), in which Respondent writes he "was not aware of that December 20, 2019 conference," is evidence that he mismanaged the practice. Furthermore, under the circumstances, it is not credible.

124. Optimum employees Mr. Groff, Terri Morphew, and David Haislip received Mr. Feinstein's email and knew or should have known that Mr. Feinstein requested that Optimum file substitutions of appearance on all of Mr. Feinstein's cases that originated with Optimum.

125. After Mr. Feinstein left Optimum, Respondent failed to take any action to protect Mr. Rosario's interest in the *Red Wine Restaurant* case, such as ensuring Mr. Feinstein's court dates were placed on the law firm's calendar, arranging for Mr. Feinstein

24

to appear, getting another lawyer in the firm admitted to the EDPA, finding substitute counsel to attend the December 20, 2019 prehearing conference, contacting Judge Robreno before the hearing to alert him to the situation, requesting a continuance to obtain substitute counsel, or making a limited appearance at the prehearing conference to explain Respondent's efforts to find substitute counsel. (NT V, 130, 155-156, 162, 166, 171)

126.    Respondent falsely testified that "Mr. Feinstein had indicated that he would be in attendance at the December 20th court date on more than one occasion to Ms. Terri Morphew and Mr. Groff." (NT V, 130). No credible evidence was offered to support this claim.   Moreover, Respondent's testimony:

a.    is inconsistent with Mr. Feinstein's testimony, and is not confirmed in writing by either Respondent's law firm or Mr. Feinstein (id. at 130-131, 162);

b.    is inconsistent with Mr. Feinstein's emails to substitute his appearance on all his cases;

c.    is contrary to Respondent's November 27, 2019 instruction, which Respondent had not retracted in writing or verbally to Mr. Feinstein (id. at 135-138);

d.    is inconsistent with Respondent's DB-7 Answer; and

e.    is not credible.

127.    At 10:28 a.m. on December 20, 2019, a pretrial conference was held before Judge Robreno, during which time defendant Alex Torres appeared pro se and Mr. Feinstein did not appear to represent Mr. Rosario. (ODC-27/Bates 211, Stip 45)

128.    Mr. Feinstein explained that he did not attend the prehearing conference because he was instructed by Respondent's office "'do not touch my files. . . . How can I go? And what happens if something I say prejudiced the plaintiff's case at the Rule 16

25

Conference, and what's my exposure with regard to that? He's not my client, Counselor." (NT II, 160-161)

129. When Mr. Feinstein failed to appear to represent Mr. Rosario, Judge Robreno called Mr. Feinstein on the telephone and had a telephonic prehearing conference, during which time (Stip 46):

a. Mr. Feinstein stated that he had instructed Respondent and other Optimum employees to substitute his appearance in all his cases (ODC-27/Bates 211, p. 4);

b. Judge Robreno found it was "troublesome" that Mr. Feinstein did not do any research concerning whether Mr. Rosario could sue the promoter (id. at pp. 8-9; see also pp. 17-18);

c. Judge Robreno noted that it was an unfair burden on Mr. Torres to have driven from Florida and there was no one in the courtroom to represent the plaintiff (id. at p. 16); and

d. Judge Robreno stated that he would dismiss the Red Wine Restaurant case without prejudice for failure to prosecute and the Court would retain jurisdiction to consider the imposition of sanctions. (Id. at pp. 8, 16)

130. Respondent did not advise Mr. Rosario, in writing, that his case had been dismissed. (NT V, 175)

131. Promptly after the prehearing conference, Mr. Feinstein notified Respondent what occurred before Judge Robreno. (NT II, 84-85; Bates 254)

132. Respondent failed to promptly file a substitution of Mr. Feinstein's appearance. (NT II, 85)

133. By email from Mr. Feinstein on December 26, 2019, to Respondent, Mr. Groff, and Mr. Haislip, Mr. Feinstein wrote: "Again, I need you to have someone substitute for my appearance." (ODC-28)

134.  By Order dated January 13, 2020 (ODC-29/Bates 232), Judge Robreno (Stip 48):

a.  dismissed the *Red Wine Restaurant I* case without prejudice for failure to prosecute (*id.* at n. 2);

b.  stated that "[i]f the complaint is refiled, it shall include legal authority for the proposition that a promoter may be held liable under the circumstances presented in this case" (*id.* at p. 1, n. 2);

c.  retained jurisdiction over the case for 90 days to consider referring Respondent for disciplinary action (*id.* at pp. 1-2); and

d.  issued a Rule to Show Cause against Respondent, Mr. Feinstein, and Optimum as to why sanctions should not be imposed. (*Id.* at p. 2)

135.  On February 6, 2020, Mr. Feinstein filed a response to the Court's Rule to Show Cause Order (ODC-30/Bates 234, Stip 49) and withdrew his appearance. (NT II, 86)

136.  On February 10, 2020, Respondent filed an answer to the Court's Rule to Show Cause Order (ODC-31/Bates 258); in Respondent's Answer, Respondent wrote, "[i]f Optimum Law Group and Mr. Lento decide to refile the Complaint, they will provide a legal basis to justify why they believe there would be a viable cause of action.  If after reviewing the law, they conclude there is not, then no further Complaint will be filed." (*Id.* at p. 6, ¶ 5) (Stip 50)

137.  By Order dated February 11, 2020 (ODC-32/Bates 267), Judge Robreno (Stip 51):

a.  found that it appeared the *Red Wine Restaurant* case was filed "without research or investigation"; and

b.  referred Respondent's handling of the *Red Wine Restaurant* case to the Disciplinary Board for investigation, and if necessary, prosecution.

27

138.    Respondent argues, at page 49 of his Memorandum, that "the genesis of the Rule violations [in the Robreno matters] stem from Steven Feinstein's failure to appear at a December 20, 2019 pretrial conference." In fact these Rule violations stem directly from Respondent's own conduct and failures as described in this Report, which he refuses to accept to this day.

### Red Wine Restaurant NJ Case

139.    Ms. Feinstein is "a counseling psychologist with an active practice seeing kids and families." (NT II, 189)

140.    Ms. Feinstein received her Ph.D. in psychology in 1985 and her law degree in 1995. (NT II, 189)

    a.    Ms. Feinstein explained she decided to go to law school because "a lot of mental health problems are entangled with some legal problems, and I felt I could be a better advocate." (id. at 189-190); and

    b.    Ms. Feinstein never intended to be a practicing lawyer. (Id. at 190)

141.    Ms. Feinstein is not an experienced attorney and did not:

    a.    know how to draft legal documents (NT II, 190);

    b.    know how to complete coversheets for documents to be filed in federal court (id.);

    c.    ever act as a trial lawyer in state or federal court (id. at 190-191); and

    d.    do legal work for any law firm. (Id. at 191)

142.    Keith Altman, Esquire, is an attorney licensed to practice law in California and Michigan, who assisted Respondent on assorted legal matters. (Stip 54)

28

143.    In late 2018, Respondent contacted Ms. Feinstein about being a consultant on mental health issues at his law firm. (NT II, 192)

      a.      Ms. Feinstein told both Respondent and Mr. Groff that she does not "practice law in any capacity" and has no experience going to court and preparing documents. (*Id.* at 195)

144.    Ms. Feinstein agreed to be a consultant on matters at Optimum (ODC-42, p. 25); Ms. Feinstein did not:

      a.      meet with clients regarding legal matters (NT II, 195);

      b.      represent clients in court (*id.* at 195-196);

      c.      handle any legal cases (*id.*); and

      d.      ever get paid for any legal work. (*Id.*)

145.    Respondent testified that "[t]hrough the winter/spring/summer of 2020, [Ms. Feinstein] would be involved in . . . trying to settle certain cases, lesser personal injury cases, talking to adjusters, in addition to more run-of-the-mill kind of matters, custody, criminal." (NT III, 61) Respondent's testimony about Ms. Feinstein's involvement in legal matters during that time is not credible.

146.    While acting as a consultant at Optimum, Ms. Feinstein:

      a.      "tried to report to Joe (Respondent), but I was often directed to John (Groff)" because Respondent would say, "I really don't want to hear that. You have to go to John" (NT II, 196; *see also* NT II, 197, 199);

      b.      would get her assignments from Mr. Groff (*id.*);

      c.      did not "know that anybody really reviewed" her assignments" (*id.*); and

      d.      was "not usually" asked any questions by Respondent about an assignment. (*Id.*)

29

147.    When Ms. Feinstein spoke to Respondent, it was about "personal things," such as him going to the gym and women he might be dating. (NT II, 200)

148.    Respondent told Ms. Feinstein that "he'd like to step back from the everyday practice of law." (*Id.* at 201)

149.    After Mr. Feinstein left Optimum, Respondent requested the assistance of three other attorneys to handle the **Red Wine** case, including offering $20,000 to $30,000 to his "ethics" counsel (D-15, p. 2), but all refused. (NT V, 183-186)

150.    In late December 2019 or early January 2020, Mr. Groff asked Ms. Feinstein if she was a member of the United States District Court for the Eastern District of Pennsylvania (EDPA), Ms. Feinstein stated that she was not admitted, Mr. Groff asked if Ms. Feinstein could get admitted, Ms. Feinstein agreed to apply, and the EDPA admitted Ms. Feinstein. (NT II, 206)

151.    After Ms. Feinstein was admitted to the EDPA, Mr. Groff asked Ms. Feinstein to sign documents for two cases, one of which was the *Red Wine Restaurant* case. (NT II, 206-207)

152.    At the time Ms. Feinstein was asked to sign for the *Red Wine Restaurant* case, Ms. Feinstein had never worked on an ADA matter, had never completed a Cover Sheet for a federal case; had never filed a federal civil complaint, and had never signed a *Pro Hac Vice* application (NT II, 207). Ms. Feinstein:

> a.    explained her concerns that she had "no experience" to Mr. Groff (*id.* at 208); and
>
> b.    Mr. Groff replied that he would find a "substitute" for Ms. Feinstein and her "involvement was just to sign the signature page, minimal involvement." (*Id.*)

153.    On or before March 24, 2020, Respondent and Ms. Feinstein discussed complainant Alex Torres's legal matter (ODC-42, p. 25/Bates 345), during which time (Stip 56):

a.    Respondent asked Ms. Feinstein whether she "would be involved in the case" (*id.* at 26/Bates 346);

b.    Respondent explained that she "would have a minimal role and they would bring in another attorney at some point" (*id.*); and

c.    Under those circumstances, Ms. Feinstein agreed to sign the complaint prepared by Respondent's law firm. (*Id.*)

154.    Ms. Feinstein agreed to help with the *Red Wine Restaurant* case because Respondent was her "friend," "a lot of attorneys walked out" of Respondent's firm, and it would be "harmful" to Respondent if she did not sign. (NT II, 210-211)

155.    Respondent testified that Ms. Feinstein's testimony was "inaccurate" and that Ms. Feinstein's involvement in the case "was not simply for her to sign the complaint and just that would be the extent of it." (NT V, 194-195) In contrast, Ms. Feinstein testified that her role was to sign-off on the complaint and that two other attorneys would come in and do the day-to-day work. (NT II, 301) Respondent's testimony regarding Ms. Feinstein's involvement in the *Red Wine Restaurant* case is not credible.

156.    At the time Ms. Feinstein agreed to help with the *Red Wine Restaurant* case, Respondent failed to inform Ms. Feinstein:

a.    of the legal and procedural background of the case (NT II, 212), including that the *Red Wine Restaurant* case had been previously filed (*id.* at 225-227);

b.    that Mr. Feinstein had been previously assigned to the case (*id.* at 292);

c.    that the *Red Wine Restaurant* case had been dismissed because Mr. Feinstein failed to appear for the prehearing conference (*id.* at 211);

d.    there was a prior Order in the case by a judge (*id.* at 212); and

31

e.      the judge had referred Respondent to Office of Disciplinary Counsel (*id.* at 226-227).

157.    As set forth in ODC-33/Bates 271, on March 24, 2020, Mr. Groff and Mr. Altman exchanged emails, with copies to Ms. Feinstein and Ms. Morphew, about filing a complaint in the *Red Wine Restaurant* matter. (Stip 57)

a.      If the exchanged emails had attached a copy of the complaint, Respondent failed to include the attachment as an exhibit. (NT II, 297-299)

158.    The foregoing emails do not request Ms. Feinstein to review, revise, or approve the *Red Wine Restaurant* complaint, which had been previously filed, but only requested Ms. Feinstein to sponsor Mr. Altman's *Pro Hac Vice* application. (NT II, 214-215, 218)

159.    On May 15, 2020, Ms. Feinstein signed the signature page of a civil complaint identical to the civil complaint dismissed by Judge Robreno in the *Red Wine Restaurant* case. (ODC-34/Bates 273, Stip 58) Ms. Feinstein could not identify her signature on the complaint at the hearing. (NT II, 234)

160.    At the time that Ms. Feinstein was asked to sign the civil complaint (ODC-34/Bates 273), Ms. Feinstein was only given the signature page of the complaint (NT II, 235); she had never seen the complaint prior to Office of Disciplinary Counsel showing it to her. (*Id.* at 236-237) At the time that Ms. Feinstein was asked to sign the signature page, Ms. Feinstein believed she was only "holding a place in the Eastern District until another local attorney could be found." (NT II, 235)

161.    On June 4, 2020, Respondent's office mistakenly filed the civil complaint signed by Ms. Feinstein in the United States District Court for the District of New Jersey (the *Red Wine Restaurant NJ* case). (ODC-35/Bates 289, Stip 59)

32

a.    The caption of the case identified the court as "In the United States Court for the Eastern District of Pennsylvania"; and

b.    The District of New Jersey docketed the *Red Wine Restaurant NJ* complaint at No. 1:20-cv-06824-RMB-JS.

162.    Respondent failed to review the civil complaint before it was filed. (NT V, 216)

163.    Later that same day, the Clerk's Office entered a Quality Control message (ODC-35/Bates 289) informing Respondent that the complaint (Stip 60):

a.    "contains an improper signature" and to "PLEASE RESUBMIT THE DOCUMENT WITH A PROPER ELECTRONIC SIGNATURE" (capital letters in original); and

b.    contained "deficiencies," including:    (1) the "Caption, Party Information is to be entered in CAPITAL LETTERS"; and (2) "Defendants added to the docket do not reflect the alias information listed in the caption of the complaint."

164.    On June 8, 2020, Respondent's office filed a "Voluntary Stipulation of Dismissal Without Prejudice" with the Clerk's office (ODC-36/Bates 291), which (Stip 61):

a.    requested that the *Red Wine Restaurant NJ* complaint be dismissed without prejudice because the complaint "was filed in error and should have been filed in the Eastern District of Pennsylvania";

b.    failed to contain any signature on the signature line; and

c.    contained the name "Denise Stone, paralegal to Joseph Lento, Esquire," under the blank signature line.

165.    On June 9, 2020, the Clerk's Office entered a Quality Control message that stated the notice of voluntary dismissal "submitted by JOSEPH D. LENTO on 6/8/2020 did not contain a proper electronic signature" and requested that Respondent resubmit the signature page with the correct electronic signature. (ODC-35/Bates 289, Stip 62)

33

166. On June 9, 2020, Respondent signed and filed a "Notice of Dismissal Without Prejudice" requesting that the *Red Wine Restaurant NJ* complaint be dismissed without prejudice because the complaint "was filed in error and should have been filed in the Eastern District of Pennsylvania." (Stip 63)

167. On June 9, 2020, the District Court of New Jersey terminated the *Red Wine Restaurant NJ* case. (Stip 64)

168. On June 15, 2020, Respondent filed a letter with the Clerk (ODC-38/Bates 293) that stated (Stip 65):

    a.    on June 4, 2020, Respondent's "secretary erroneously filed a complaint" in the United States District Court, District of New Jersey;

    b.    admitted that the "complaint should have been filed in the United States District Court for the Eastern District of Pennsylvania"; and

    c.    requested that his law "firm be refunded $400 for the incorrect filing" in the *Red Wine Restaurant NJ* case.

169. In response, on June 15, 2020, the Clerk entered a Quality Control message advising that Respondent's letter "was submitted incorrectly" and instructing Respondent to resubmit a letter using the Application for Refund of Fees. (ODC-35/Bates 289, Stip 66)

170. Subsequently on June 15, 2020, Respondent submitted the correct application for a refund to the Clerk's Office. (Stip 67)

    a.    On June 26, 2020, the Clerk's Office signed an order refunding Respondent's filing fee.

171. Respondent admitted that he and his support staff made multiple mistakes in the filing of the Red Wine Restaurant NJ case. (NT V, 197, 199, 200, 202, 204)

*Red Wine Restaurant II* Case

172. On June 19, 2020, Respondent's office filed a civil complaint (ODC-39/Bates 316) with a Civil Cover Sheet (JS 44), Designation Form, and Case Management Track Designation Form in the EDPA. (Stip 74)

    a.    The EDPA docketed the civil complaint, hereinafter the *Red Wine Restaurant II* case, at No. 20-2966. (ODC-41/Bates 340)

173. The civil complaint was:

    a.    identical to the civil complaint dismissed by Judge Robreno in the *Red Wine Restaurant* case (Stip 70); and

    b.    failed to include any "legal authority for the proposition that a promoter may be held liable under the circumstances presented in this case," as was specifically ordered by Judge Robreno on January 13, 2020.

174. Respondent knew about all the previous mistakes in the filing of the *Red Wine Restaurant I* and *Red Wine Restaurant NJ* cases. (NT V, 219)

175. Respondent failed to review the complaint filed on June 19, 2020 in the *Red Wine Restaurant II* case before it was filed. (NT V, 214, 216, 220) The failure of the complaint to contain legal authority "only came to [Respondent's] attention at a later point in time." (*Id.* at 214)

176. Local Federal Rule of Civil Procedure 40.1(b)(3) requires counsel at the time of filing a civil action to "indicate on the appropriate form whether the case is related to any other pending or within one (1) year previously terminated action of this court." (ODC-40/Bates 335, Stip 72)

177. Local Federal Rule of Civil Procedure 40.1(c)(1) provides, in pertinent part, that "[i]f the fact of the relationship is indicated on the appropriate form at the time of filing, the assignment clerk shall assign the case to the same judge to whom the earlier numbered related case is assigned." (ODC-40/Bates 335, Stip 73)

178.    On the Civil Cover Sheet (JS 44) prepared by Respondent's legal assistant, Ms. Stone, Ms. Stone (Stip 75):

    a.    in Section V., "Origin," placed an X in the box indicating that the *Red Wine Restaurant II* case was an "Original Proceeding";

    b.    did not make any mark next to the box "Reinstated or Reopened"; and

    c.    left blank Section VIII, "Related Case(s) if any."

179.    The initial "J," purporting to be Ms. Feinstein's signature, appeared on the attorney signature line of the Civil Cover Sheet. (Stip 76)

180.    Ms. Feinstein (NT II, 238):

    a.    was not asked by anyone to complete the Civil Cover Sheet;

    b.    did not review the Cover Sheet after it was completed;

    c.    could not identify her signature/initials on the signature line; and

    d.    did not authorize anyone to put her signature/initials on the signature line.

181.    On the Designation Form (Bates 318) prepared by Ms. Stone, Ms. Stone incorrectly marked "No" in answer to Question 2 inquiring, "Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?" (Stip 77)

182.    The initial "J," purporting to be Ms. Feinstein's signature, was placed on the attorney signature line of the Designation Form certifying "that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in the court." (Stip78)

183.    Ms. Feinstein did not authorize anyone to put her signature/initials on the signature line of the Designation Form. (NT II, 239)

36

184. As a result of the information contained on the Designation Form, on or before June 26, 2020, the Clerk's Office assigned the *Red Wine Restaurant II* case to the Honorable Mitchell S. Goldberg. (Stip 79)

185. On the Case Management Track Designation Form (Bate 319) prepared by Ms. Stone, Ms. Feinstein did not (NT II, 240):

   a.   write the date, Ms. Feinstein's email address at Lento Law Group, telephone number, and fax number; and

   b.   authorize anyone to sign her name/initial to the Case Management Form.

186. Ms. Feinstein was unable to identify her signature/initial on the signature page of the *Red Wine Restaurant II* civil complaint (Bate 334) and recalled signing only a "placeholder" document in the case. (NT II, 241)

187. At the time Ms. Feinstein was asked to sign the signature page, Ms. Feinstein was given no information, from any source, that the *Red Wine Restaurant* complaint had been filed previously. (NT II, 230-231)

188. In Respondent's Answer to the PFD (ODC-2, ¶ 72(b)/Bates 089), Respondent wrote: (1) "Respondent had multiple conversations with Ms. Feinstein during which they discussed the prior dismissal" of the *Red Wine Restaurant* case; (2) "at all pertinent times, Ms. Feinstein was aware of and knew about the dismissal" of the *Red Wine Restaurant* case; and (3) "Ms. Feinstein consulted with an attorney to determine whether re-filing [*Red Wine Restaurant* case] would raise any ethical concerns." These Petition for Discipline Answers by Respondent are false. (NT II, 229)

189. Other than signing the signature page of a document, Ms. Feinstein was not asked to do any legal work on the *Red Wine Restaurant II* case. (NT II, 245)

190. Respondent was the managing attorney at Lento Law Group, P.C., with direct supervisory authority over Ms. Feinstein and his nonlawyer assistants. (Stip 80)

191. As the managing partner at Lento Law Group, P.C., with direct supervisory authority over Ms. Feinstein and his nonlawyer assistants, Respondent's failure to inform Ms. Feinstein and Ms. Stone about Judge Robreno's prior dismissal of the complaint in the *Red Wine Restaurant* case resulted in Ms. Stone's completing and Ms. Feinstein's (or someone else) initialing of incorrect forms and the EDPA's assignment of the *Red Wine Restaurant II* case to Judge Goldberg.

192. Even though Respondent knew there were issues with the *Red Wine Restaurant I* complaint, Respondent failed to review the *Red Wine Restaurant* complaint before it was filed in New Jersey and refiled in the EDPA. (NT III, 67-68; NT V, 214, 216, 220)

193. At the time the *Red Wine Restaurant II* case was filed, Mr. Altman and Respondent were discussing Mr. Altman becoming an associate "with the Lento Law Group on a fairly systematic basis." (ODC-42/Bates 345, p. 9, Stip 81)

194. In or around March 2020, Lento Law Group contacted Mr. Altman about being co-counsel with Ms. Feinstein in representing Mr. Rosario in the *Red Wine Restaurant II* case. (Stip 82)

195. Ms. Feinstein had never done a *Pro Hac Vice* application and had some concerns about signing Mr. Altman's *Pro Hac Vice* application without first interviewing Mr. Altman. (NT II, 220) Local Rule of Civil Procedure in the U.S. Court for the Eastern District of Pennsylvania 83.5.2 (b) requires that the sponsor attest, under the penalty of perjury, to personal knowledge (or after reasonable inquiry) that the *Pro Hac Vice* applicant's private and personal character is good.

38

196.    When Ms. Feinstein told Respondent that she wanted to interview Mr. Altman before signing the application, Respondent told Ms. Feinstein, "[I]t wasn't necessary and I worry too much." (NT II, 221)

197.    Ms. Feinstein then sought the advice of counsel regarding her request to interview Mr. Altman. (NT II, 221-222) Respondent was aware that Ms. Feinstein had consulted with counsel and "he would tease [her] about it." (*Id.* at 222)

198.    Ms. Feinstein interviewed Mr. Altman, during which time (NT II, 230-231):

   a.    Mr. Altman never told Ms. Feinstein that the *Red Wine Restaurant* case had been previously filed (*id.* at 230);

   b.    Mr. Altman explained that Ms. Feinstein's role would be limited to her signing the signature page of the complaint until the firm could find substitute counsel (*id.* at 232); and

   c.    there was no expectation that Ms. Feinstein would provide any legal assistance. (*Id.* at 232)

199.    After completing the interview, Ms. Feinstein was satisfied that she could sponsor his *Pro Hac Vice* application. (NT II, 220, 232-233)

200.    On June 26, 2020, Respondent's office filed Ms. Feinstein's application for Mr. Altman's *Pro Hac Vice* admission (ODC-136/Bates 946), which Judge Goldberg granted the same day. (Stip 83)   Ms. Feinstein did not sign the *Pro Hac Vice* admission form. (NT II, 244)

201.    On August 20, 2020, Mr. Altman filed a Request for Default against Alex Torres Productions, Inc., for failure to appear, plead, or otherwise defend. (Stip 84)   The Court granted Mr. Altman's request the same day.

202.    On November 5, 2020, Judge Goldberg referred the *Red Wine Restaurant II* case to Magistrate Judge David R. Strawbridge for settlement purposes. (Stip 85)

39

203.    On July 21, 2021, in accordance with Local Civil Rule 40.1(c)(2), the Clerk of Court ordered that the *Red Wine Restaurant II* case be "directly reassigned from the calendar of the Honorable Mitchell S. Goldberg, to the calendar of the Honorable Eduardo C. Robreno, as related to" the *Red Wine Restaurant* case. (ODC-43/Bates 389, Stip 86)

204.    By Order dated September 30, 2021 (ODC-44/Bates 390), Judge Robreno (Stip 87):

   a.    held that "in light of the multiple irregularities present in this case," Mr. Altman and Ms. Feinstein must show cause why they "should not be sanctioned for their: (1) failure to accurately certify that there were no related cases in violation of RPC 3.3(a); and (2) failure to provide authority in the complaint regarding promoter liability as ordered by the Court on January 13, 2020" in the *Red Wine Restaurant* case;

   b.    instructed Ms. Feinstein and Mr. Altman to file a response to the Rule to Show Cause no later than October 25, 2021; and

   c.    ordered that the Rule was "answerable in person" (underlining in original) in his courtroom on November 10, 2021.

205.    By text message dated October 4, 2021, from Respondent to Ms. Feinstein and Mr. Altman, Respondent requested a three-way telephone conversation with Ms. Feinstein and Mr. Altman. (ODC-138)

206.    Ms. Feinstein subsequently spoke to Respondent and Mr. Altman (NT II, 259), during which time:

   a.    Ms. Feinstein was advised that there was a problem with the filing of the *Red Wine Restaurant* complaint (*id.*);

   b.    Mr. Altman minimized what had occurred and stated its "not a big deal" (*id.* at 260);

   c.    Mr. Altman explained that the problem was the secretary had checked the wrong box and filed the complaint in New Jersey, but New Jersey rejected the complaint and refunded the money (*id.* at 261);

d.  Respondent complained that he has "bad luck with these things," such as the "Disciplinary Board, judges coming on him," claimed that he was "unjustly accused in 2013," and "very upset that it became reciprocal in Jersey" (*id.* at 263-264); and

e.  Ms. Feinstein was told she was asking too many questions, which caused her to become upset. (*Id.* at 260).

207.  Ms. Feinstein was never told by Respondent (NT II, 262) that:

a.  the *Red Wine Restaurant* case was originally dismissed in the Eastern District of Pennsylvania (*id.*);

b.  the court ordered that if the case was re-filed, it must include legal authority on promoter liability (*id.*); and

c.  there was a prior complaint filed before the same judge who would be conducting the conference. (*Id.* at 265)

208.  Ms. Feinstein was told that the Court had ordered an Answer to be filed by October 25, 2021, and Mr. Altman would be responsible for writing the Answer. (NT II, 265)

209.  Mr. Altman did not discuss the proposed Answer with Ms. Feinstein or give Ms. Feinstein the Answer to review. (NT II, 266)

210.  By text message dated October 23, 2021 (ODC-138, pp. 4-5/Bates 955-956), Mr. Altman informed Ms. Feinstein that she needed to be in federal court on November 10, 2021. (NT II, 267)  At the time Ms. Feinstein was told she needed to be in court, Ms. Feinstein still had not told that *Red Wine Restaurant* case had been dismissed by Judge Robreno. (*Id.* at 269)

211.  On the morning of November 10, 2021, Respondent scheduled a meeting with Ms. Feinstein, Mr. Altman, and Ms. Stone at Respondent's Philadelphia law office "to prepare [their] testimony in front of Judge Robreno" at the Rule to Show Cause hearing (NT II, 270), during which time:

41

a.     Ms. Feinstein, Mr. Altman, and Ms. Stone went to Respondent's office to meet with Respondent (*id.* at 271);

b.     Respondent contacted Ms. Stone and said that he would not be meeting with them (*id.*); and

c.     Respondent also spoke to Ms. Feinstein and informed her that he would not be attending the scheduled meeting or appearing at the Rule to Show Cause hearing. (*Id.* at 271-272).

212.     Respondent did not provide counsel to represent his employees and others whom he supervised at the Rule to Show Cause hearing. (NT II, 272)

213.     At 2:00 p.m. on November 10, 2021, a Show Cause hearing was held before Judge Robreno, at which Mr. Altman, Ms. Feinstein, and John J. Griffin, Esquire, counsel for defendant La Guira, Inc., were in attendance. (ODC-42/Bates 345, Stip 88)

214.     During the November 10, 2021 hearing (ODC-42/Bates 345, Stip 89):

a.     Judge Robreno explained the "relatedness rule" that required Ms. Feinstein to identify that the *Red Wine Restaurant II* case was related to the *Red Wine Restaurant* case that Judge Robreno had dismissed on January 13, 2020 (ODC-42/Bates 345, p. 13);

b.     Mr. Altman stated that "the individuals who were involved in actually preparing and filing the instant case [*Red Wine Restaurant II* case] were just unaware that it [*Red Wine Restaurant* case] had been filed before" (*id.* at p. 14) and there was a "lapse of time and change of personnel" (*id.* at 16);

c.     Mr. Altman acknowledged that the *Red Wine Restaurant* case was "accidentally filed in the District of New Jersey" (*id.* at 13);

d.     Mr. Altman revealed that the first time he had heard about Judge Robreno's January 13, 2020 Order was when he was before Judge Goldberg (*id.* at 19);

e.     Mr. Altman blamed the Lento Law Group and Ms. Feinstein for preparing an incorrect Civil Docket Sheet and incorrect Designation Form filed with the complaint (*id.* at 21);

42

f.   Ms. Feinstein admitted she had never met Mr. Rosario and had "relied on the firm's judgment" when she signed the complaint (*id.* at 26);

g.   Mr. Altman noted that "the firm itself, somebody knew the case was being refiled, but somehow that message did not get to the people who actually executed it months later" (*id.* at 29);

h.   Judge Robreno stated that "there is no question at all that serious violations of both our local rules and perhaps the Rules of Professional Conduct were implicated in this case," he was "pretty troubled that no one seems to . . . take responsibility and take charge," and "[m]aybe this Lento Firm may be the one" (*id.* at 31); and

i.   Mr. Altman agreed that "clearly, the firm is responsible for not communicating to the people that had to execute." (*Id.* at 32).

215.   The Rule to Show Cause hearing was the first time Ms. Feinstein heard that:

a.   she had signed the same complaint that had previously been dismissed by Judge Robreno (NT II, 273); and

b.   Judge Robreno had entered an order that if the *Red Wine Restaurant* case was ever refiled, it must include law of promoter liability. (*Id.* at 272)

216.   On November 16, 2021, Mr. Altman filed a Response to Order to Show Cause alleging that when the *Red Wine Restaurant II* case was filed, "neither the paralegal who prepared the documents nor the attorney who signed the documents was aware the case had been previously filed." (ODC-45/Bates 392, Stip 90)

217.   By Order dated November 23, 2021 (ODC-46/Bates 404), Judge Robreno held (Stip 91):

a.   The Lento Law Group and Ms. Feinstein are barred from further representation of Mr. Rosario (ODC-46/Bates 404, p. 2);

b.   Mr. Altman's *pro hac vice* status is revoked (*id.*);

43

c.     the default judgment entered against Alex Torres Production, Inc., is stricken (*id.* at 3);

d.     Ms. Feinstein, Mr. Altman, Respondent, and the Lento Law Group are referred to the Pennsylvania Disciplinary Board (*id.*);

e.     Respondent has supervisory or managerial authority over Lento Law Group (*id.* at 4); and

f.     "the conduct of Joan Feinstein, Keith Altman, Joseph Lento, and the Lento Law Group may constitute violations of Pennsylvania Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 4.1, or 5.1." (*Id.* at p. 4)

218.    Respondent received a copy of Judge Robreno's November 23, 2021 Order. (Stip 92)

219.    After Ms. Feinstein received a copy of the Order referring her to ODC for possible RPC violations, she felt "horrible" and called Respondent (NT II, 276); during Ms. Feinstein's conversation with Respondent:

a.     Ms. Feinstein explained she was "upset," was "trying to help a friend," and "was just disappointed" (*id.*); and

b.     Respondent failed to take any responsibility for what had occurred and blamed Mr. Altman. (*Id.* at 277)

220.    Although Ms. Feinstein had agreed to be removed from the case at the Rule to Show Cause hearing, Ms. Feinstein did not know how to remove herself. (NT II, 277)

221.    When Ms. Feinstein contacted Respondent for assistance in getting removed, Respondent told her to contact Mr. Groff, who told Ms. Feinstein she was "an idiot" and the judge had removed her. (NT II, 278)

222.    Ms. Feinstein then contacted outside counsel who taught her how to go on PACER and "to make sure that everything was off." (NT, II, 278)

223.    On December 22, 2021, Mr. Altman filed a Notice of Appeal of Judge Robreno's November 23, 2021 Order imposing sanctions to the Third Circuit Court of

Appeals. (Stip 93) The Third Circuit docketed the appeal at No. 21-3337. (ODC-47/Bates 408) The Third Circuit Court of Appeals subsequently dismissed the appeal, see page 20, paragraph 138 of Respondent's Memorandum.

224.    On May 3, 2022, Mr. Altman filed Concise Summary of the Case identifying the issues to be raised on appeal. (ODC-48/Bates 412, Stip 94)

225.    Respondent admitted that in the *Red Wine Restaurant* cases, he failed to:

    a.    properly supervise his employees in their handling of the pleadings (NT V, 222); and

    b.    have safeguards in place to prevent all the mistakes that had occurred. (*Id.* at 223)

226.    In answer to counsel's prompting Respondent, "[d]o you express any remorse or regret with respect to the mistakes that were made in connection with the Rosario litigation," Respondent stated he regretted "the mistakes that were made" and that Judge Robreno's and the District Court of NJ's "time and resources were unnecessarily used to address these issues." (NT III, 134) Respondent failed to express any remorse or recognition of the harm his reckless conduct inflicted on his client, his colleagues, and the profession.

### The Watsons Matter

227.    On or before July 31, 2019, Optimum assigned Mr. Feinstein to represent Conrad J. Benedetto in a breach of contract, confession of judgment, and unjust enrichment matter. (Stip 95)

    a.    Mr. Benedetto had retained Respondent's law firm and Mr. Benedetto was Respondent's client. (NT V, 58); and

b.    "Mr. Feinstein was an associate with the [ ] Optimum Law Group" and Respondent was the "supervising and managing attorney" for the firm. (*Id.* at 59)

228.    Mr. Feinstein testified that he drafted a civil complaint (NT II, 92; ODC-49/Bates 419, Stip 96):

a.    on behalf of Plaintiff, Mr. Benedetto;

b.    against Defendants, Raheem Watson, and Christy Laverne Watson (the Watsons); and

c.    alleging that Plaintiff loaned $10,000 to Defendant Raheem Watson pursuant to a promissory note and Defendant Raheem Watson had not made any payments in accordance with the terms of the promissory note.

229.    After Mr. Feinstein drafted the complaint, he gave the complaint to one of the secretaries for filing. (NT II, 92)

230.    No other attorney reviewed the complaint before it was filed. (NT V, 71)

231.    Mr. Feinstein did not give the complaint to Respondent to review because "I don't know that Mr. Lento does anything at the firm, so it would have been useless to ask him to review it." (NT II, 137)

232.    Mr. Feinstein was not involved in filing the complaint, service of the complaint, or uploading documents from the case into the CLIO system. (NT II, 92-93)

233.    On July 31, 2019, Optimum filed the complaint in the Court of Common Pleas of Philadelphia County (First Judicial District). *Benedetto v. Watson et al.*, No. 190704102. (ODC-50/Bates 424, Stip 97)

234.    Although Respondent's law firm had a case management system, after investigation, Respondent was unable to determine who filed the complaint (NT V, 73, 76) and who made the arrangements to have the complaint served on the defendants. (*Id.* at 79-80)

46

      a.     Respondent's law firm had a "general problem" of employees not entering information into the case management system. (NT V, 77)

      b.     As the supervising lawyer, it was Respondent's responsibility to review the case management system and determine that his employees were doing things in a timely and proper manner. (*Id.*, 86)

235.   On or before August 6, 2019, Optimum retained the services of Russell R. D'Alonzo to make service of process of the civil complaint on the Watsons.

236.   At 6:55 p.m. on August 6, 2019, Mr. D'Alonzo made service of process of the civil complaint by handing a copy of the complaint to Makayla Daniels, the Watsons' daughter, at 1013 Pennsylvania Avenue, Havertown, PA 19083. (ODC-51/Bates 432, Stip 99)

237.   Pa.R.Civ.P. 400.1 provides that in an action commenced in the First Judicial District, service of original process shall be made (Stip 100):

      a.     in the First Judicial District, by the sheriff or a competent adult, Pa.R.Civ.P. 400.1(a)(1); and

      b.     in any county other than the First Judicial District, by the sheriff of the other county who is deputized by the sheriff of the First Judicial District, Pa.R.Civ.P. 400.1(a)(2).

238.   The Watsons did not reside in the First Judicial District. (Stip 101)  The Watsons resided in Delaware County.

239.   Russell R. D'Alonzo is not the sheriff of Delaware County. (Stip 102)

240.   As the managing attorney at Optimum with managerial authority over lawyers and nonlawyer assistants, Respondent failed to make reasonable efforts to ensure that employees of Respondent's law firm acted with competence and have policies and procedures in place to ensure that service of original process of a complaint that had been filed in the First Judicial District against residents of Delaware County was

47

served by the Delaware County sheriff who had been deputized by the sheriff of the First Judicial District. (PFD ¶ 106 and PFD Answer ¶ 106; NT V, 81-82)

241.   On August 12, 2019, Optimum filed Affidavits of Service establishing proof of service of the complaint on the Watsons, albeit not service in the manner authorized by Pa.R.Civ.P. 400.1. (Stip 104)

242.   The Watsons did not file an answer to the complaint within 30 days of service. (Stip 105)

243.   Mr. Groff instructed Mr. Feinstein to draft a Praecipe to Enter a Default Judgment (Praecipe) against the Watsons. (NT II, 106-107, 137)

244.   At the time Mr. Groff instructed Mr. Feinstein to draft the Praecipe, Mr. Feinstein "asked him [Mr. Groff] if a 10-day notice was sent, and he [Mr. Groff] said 'yes.'" (NT II, 106, 107)

245.   The clerical staff was responsible for sending out the 10-day notice. (NT V, 90-91)  Neither a copy of the 10-day notice or confirmation of its mailing to the Watsons was uploaded to the CLIO system. (NT V, 92-93)

246.   By email to JEdwards and LJones on October 23, 2019, Mr. Feinstein attached a draft Praecipe to Enter Default Judgment (Praecipe) and wrote: "Here is the default judgment, anything in red has to be changed to reflect the correct date, the docket number has to be put in and this should be good to go." (ODC-52/Bates 434, Stip 106)

247.   Mr. Feinstein sent the email with the draft Praecipe to Mr. Groff and Ms. Jones and "highlighted certain areas of the draft because the dates were wrong, so I wanted to make sure that those were corrected to the correct date and to put the correct docket number on the corrected docket." (NT II, 104)

48

248.   The date that the Notice of Intent to Take Default Judgment was sent was one of the dates that Mr. Feinstein highlighted to be corrected as the draft Praecipe (D-26) date is April 24, 2018. (NT 101-102, 109-112)

249.   By email exchange between Mr. Feinstein and Ms. Jones on October 28, 2019 (ODC-53/Bates 435, Stip 107):

> a.   at 4:13 p.m., Ms. Jones wrote:   I am working on getting this filed today.  I do not see Notice of Intent to Default that is Exhibit B.  Can you please let me know where I can find this so we can file this?; and
> b.   at 4:16 p.m., Mr. Feinstein replied:  I have no idea.  John said it was sent."

250.   Mr. Feinstein stated that (NT II, 107):

> a.   a 10-day notice was not uploaded onto the CLIO system; and
>
> b.   Mr. Feinstein was not given the praecipe to proofread after Ms. Jones typed it, added the dates, and finalized the pleading.

251.   At 1:59 p.m. on October 29, 2019, Optimum filed a Certification of Service stating that copies of Notice of Intent to Take Default judgment were mailed to the Watsons on September 11, 2019. (ODC-54/Bates 0437)

252.   The Praecipe to Enter Default Judgment (Praecipe) against the Watsons (Stip 109):

> a.   stated the Notice of Intent was mailed to the Watsons, via first class mail, postage prepaid, on October 28, 2019;
>
> b.   attached as Exhibit B an unfiled "Important Notice," dated September 11, 2019, informing the Watsons that they had failed to enter a written appearance and unless they act within 10 days from the date of the Notice, a judgment may be entered against them; and
>
> c.   affixed the signature of Mr. Feinstein.

253.   The Praecipe contained contradictions regarding the date the 10-day notice was mailed to the Watsons. (NT V, 98)

49

a. If Optimum had mailed the Notice of Intent on September 11, 2019, then Optimum's Praecipe wrongly stated that the Notice of Intent was mailed to the Watsons on October 28, 2019.

254. At 2:06 p.m. on October 29, 2019, the Praecipe against the Watsons was filed. (ODC-55/Bates 438, Stip 111)

255. Mr. Feinstein did not review the Praecipe before it was filed. (NT II, 107)

256. As the managing attorney at Optimum with managerial authority over lawyers and nonlawyer assistants, Respondent failed to ensure that documents prepared on behalf of an attorney are reviewed and proofread by an attorney prior to filing with the Court.

257. On October 29, 2019, the Court granted the Praecipe and entered a Judgment by Default against the Watsons. (Stip 113)

258. On November 11, 2019, the Watsons filed a Petition to Strike Entry of Default Judgment (Petition) (ODC-56/Bates 451, Stip 114):

a. admitting that the Watsons had been personally served with the Complaint on August 12, 2019;

b. admitting that on November 1, 2019, the Watsons received notice via certified mail that Plaintiff had requested a judgment by default on October 29, 2019;

c. alleging that prior to November 1, 2019, the Watsons had not received any other notices of intent to take default for failing to file an answer to the Complaint;

d. noting that the Praecipe is dated and signed on October 28, 2019;

e. explaining that Pa.R.Civ.P. 237.1(2) states, in pertinent part, that:

[N]o judgment by default for failure to plead shall be entered by the prothonotary unless the praecipe for entry includes a certificate that a written notice of intention to file the praecipe was mailed or delivered . . . at least ten [10] days prior to the date of the filing of the praecipe to the party against whom

50

judgment is to be entered and to the party's attorney of record, if any.;

f.      alleging that Plaintiff and Mr. Feinstein "have perpetrated a fraud on this court" by having the Court issue an "unjust default judgment against Defendants"; and

g.      requesting that Plaintiff's Praecipe for Entry of Default be stricken.

259.   By Order docketed on December 5, 2019, the Honorable Edward C. Wright issued a Rule to Show Cause as to why the relief requested in the Watsons' Petition should not be granted, scheduled a Rule Returnable Hearing for January 9, 2020, and ordered that any written response to the Petition should be filed no later than 5 days before the January 9, 2020 hearing. (Stip 115)

260.   Mr. Feinstein received the Petition to Strike and was "mortified by what was filed over [his] name." (NT II, 113)

261.   By email sent on December 19, 2019, from Mr. Feinstein to Respondent, JEdwards, and Mr. Benedetto (ODC-26/Bates 210), Mr. Feinstein (Stip 116):

a.      attached the Rule to Show Cause that was served on him by certified mail that day;

b.      requested that someone substitute their appearance "per the letter I got from Joe Lento to immediately stop any work on Optimum cases"; and

c.      reminded the email recipients to substitute his appearance in all Optimum cases.

262.   Respondent received notice of the January 9, 2020 hearing. (NT V, 101-102; ODC-26/Bates 210)

51

263. Although Mr. Benedetto was a client of Respondent's law firm (NT V, 100), Respondent failed to act with the competence and diligence necessary for the representation and filed a substitution of appearance for Mr. Feinstein. (NT II, 114)

264. On January 2, 2020, Mr. Feinstein filed Plaintiff's Response to Defendants' Petition to Strike Default Judgment (ODC-57/Bates 468, Stip 117):

    a.    claiming that the Praecipe to Enter Default Judgment, which states that the Notice of Intent to Take Default was mailed on October 28, 2019, "appears to be a clerical error";

    b.    alleging that the Notice of Intent to Take Default Judgment was mailed on September 11, 2019;

    c.    attaching a Certificate of Service for Notice of Intent to Take Default Judgment that was filed on October 29, 2019; and

    d.    failing to attach any proof that a Notice of Intent to Take Default Judgment was mailed on September 11, 2019, such as a:  mail receipt;  copy of envelope to the Watsons; Affidavit from the individual(s) who drafted the Notice of Intent, addressed the envelope to the Watsons, placed the Notice of Intent in an envelope, and mailed the Notice of Intent; certificate of service filed on or about September 11, 2019; or cover letter for Notice of Intent.

265. Mr. Feinstein explained that he filed the Response because he had "waited a period of time to see if [Respondent was] going to answer the petition. . . So when it got to January and they still had not entered their appearance and a response to the petition had to be filed, I didn't want to have any concerns—I didn't want to have a rerun of what happened in the Eastern District by not responding to the motion." (NT II, 114-115; *see also* NT II, 116-117)

266. Mr. Feinstein obtained Mr. Benedetto's authorization to file the Response. (NT II, 117)

267. By email exchange dated January 3, 2020, between Mr. Feinstein and JEdwards (Mr. Groff) (ODC-58/Bates 478, Stip 118):

52

    a.    JEdwards inquired whether Mr. Feinstein was taking the Watsons' matter on behalf of Conrad or should Optimum substitute Mr. Feinstein's appearance;

    b.    Mr. Feinstein replied:

        i.    "You failed to substitute anyone in for my appearance. As a favor to Conrad I filed a response"; and

        ii.    "I have not agreed to handle the case for Conrad, but I was not going to commit malpractice."

268. On January 9, 2020, Judge Wright held a Rule Returnable Hearing on the Watsons' Petition to Strike (ODC-59/Bates 480), during which time (Stip 119):

    a.    Mr. Watson was in attendance;

    b.    Mr. Watson provided the Court with green card receipts showing that Optimum had notice of the Rule Returnable Hearing;

    c.    Mr. Watson explained that he did not receive the required 10-day Notice of Intent to Take Default Action that Optimum purportedly had sent on September 11, 2019, until Optimum mailed the Praecipe on October 28, 2019; and

    d.    requested that the default judgment entered against the Watsons be stricken.

269. Although Mr. Benedetto did not discharge Respondent's law firm and Respondent did not withdraw from the representation, no one from Respondent's law firm appeared to represent Mr. Benedetto. (NT V, 105-106, 110) Respondent failed to act with the competence and diligence necessary for the representation and assign another attorney to substitute his appearance for Mr. Feinstein and attend the January 9, 2020 hearing. (*Id.* at 114)

270. By Order docketed on January 10, 2020, Judge Wright granted Defendants' Petition to Strike Default Judgment. (ODC-50/Bates 424, Stip 120)

271. Respondent admitted that his supervisory and managerial duties in his handling of the Watsons matter fell below the standards mandated by the Rules of Professional Conduct. (NT V, 121-122)

<u>American Club of Beijing Matter</u>

272. On September 13, 2019, Mr. Feinstein filed a civil complaint on behalf of American Club of Beijing and against Board of Governors AME in the Court of Common Pleas of Philadelphia County. *American Club of Beijing v. Board of Governors AME*, No. 19091807. (American Club) (ODC-60/Bates 489, Stip 121)

273. On January 7, 2020, Respondent filed a Praecipe for Entry of Appearance on behalf of American Club. (ODC-61/Bates 500, Stip 122)

274. On January 8, 2020, Mr. Feinstein filed a Withdrawal of Appearance on behalf of American Club. (ODC-61/Bates 500, Stip 123)

275. By email dated April 3, 2020, from Ms. Stone to Mr. Groff with a "cc" to Respondent, Ms. Stone (D-29):

     a.     attached a draft *Pro Hac Vice* motion for the admission of Anthony Scordo, which was to be signed and verified by Respondent; and

     b.     explained that she would re-type the motion, but "need[ed] the corrections first...."

276. Respondent received the draft *Pro Hac Vice* motion from Ms. Stone. (NT III, 137)

277. Respondent failed to act with reasonable diligence and review and correct the *Pro Hac Vice* motion after it was received. (NT III, 137; NT V, 12, 13, 14)

278. On May 19, 2020, the Honorable Gary Glazer transferred *American Club* to Commerce Court. (Stip 124)

279. On May 27, 2020, Ms. Stone filed a Motion for *Pro Hac Vice* Admission to Commerce Court (Motion). (ODC-62/Bates 515, Stip 125)

280. The Motion (Stip 126):

a. states that Respondent moves for the *pro hac vice* admission of Anthony Scordo, Esquire, an attorney in good standing in New Jersey and an associate at Lento Law Group, P.C.;

b. contains the signature of Joseph D. Lento and is dated May 26, 2020; and

c. attaches Verification of Joseph D. Lento, Esquire, In Support of Motion for Admission *Pro Hac Vice* (Verification).

281. The Verification, which Respondent signed and dated May 26, 2020, stated Respondent (Stip 127):

a. declares, "under penalty of perjury that the foregoing is true and correct";

b. "understand[s] that false statements made herein are subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities";

c. is the President of Lento Law Group, P.C. (¶ 1); and

d. is "a member in good standing of the Pennsylvania Bar, I presently am not, and have never been, the subject of any disbarment or suspension proceeding before this or any Court" (¶ 3).

282. Respondent's Verification was incorrect in that (Stip 128):

a. by Order dated July 17, 2013, the Pennsylvania Supreme Court granted the Joint Petition in Support of Discipline on Consent and suspended Respondent from the practice of law for one year, followed by a one-year period of probation with conditions;

b. by Order dated April 26, 2017, the Supreme Court of New Jersey entered an Order of reciprocal discipline suspending Respondent from the practice of law;

c. by Order dated September 13, 2013, the Eastern District of Pennsylvania entered an Order of reciprocal discipline suspending

55

Respondent from the practice of law for one year, effective thirty days from the date of its Order; and

d.  Respondent has not been granted reinstatement to the practice of law in the Eastern District of Pennsylvania.

283.  Respondent testified that he did not know the requirements for filing a *Pro Hac Vice* motion until the summer of 2022. (NT V,11)  Respondent failed to possess the competence necessary for the representation.

284.  On June 1, 2020, Defendants William L. Rosoff, Timothy P. Stratford, and James M. Zimmerman (Defendants) filed a Response and New Matter in Opposition to Plaintiff's Motion for Admission *Pro Hac Vice* (Response). (ODC-63/Bates 531, Stip 129)

285.  The Response (Stip 130):

a.  alleges that Respondent misstated his disciplinary history as the Pennsylvania Supreme Court suspended Respondent from the practice of law for one year, followed by a one-year period of probation with conditions;

b.  alleges that as a result of Respondent's misstatement and other reasons set forth in the Defendants' Response, good cause exists to deny Respondent's Motion; and

c.  requests that, pursuant to the Court's inherent powers to govern the conduct of attorneys, the Court enter a Rule to Show Cause as to why sanctions should not be imposed.

286.  Although Respondent did not know the legal requirements for filing a *Pro Hac Vice* motion and failed to correct the false statements in the draft motion that was sent to him for review (NT V, 11, 13), Respondent requested that Ms. Stone "send a letter informing all necessary parties that it (the motion) was a clerical error." (D-30) Respondent reasoned that "[i]t was deemed [to] be the appropriate way to address the matter." (NT V, 22)

287. On June 4, 2020, Respondent filed a Praecipe to Attach Certification of Denise Stone and the Certification of Denise Stone (Certification). (ODC-64/Bates 599, Stip 131)

288. Ms. Stone's Certification stated that she (Stip 132):

    a.    was a paralegal at Lento Law Group, P.C.;

    b.    "inadvertently stated that Joseph Lento, Esquire has 'never' been the subject of 'any' suspension proceedings in 'any' Court";

    c.    had filed the Motion;

    d.    apologized for her mistake; and

    e.    requested permission to withdraw the Motion and file a "corrected" motion.

289. Respondent testified that he did not know who prepared Ms. Stone's Certification or how it was prepared. (NT V, 25, 26)

290. On June 15, 2020, Defendants filed a Praecipe to Supplement and Response to Ms. Stone's Certification requesting the denial of the *Pro Hac Vice* Motion and the award of sanctions. (ODC-65/Bates 603, Stip 133)

291. In support of its request, Defendants allege, among other reasons, that (Stip 134):

    a.    Respondent's signed Verification "egregiously misstated Mr. Lento's disciplinary history" (p. 1);

    b.    Ms. Stone's Certification compounds Respondent's misconduct because he failed to properly supervise Ms. Stone and review the Certification before it was filed (pp. 3-4); and

    c.    Mr. Scordo was not a member of the Pennsylvania Bar at the time he co-signed the Complaint in *American Club* as "Attorney for Plaintiff seeking admission *Pro Hac Vice.*" (p. 5)

57

292.    On June 26, 2020, Respondent filed a response to Defendants' Response (ODC-66/Bates 619) alleging, in pertinent part, that (Stip 135):

    a.    "[i]t is highly unlikely that such a minor issue relating to [Respondent's] disciplinary record would result in the denial of *Pro Hac Vice* admission of Mr. Scordo" (p. 2);

    b.    Respondent "never attempted to hide" his disciplinary record (p. 4); and

    c.    Respondent's paralegal's error "was a mere oversight." (p. 5)

293.    By Order dated July 14, 2020 (ODC-67/Bates 633), the Honorable Ramy I. Djerassi ordered that Respondent's motion for Mr. Scordo's *pro hac vice* admission be denied (Stip 136):

without prejudice to a refiling that complies in all respects with applicable rules under Pa.R.Civ.P. 1012.1 and disclosure of movant's disciplinary history. The proposing attorney shall sign the motion and verification.

294.    Judge Djerassi's order placed Respondent on notice to comply with Pa.R.Civ.P. 1012.1, disclose his disciplinary history, and to sign the motion and verification. (NT V, 31)

295.    Respondent and Ms. Stone drafted the Second Motion for Admission *Pro Hac Vice*. (NT V, 31)

296.    By email exchange between Respondent and Mr. Scordo on August 11, 2020 (ODC-68/Bates 634), with the subject line "Pro Hac" (Stip 137):

    a.    Respondent wrote at 8:12 a.m.: "Anthony, would you agree the one with just the PA consent suspension is sufficient? No need to get into NJ or Eastern District reciprocal right?;

    b.    Mr. Scordo wrote at 9:42 a.m.: "Joe, With these clowns on the other side, it might be worth just putting in a short one-sentence reference as part of the same paragraph without going into detail;

58

c.   Respondent wrote at 10:23 a.m., "Is this one OK? I basically put that NJ initially recommended a reprimand (Attorney Ethics and NJ DB) but NJ Supreme Court basically was like we're just going to retro reciprocal because it took them 4 years to get around to it. NJ basically said I got farked in PA with the suspension but was going to just do the reciprocal"; and

d.   Mr. Scordo wrote at 10:24 a.m.: "Looks fine."

297.   Respondent also spoke to Mr. Groff, who was not a lawyer, to determine which draft of the Second Motion was most appropriate to file. (NT V, 38; D-71)

298.   By Order dated August 13, 2020, Judge Djerassi sustained Defendants' Preliminary Objections, which had been filed on May 11, 2020, and dismissed the Complaint against Defendants. (Stip 138)

299.   On August 14, 2020, Respondent filed a second Motion for Admission *Pro Hac Vice* and attached a Verification of Joseph D. Lento, Esquire, In Support of Motion for Admission *Pro Hac Vice* (Second Verification). (ODC-69/Bates 635, Stip 139)

300.   In the Second Verification, Respondent states (Stip 140):

a.   "under penalty of perjury that the foregoing is true and correct";

b.   Respondent "understand[s] that false statements made herein are subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities";

c.   Respondent is the President of Lento Law Group, P.C. (¶ 1);

d.   Respondent's law license was suspended for one-year in Pennsylvania and Respondent was reciprocally disciplined in New Jersey (¶ 3);

e.   "I presently am not the subject of any disbarment or suspension proceedings before this or any Court" (¶ 3); and

f.   "I believe that Anthony Scordo, Esquire is reputable and competent (¶ 6)."

59

301.    Respondent signed the Motion as Joseph D. Lento. (Stip 141)

302.    Respondent's Second Verification did not (Stip 142):

    a.    include Respondent's disciplinary history in the United States District Court for the Eastern District of Pennsylvania (¶ 3(a));

    b.    comply with Pa.R.Civ.P. 1012.1(b), in that it failed to state that the information required by IOLTA regulations had been provided to the IOLTA Board (¶ 4(a)); and

    c.    comply with Pa.R.Civ.P. 1012.1(d)(2)(iii), in that it failed to state that any proceeds from a settlement will be handled in accordance with RPC 1.15. (¶ 4(b)).

303.    Respondent admitted that his Second Motion failed to fully disclose Respondent's disciplinary history (NT V, 32) and comply with Judge Djerassi's order. (Id. at 33)

304.    Respondent also failed to disclose his suspension from the EDPA on his Pennsylvania annual attorney registration statements from 2015-2021. (ODC-122-128/Bates 917-925) (NT V, 48)

    a.    Respondent continued to file false attorney registration statements after Judge Djerassi dismissed his false *Pro Hac Vice* motions (NT V, 50); and

    b.    Respondent explained that it was his "misunderstanding" of the attorney registration statement and Respondent not doing his "diligence in understanding" the question. (NT V, 49)

305.    Respondent knew that his first motion had failed to comply with Pa.R.Civ.P. 1012.1 and Respondent testified that his failure to comply with Pa.R.Civ.P. 1012.1 in his Second Motion "was an error and oversight."[2] (NT V, 51-52)

---

[2] Respondent contends that he did not intentionally intend to deceive the Court in the *American Club* matter. The evidence is that Respondent was not candid to the Court in his second verification, and chose to not fully disclose his disciplinary record. Respondent asked his colleague *before* he filed the second verification whether there was a "need" to be fully candid to the Court, and reference his *ongoing* suspension in the Eastern District of PA in his sworn verification. He chose to not fully disclose.

306. On August 23, 2020, Defendants attempted to file a Response to Plaintiff's Second Motion for Admission *Pro Hac Vice* (Second Response), but the Prothonotary's office rejected the filing as Defendants had been dismissed from the *American Club* case. (Stip 143)

307. By email to Judge Djerassi dated August 26, 2020, with a copy to Respondent (ODC-70/Bates 650), Defendants stated that they (Stip 144):

    a. had attempted to file their Second Response, but it was rejected by the Prothonotary;

    b. viewed Respondent's Second Motion as being noncompliant with the Court's July 13, 2020 Order in that Respondent failed to disclose his full disciplinary record and comply with Pa.R.Civ.P. 1012.1;

    c. "believe[d] we are duty bound to bring this matter to the Court's attention"; and

    d. attached Defendants' Second Response.

308. In pertinent part, the Second Response alleged Respondent's Second Motion failed to (Stip 145):

    a. include Respondent's disciplinary history in the Eastern District of Pennsylvania (¶ 3(a));

    b. comply with Pa.R.Civ.P. 1012.1(b), in that it failed to state that the information required by IOLTA regulations had been provided to the IOLTA Board (¶ 4(a)); and

    c. comply with Pa.R.Civ.P. "1012.1(d)(2)(iii)," in that it failed to state any proceeds from a settlement would be handled in accordance with RPC 1.15. (¶ 4(b)).

309. Judge Djerassi, by Order docketed on September 1, 2020 (ODC-71/Bates 663), ruled that upon consideration of the Second Response to Plaintiff's Second Motion for Admission *Pro Hac Vice*, that within twenty days, Respondent should (Stip 146):

61

a. either file a written reply explaining why the Court should not deny with prejudice Respondent's Second Motion for Mr. Scordo's *pro hac vice* admission; or

b. file a praecipe before the twentieth day of its Order, withdrawing Respondent's Second Motion and seek the assistance of another Pennsylvania attorney to move for Mr. Scordo's admission.

310. Judge Djerassi also "encouraged [Respondent] to exercise caution" as "Rules of Professional Responsibility may be implicated here and full disclosure is the essence of a successful *pro hac vice* application." (Stip 147)

311. On September 18, 2020, Respondent withdrew his appearance on behalf of American Club of Beijing. (Stip 148)

312. Having failed twice to file a correct *Pro Hac Vice* motion and having twice failed to fully disclose his disciplinary hearing, Respondent assigned Scott Wiggins, Esquire, an associate with Lento Law Group, P.C., to do so. (NT V, 52)

313. As the supervising attorney for Mr. Wiggins, Respondent failed to explain to Mr. Wiggins "what would be needed to make sure that [the *Pro Hac Vice* motion] was done in full compliance." (NT V, 54)

314. On September 22, 2020, Mr. Wiggins filed a Motion for Admission *Pro Hac Vice* seeking to admit Mr. Scordo to handle *American Club*. (ODC-72/Bates 664, Stip 149)

315. Mr. Wiggins' Motion for Admission *Pro Hac Vice* failed to comply with Pa.R.Civ.P. 1012.1(b)(1)(i), (c)(1)(i) and (ii), and (d)(2)(i) and (iii). (Stip 150)

316. By Order dated October 19, 2020, Judge Djerassi, pursuant to Pa.R.Civ.P. 1012.1(e)(7) and (8), denied Mr. Wiggins' Motion for failing to comply with Pa.R.Civ.P. 1012.1(b)(1)(i), (c)(1)(i) and (ii), and (d)(2)(i) and (iii). (ODC-73/Bates 681, Stip 151)

317.    Respondent testified that he was "mistaken" in his first filing, he "was trying in good faith" in the second filing, and "the ball was dropped" in the third filing. (NT III, 146)

318.    Respondent admitted that his conduct in handling the *Pro Hac Vice* applications demonstrated a lack of competence in violation of RPC 1.1. (NT V, 55-56)

319.    Respondent admitted that as the managing partner of Lento Law Group, P.C., with supervisory authority over his law firm's attorneys and support staff, Respondent violated RPC 5.1 and RPC 5.3 when he failed to make reasonable efforts to ensure that his law firm's employees acted with competence in drafting and filing motions. (NT V, 56)

320.    Respondent admitted that the totality of his conduct in handling the *Pro Hac Vice* admission of Mr. Scordo was prejudicial to the administration of justice in violation of RPC 8.4(d) in that it needlessly expended the limited time and resources of the court system. (NT V, 57)

321.    While Respondent admitted his misconduct, his testimony in certain key respects is not credible, and Respondent failed to express sincere remorse for his misconduct and recognize that his misconduct had a negative impact on the public and profession.

<u>Renee Dougalas Matter</u>

322.    Renee Dougalas is a "recovering pharmacist" (NT I, 24) with an active pharmacy license in Texas and an inactive pharmacy license in Pennsylvania. (NT I, 22, 31)

323.    Ms. Dougalas currently practices at a sterile compounding pharmacy and at an independent pharmacy, works with a doctor platform managing the pharmacies that

63

dispense for them, and owns a compliance company that ensures pharmacies stay compliant with state laws and helps them through pharmacy audits and credentialling. (NT I, 22-23)

324.    Ms. Dougalas is a recovering drug addict who over 20 years ago stole her daughter's father's prescription pad, forged prescriptions for Vicodin (a Schedule III controlled substance at that time, which is now Schedule II), and "wrote and falsified controlled substance prescriptions." (NT I, 27)

325.    Renee Dougalas (Stip 154):

- a.    was convicted in the following criminal matters in Pennsylvania (ODC-74/Bates 683):

    1.    *Commonwealth v. Renee Dougalas*, No. CP-40-CR-0001221-1995 (on 9/25/1996, convicted of Knowing Possession of a Controlled Substance (M), 35 Pa.C.S. § 780-113(a)(16));

    2.    *Commonwealth v. Renee Dougalas*, No. CP-40-CR-0002286-1996 (on 1/30/1997, convicted of Acquisition of a Controlled Substance by Misrepresentation (F), 35 Pa.C.S. § 780-113(a)(12) (two counts); and Knowing Possession of a Controlled Substance (M) (two counts)); and

    3.    *Commonwealth v. Renee Dougalas*, No. CP-40-CR-0002631-1998 (on March 31, 1998, convicted of Acquisition of a Controlled Substance by Misrepresentation (F), 35 Pa.C.S.A. § 780-113(a)(12) (eleven counts).

- b.    had an inactive criminal case docketed at MJ-1102-CR-000005-1999 charging purchase of drug-free urine (M) in violation of 18 Pa.C.S.A. § 7509(a); and

- c.    had a disposed case docketed at CP-40-MD-0001614-1999, under the Uniform Criminal Extraditions Act, 42 Pa.C.S.A. § 1921 (S).

326.    On June 25, 1999, Ms. Dougalas was convicted in the following criminal matter in New Jersey: (ODC-75/Bates 702, Stip 155)

64

a.    *State of New Jersey v. Renee Dougalas*, Indictment No. 99-06-0558 (Mercer County, New Jersey) of Eluding Police, NJ 2C:29-2b (3rd degree), and Possession Controlled Substances, NJ 2C:35-10a(1) (3rd degree).

327.    In 2004, Ms. Dougalas entered drug treatment and attained her sobriety (NT I, 29); thereafter, Ms. Dougalas petitioned for reinstatement of her pharmacy license in Pennsylvania, had a hearing, and was granted reinstatement in 2010. (*Id.*)

328.    Ms. Dougalas subsequently relocated to Texas (NT I, 21) and decided she wanted to expunge or seal her criminal records in Pennsylvania and New Jersey. (Stip 156)

329.    Ms. Dougalas had done some legal research and "felt that [she] needed some good legal advice about the Clean Slate Act and if there was anything [she] could do about old felonies." (NT I, 91)

330.    On February 19, 2020, Ms. Dougalas left a message on a Clean Slate lawyer website (NT 1, 33, 95; ODC-76/Bates 703):

a.    explaining that she had criminal convictions that were "20 plus years old";

b.    stating that she wanted "to apply for clean slate"; and

c.    inquiring whether Respondent could "help" her.

331.    At the time Ms. Dougalas left the message, she:

a.    "absolutely knew the difference between a felony and a misdemeanor conviction" (NT I, 34);

b.    "absolutely knew [she] had thirteen felony convictions" (*id.*);

c.    knew how to use the Unified Judicial System portal to obtain a record of her convictions (*id.*); and

d.    knew she had written a prescription for Vicodin, which was then a Schedule III controlled drug. (*Id.*)

332.    Respondent called Ms. Dougalas in response to the message she had left on the website, during which time, Ms. Dougalas advised Respondent she:

a.    had "felony and misdemeanor convictions" (NT I, 96, 97);

b.    was considering a real estate license and her felony convictions come up as a background issue (*id.* at 35);

c.    had researched the difference between New Jersey and Pennsylvania Clean Slate laws (*id.*);

d.    had contacted New Jersey and was told she could file the expungement papers herself (*id.*);

e.    was "confused" whether she qualified in Pennsylvania "because of the time span." (*id.*);

f.    explained that her "main concern was the felony convictions because they follow [her] around anywhere" (*id.* at 36); and

g.    wanted to know if she qualified for Clean Slate to clean up her record. (*Id.*)

333.    The Clean Slate Limited Access Act (Clean Slate Act), 18 Pa.C.S. § 9122.2 *et. seq.* (ODC-81/Bates 711), provides for granting limited access to criminal history record information for some misdemeanor convictions, summary offenses, pardons, and dispositions other than convictions. (Stip 165)

334.    Section 9122.3 of the Clean Slate Act (ODC-82/Bates 713) lists exceptions to granting limited access to criminal records as follows (Stip 166):

(a)    Limited access for records under section 9122.2(a)(1) (relating to clean slate limited access) shall not be granted for any of the following:

(1)    An individual who at any time has been convicted of:

(i)    a felony;

66

(ii) two or more offenses punishable by imprisonment of more than two years;

(iii) four or more offenses punishable by imprisonment of one or more years.

335. While on the telephone with Respondent, Ms. Dougalas sent Respondent the dockets from her Pennsylvania and New Jersey cases. (NT I, 36-38); *See* ODC-77/Bates 704-705, ODC-78/Bates 706, ODC-130/Bates 933; ODC-131/Bates 934)

336. Respondent did not take any notes of his conversation with Ms. Dougalas. (NT IV, 55)

337. Respondent failed to recall:

a. looking at Ms. Dougalas' criminal dockets (NT IV, 166, 185);

b. asking Ms. Dougalas the schedule of the drug for which she was convicted of forging prescriptions (*id.* at 64, 68);

c. asking Ms. Dougalas if she had any felony convictions. (*id.* at 58, 59, 61, 105, 139, 160, 161); and

d. Ms. Dougalas informing Respondent of her felony convictions. (*Id.* at 62, 63, 66, 101, 106)

338. Respondent's testimony that he did not communicate with Ms. Dougalas regarding the felony convictions is not credible, given that the reason for the retention concerned the extent of her criminal record.

339. In Respondent's Answer to the Petition for Discipline, Respondent:

a. falsely claimed that Ms. Dougalas had never informed him that she had felony convictions that were over 20-years old (ODC-2, ¶161(A)/Bates 108) (NT I, 53); and

b. falsely claimed that during the initial call, Ms. Dougalas did not advise Respondent she had any prior felony convictions (ODC-2, ¶ 161(G)/Bates109). (NT I, 54)

67

340. Ms. Dougalas credibly testified that all of Respondent's Petition for Discipline Answers in which Respondent claims that Ms. Dougalas never informed him that she had prior felony convictions are "not true." (NT I, 55)

341. At no time during Respondent's conversation with Ms. Dougalas, did Respondent:

      a.    inform Ms. Dougalas that her felony convictions could not be sealed (NT I, 41); and

      b.    explain to Ms. Dougalas that the Clean Slate Act prohibited the sealing of her felony convictions. (*Id.* at 42)

342. Respondent advised Ms. Dougalas that his total legal fee would be $5,500 plus filing fees (Stip 158(f)).

343. Ms. Dougalas agreed to have Respondent represent her and emailed Respondent all her contact information. (Stip 158(g))

344. Had Respondent informed Ms. Dougalas that the Clean Slate Act prohibited the sealing of Ms. Dougalas' thirteen felony convictions, Ms. Dougalas would not have continued her conversation about retaining Respondent because "if it's still there, it still follows me. It's a bad investment. Why would I do it?" (NT I, 42)

345. Ms. Dougalas reiterated that had Respondent informed her that her felony convictions did not "qualify for anything," it would have been the "[e]nd of the conversation right there." (NT I, 113)

346. The criminal dockets revealed that Ms. Dougalas was arrested and held over for trial on felony charges. (ODC-133/Bates 936-37)

347. Respondent knew the criminal dockets he received from Ms. Dougalas did not contain the grading for all her convictions. (NT III, 164)

68

348. Respondent failed to possess the competence necessary for the representation in that:

    a.    Respondent was only concerned about the inactive case on the dockets and not concerned about Ms. Dougalas' ungraded convictions (NT IV, 154, 157); and

    b.    prior to December 2020, Respondent failed to read Ms. Dougalas' criminal dockets in detail. (*Id.* at 200)

349. Although Respondent knew the criminal dockets that he received from Ms. Dougalas did not contain the grading for all her convictions, by email to Ms. Dougalas sent at 5:59 p.m. EST on February 19, 2020, Respondent wrote explaining his scope of work and fee (ODC-78/Bates 706, D-38, Stip 160); Respondent wrote that:

    a.    he would "be seeking a record sealing of the 3 applicable cases in Luzerne County and an expungement of the 2 applicable cases in Luzerne County";

    b.    he would "also be seeking an expungement of the applicable New Jersey case";

    c.    Respondent's reduced fee would be $5,500, plus fees and costs; and

    d.    Respondent would get started working with an initial payment of $2,500 and the balance paid over the course of the next several weeks.

350. "[B]ased upon the dockets that [Ms. Dougalas] sent [Respondent]," Ms. Dougalas assumed that "three applicable" and "two applicable" referred to her misdemeanor and felony cases. (NT I, 57)

351. At 6:19 p.m. EST on February 19, 2020, Ms. Dougalas attached her PA dockets again and replied: "Atty Lento please see attached. Isn't it PA: 4 CP and 2 MJ cases." (ODC-78/Bates 706, 130/Bates 932, Stip 161) At 7:46 a.m. on February 20, 2020, Respondent confirmed, "I understand." (ODC-79/Bates 707)

69

352.   On February 20, 2020, at 6:18 a.m. EST, Respondent sent an email to Ms. Dougalas that (Stip 162):

    a.    requested Ms. Dougalas to provide him with a detailed autobiography and character letters so that Respondent "can provide positive information and character letters to the Luzerne County District Attorney's Office/Mercer County Prosecutor's Office in an effort to get them to agree to our request" (ODC-79/Bates 707); and

    b.    attached an Engagement Letter for Ms. Dougalas to sign, date, and return to Respondent's office. (ODC-80/Bates 709)

353.   Respondent's Engagement Letter (ODC-80/Bates 709) provided:

    a.    Respondent would "be seeking a record sealing of the 3 applicable Luzerne County, PA cases, and expungement of the 2 applicable Luzerne County PA cases, and an expungement of the Mercer County, NJ case";

    b.    noted that Ms. Dougalas' case docketed at MJ-11102-CR-0000005-1999 was listed as "inactive" and Respondent needed to follow up on this case;

    c.    Respondent's legal fee was $5,500 plus filing fees and costs; and

    d.    Respondent received $2,500 from Ms. Dougalas as of the date of the Engagement Letter.

354.   The five cases that Respondent referenced in his email included all the felony and misdemeanor convictions that Ms. Dougalas was seeking to seal under the Clean Slate Act, including thirteen felonies. (NT I, 60, 62)

355.   Later that same day, Respondent and Ms. Dougalas signed and dated Respondent's Engagement Letter. (Stip 164)

356.   Respondent's Engagement Letter acknowledged Ms. Dougalas' payment of $2,500 and provided that the balance of the fee was to be paid upon the request of the Lento Law Firm. (NT I, 64)

357.    Nowhere in Respondent's email or Engagement Letter did Respondent write that he cannot seal Ms. Dougalas' thirteen felony convictions. (NT I, 62)

358.    Respondent failed to inform Ms. Dougalas that "he cannot do anything about [her] felony convictions until a year later approximately." (NT I, 62)

359.    Ms. Dougalas would not have agreed to pay Respondent $5,500 if she knew that her felony convictions could not be sealed and "could have put the money somewhere else." (NT I, 63)

360.    By email to Respondent sent at 4:07 p.m. on February 20, 2020, Ms. Dougalas provided Respondent with most of the information and documents that Respondent had requested in his morning email, including her "autobiography." (ODC-83/Bates 714, Stip 167)

361.    Ms. Dougalas provided Respondent with all the information he had requested within four days of Respondent's request. (NT I, 65)

362.    By email to Ms. Dougalas sent at 6:14 a.m. on March 24, 2020, Respondent advised Ms. Dougalas that her New Jersey expungement was almost complete. (Stip 168)

363.    From time to time thereafter, Ms. Dougalas wrote emails to Respondent inquiring about the status of all her legal matters. (ODC-84/Bates 719-725) See, e.g., emails sent at (Stip 169):

      a.    10:37 a.m. on May 15, 2020;

      b.    1:24 p.m. on July 20, 2020;

      c.    11:15 a.m. on August 21, 2020;

      d.    12:46 p.m. on September 4, 2020;

      e.    10:08 a.m. on October 16, 2020;

f.      6:12 p.m. on December 4, 2020; and

g.      12:56 p.m. on January 25, 2021.

364.    At no time during the foregoing email correspondence did Respondent inform Ms. Dougalas that her Luzerne County felony convictions were not eligible for Clean Slate limited access as they were listed as specific exceptions under the Act. (Stip 170)

365.    Except for Ms. Dougalas' inactive Luzerne County case, Respondent did not raise any concerns about sealing Ms. Dougalas' criminal records. (NT I, 70)

366.    At no time after Respondent's initial conversation with Ms. Dougalas, did Respondent inform Ms. Dougalas that:

a.      her criminal dockets were unclear regarding the grading of her offenses (NT I, 67, 100); and

b.      he needed to obtain the State Police records because the grading of her convictions was not clear. (*Id.* at 67, 100)

367.    Respondent's "attorney helper," Marco J. Capone, Esquire, advised Respondent on March 18, 2020, that Ms. Dougalas' convictions were so old he could not ascertain the grading of her convictions and complete the petitions for expungement. (D-39, -40, -41; NT III, 176; NT IV, 205),

368.    After receiving Mr. Capone's email, Respondent did not ask Ms. Dougalas if she had any information about the grading of her convictions as "it wasn't a question in his mind." (NT IV, 210)

369.    Respondent did not order the State Police records to ascertain the grading of Ms. Dougalas' convictions until mid to late October 2020. (NT III, 183; NT IV, 119, 212-213)

72

a.    Respondent failed to act with reasonable diligence and promptly obtain the State Police records.

b.    Respondent failed to possess the competence necessary for the representation and do anything prior to October 2020 to ascertain the grading of Ms. Dougalas' convictions.

370.    Ms. Dougalas had been making periodic payments to Respondent, and prior to July 20, 2020, Ms. Dougalas had not received any bills or correspondence from Respondent about money owed. (NT I, 169)

371.    Respondent's Letter of Engagement provides that payment of the balance of his legal fee is due upon request. (ODC-80/Bates 709) Prior to July 20, 2020, Respondent did not make any requests for payment of the balance of his fee. (NT I, 69)

372.    After learning on July 20, 2020, that Respondent was waiting for payment of the balance of his fee, Ms. Dougalas promptly paid the balance. (NT I, 69-70)

373.    Respondent admitted that he did not request the balance of Ms. Dougalas' legal fee until Ms. Dougalas inquired about the status of her case. (NT III, 181)

374.    Respondent's Petition For Discipline Answer, ¶ 157 (ODC-2/Bates 107) and testimony (NT III, 77), claiming that Respondent's receipt of Ms. Dougalas' background check information was delayed because Ms. Dougalas did not timely pay his fee, is false.

375.    By emails to Assistant District Attorney Chester Dudick, Luzerne County, on September 28, and October 19, 2020 (ODC-85/Bates 726), Respondent (Stip 171):

a.    advised that Respondent was working on "several expungements/record sealings" for Ms. Dougalas;

b.    explained that "[a]ccording to my research, 3 would be eligible for record sealing and 2 would be eligible for an expungement"; and

c.    noted that the matter docketed at MJ-11102-CR-1999 was listed as "inactive" and inquired whether the District Attorney's office would automatically object if Respondent moved for expungement/sealing of the closed cases because of the unresolved inactive matter.

73

376. Respondent failed to act with the competence necessary for the representation when he contacted the District Attorney's Office without first ascertaining the grading of Ms. Dougalas' convictions and "operating under the impression that they don't involve felonies." (NT IV, 223-224)

377. By email to Ms. Dougalas sent at 6:20 a.m. on October 19, 2020, Respondent wrote (ODC-86/Bates 728):

    a.    the New Jersey expungement is proceeding through the process and he anticipates a hearing date to be scheduled shortly; and

    b.    he had been trying to contact the District Attorney's Office regarding resolving the outstanding "inactive" criminal matter, which will impact the expungements of the other Luzerne County criminal cases.

378. Respondent received the Pennsylvania State Police Background Check in December 2020. (NT IV, 234)

379. Respondent's receipt of the Background Check` was the first time Respondent "saw confirmation that [Ms. Dougalas] had felony convictions." (NT IV, 234)

380. By email to Ms. Dougalas sent at 7:02 a.m. on January 28, 2021 (ODC-87/Bates 729), Respondent wrote that (Stip 173):

    a.    the New Jersey expungement should be finalized shortly;

    b.    "[o]nce the Pennsylvania process is complete, [Respondent] anticipate[s] the final result being":

        1.    record sealing for one misdemeanor charge;

        2.    expungement of one summary offense;

        3.    a record sealing for one misdemeanor charge;

        4.    "a felony charge that was not able to be addressed";

    5.    "There is also one other case which had 11 felony charges which was not able to be addressed" because Respondent "could not have these charges sealed or expunged"; and

    6.    an inactive case that Respondent has been trying to have closed.

    c.    Ms. Dougalas' "record will be significantly cleaned up once everything is complete, but there will be remaining charges which cannot be sealed or expunged"; and

    d.    it "may be worth considering a pardon" of Ms. Dougalas' felony convictions after Respondent resolved the inactive case.

381.    Respondent did not have Ms. Dougalas' State Police Background Check at the time he drafted the email to Ms. Dougalas, having purportedly mailed the Background Check to the Luzerne County Clerk's Office. (NT IV, 261)

    a.    Respondent failed to possess the competence necessary for the representation and keep a copy of the Background Check for his files; and

    b.    Respondent failed to communicate with Ms. Dougalas and send her a copy of her Background Check and his purported filing with Luzerne County.

382.    Upon receiving Respondent's January 28, 2021 email, Ms. Dougalas felt:

    a.    "lied to and grifted"; (NT I, 72);

    b.    "[i]t's kind of comical" to assert her record was going to be significantly cleared up when by getting "rid of two misdemeanors sitting over there, but you have thirteen felonies staring me in the face" (*id.* at 73);

    c.    "violated" (id. at 77); and

    d.    that Respondent's receipt of $5,500 "hurt [her] and [her] family" when she was going through a "really bad, expensive divorce." (*Id.*)

383.    By emails to Respondent on the morning of January 28, 2021 (ODC-88/Bates 730), Ms. Dougalas wrote at (Stip 174):

75

a.    7:48 a.m., "why can't the other felonies be addressed in cases 3 and 4? In reading clean slate if your record is clear over 10 years with no new charge you qualify. Doesn't seem worth the money to do this if things are still left on";

b.    8:24 a.m., that "[i]f I had known I could not do anything with the pa felony convictions I would not have gone through this process or spent the money. Cleaned up record is just as bad as the original record"; and

c.    8:55 a.m., that over one year ago when Respondent called her, Ms. Dougalas "made clear about [her] felonies in PA and NJ," "sent you [Respondent] the dockets the same day," Respondent "never disclosed in the initial consult that nothing could be done with felonies in PA" and had she "known that," she "never would have moved forward," "as a client I made my goals clear to clean up my entire record," and her retaining Respondent was "clearly" a "waste of [her] money."

384.    Thereafter, by emails to Mr. Altman (ODC-89/Bates 732), Respondent:

a.    forwarded Ms. Dougalas' emails and wrote at 9:59 a.m. on January 28, 2021, "this is not accurate but..";

b.    sent at 8:15 a.m. on January 29, 2021, Respondent's draft response to Ms. Dougalas; and

c.    asked Mr. Altman to review Respondent's draft response, which Respondent finalized and sent on February 8, 2021.

385.    Eleven days later, on February 8, 2021, Respondent wrote at 8:00 a.m. (ODC-89/Bates 732):

a.    "[a]t no time do I ever state that felonies (or misdemeanors) can be expunged"; and

b.    "[b]y the nature of what we were in part prospectively seeking, namely, a record sealing of applicable cases, there would arguably be no fundamental relief because sealed records still exist and must be disclosed as applicable."

386.    At 10:36 a.m. on February 8, 2021, Ms. Dougalas replied (ODC-78/Bates 706, last email at bottom of page and continued on ODC-90/Bates 734 top of page):

76

a.  during Respondent's initial telephone conversation with her, she "told you [Respondent] about [her] past situations and the resultant FELONIES and misdemeanors that resulted therefrom";

b.  "[w]hile on the telephone [she] emailed you [Respondent]" the dockets" that "clearly outlined" her charges;

c.  had Respondent "told" Ms. Dougalas that "'I cannot expunge or seal the Felony charges in PA,'" then Ms. Dougalas "would never have engaged" Respondent's legal services; and

d.  "[n]ot until one year later" did Respondent inform her that she "cannot seal/expunge" her felonies in Pennsylvania.

387.  On March 22, 2021, Respondent filed a Petition for Expungement with attached Background Check on behalf of Ms. Dougalas. (NT IV, 237)

388.  Respondent failed to:  review the Petition with Ms. Dougalas prior to its filing; advise Ms. Dougalas that he had filed a Petition; keep Ms. Dougalas informed about the status of her case; keep a copy of the Petition and Background Check in his office files; and provide Ms. Dougalas with a copy of the filed Petition and Background Check. (NT IV, 250-251)

389.  On March 24, 2021, Ms. Dougalas sent an email to Respondent requesting a copy of the New Jersey filing Respondent claimed to have made on behalf of Ms. Dougalas, a receipt from New Jersey for the filing, and a refund of Respondent's unearned fee for Respondent's handling the "sealing" of her Luzerne County felony convictions. (ODC-90/Bates 734, Stip 177)

390.  Respondent failed to send Ms. Dougalas copies of:  correspondence with the Luzerne County District Attorney's office; drafts of pleadings; copies of pleadings he filed on her behalf in Pennsylvania; and Ms. Dougalas' PA State Police criminal records. (NT I, 78-79, 81; NT IV, 294)

391.    Respondent sent Ms. Dougalas a copy of her New Jersey records in the spring of 2021. (NT I, 80; NT IV, 219)

392.    By email to Respondent at 8:24 a.m. on May 14, 2021, Ms. Dougalas (ODC-91/Bates 735):

a.    reiterated her request for a refund;

b.    requested "a copy of any document and notes on [her] case";

c.    advised that New Jersey had forwarded her what she "need[s] to handle everything on [her] own";

d.    reminded Respondent that at her initial consult, Respondent "never said I cannot do anything about my [her] felonies";

e.    explained that had Respondent given her "an honest consult I would not have engaged [him].  That is the heart of the matter"; and

f.    informed Respondent that she had filed a complaint with the PA Bar association.

393.    Upon the termination of the representation, Respondent failed to comply with Ms. Dougalas' request for a surrender of her documents and client file. (NT I, 81)

394.    On the advice of Ms. Dougalas' attorney in Texas (NT I, 85), Ms. Dougalas filed a complaint with Office of Disciplinary Counsel because she "was an honest client, put all her cards on the table, and I should have been advised on day one that I did not qualify for anything because of my felonies....Because if he did it to me, he's doing it to other people too." (*Id.* at 86)

395.    On June 16, 2021, Ms. Dougalas filed a Statement of Claim with the Fund. (ODC-92/Bates 736, Stip 180)

78

396.    In her Statement of Claim, Ms. Dougalas wrote she had a telephone consultation with Respondent about her "20 yr old felony & misdemeanors" and "wanted to see if I could expunge/seal. He said I could on all." (Stip 181)

397.    On June 23, 2021, the Fund advised Respondent that Ms. Dougalas had filed a Statement of Claim with the Fund; by letter to Ms. Dougalas dated July 7, 2021, Respondent enclosed a $5,500 check written from the operating account of Lento Law Firm, LLC and Joseph D. Lento, Esq., to Ms. Dougalas, with the notation "refund" in the memo portion of the check; following receipt of Respondent's letter, the Fund closed Ms. Dougalas' claim. (Stip 182)

398.    Although Respondent testified that he had filed pleadings on behalf of Ms. Dougalas (NT III, 186), Respondent failed to introduce any exhibits to support his testimony. (NT III, 186, 188)

399.    Respondent claimed it was "ludicrous" to question his handling of Ms. Dougalas' legal matter. (NT III, 190)

400.    Respondent failed to recognize his wrongdoing in his handling of Ms. Dougalas' legal matter.

401.    Respondent failed to express remorse for the harm his misconduct inflicted on Ms. Dougalas, the public, and the legal profession.

### La'Slondi Copelin Matter

402.    Respondent maintained a website address that as of August 16, 2021, advertised ODC-93/Bates 743) that Respondent (Stip 183):

    a.    "represents students and others in disciplinary cases and other proceedings at colleges and universities across the United States";

79

b.  "helped countless students, professors, and others in academia at more than a thousand colleges and universities across the United States";

c.  is "admitted pro hac vice as needed nationwide;" and

d.  is licensed in Pennsylvania, New Jersey, and New York.

403.  Ms. La'Slondi Copelin, a resident of Georgia, had an associate degree from Georgia State University (GSU) and had decided to return to school to obtain a four-year degree. (NT I, 184)

404.  On or before February 4, 2021, Ms. Copelin, received a letter notifying her that she would be expelled from GSU. (NT I, 185; Stip 184)

405.  The letter advised Ms. Copelin that she had 10 days to write an appeal to the GSU college president. (NT I, 185)

406.  Ms. Copelin called GSU and was "advised" that her letter "needed to be done by end of business day" on February 9, 2021. (NT I, 226)

a.  The GSU student handbook defines a "business day" as any day that the Office of the Dean of Students is open. (NT IV, 313)

407.  Ms. Copelin wanted to file an appeal, but did not want to handle the appeal herself, and decided that she needed an attorney to handle the appeal "[b]ecause it needed to be litigated.  It was out of my hands, so—and I had tried initially, so I felt that I needed to go ahead and escalate it to someone of counsel who is familiar with the process." (NT I, 185)

408.  Ms. Copelin had discussed the pending expulsion matter with her family and friends, who likewise advised Ms. Copelin that she needed a lawyer. (NT I, 186)

80

409.   Ms. Copelin did some research, "Googled 'school discipline attorneys,'" and his [Respondent's] name popped up (NT I, 186); Ms. Copelin did not contact any attorneys other than Respondent to handle her matter. (*Id.*)

410.   On February 4, 2021:

a.   prior to 10:01 a.m. Ms. Copelin contacted Respondent regarding her pending GSU expulsion;

b.   at 10:01 a.m., Respondent sent a text message to Ms. Copelin that (ODC-95/Bates 751-752):

1.   acknowledged receipt of Ms. Copelin's inquiry and stated that he would be available by telephone after 10:15 a.m. (Bates 751); was signed as follows (Bates 752):

Attorney Joseph D. Lento
Lento Law Firm
Helping Clients Nationwide

Additional Information:
StudentDisciplineDefense.com

c.   at 11:27 a.m., Ms. Copelin replied that she had a break at 1:00 p.m., could call Respondent then, and in the meantime would send Respondent information to look at to see "what's going on." (Bates 753).

411.   Ms. Copelin sent Respondent "everything that she had received from the school so he could be prepared for the phone consultation," including the expulsion letter and university rules. (NT I, 189)

412.   Respondent spoke with Ms. Copelin at 1:00 p.m. on February 4, 2021, during which time:

a.   Ms. Copelin told Respondent she wanted a lawyer (NT I, 189);

81

b.    Respondent stated that he "helps students nationwide," has "helped plenty of students in Georgia," and "he can take on this case and get it done" (*id.* at 190);

c.    Ms. Copelin told Respondent about her February 9, 2021 deadline (*id.*) and that the deadline was "by end of business day" on February 9, 2021 (*id.* at 226);

d.    Respondent reassured Ms. Copelin not to worry and "[w]e always get things done in the 11th hour" (*id.* at 190);

e.    Respondent failed to inform Ms. Copelin that he was not licensed to practice law in Georgia: failed to explain his limitations because he was not licensed to practice law in Georgia, and never informed her that he could only act as her "advisor" (*id.*); and

f.    Respondent failed to inform Ms. Copelin that he intended to "ghostwrite" a letter for her. (*Id.* at 191)

413.   Respondent also negotiated a $350 telephone consultation fee with Ms. Copelin. (Stip 185)

414.   Thereafter, at 4:15 p.m. on February 4, 2021, Respondent sent Ms. Copelin (Stip 186):

a.    an email requesting information related to her school discipline case (ODC-96/Bates 754); and

b.    a consultation agreement between the Lento Law Firm and Ms. Copelin charging a $350 consultation fee. (ODC-97/Bates 756)

c.    Respondent charged his $350 fee to Ms. Copelin's credit card.

415.   Respondent's email (ODC-96/Bates 755) was signed:

> Joseph D. Lento, Esquire
> Attorney & Counselor at Law
> Lento
> Law Firm
> Helping Clients Nationwide

416.   On February 5, 2021 (Stip 187):

a.   Ms. Copelin returned a signed consultation agreement that was written on Lento Law Firm stationery (ODC-97/Bates 756); and

b.   Respondent requested that Ms. Copelin call him at 1:45 p.m. the following day to discuss her case. (ODC-98/Bates 758)

417.   On February 6, 2021, Respondent had a telephone consultation with Ms. Copelin about her school discipline matter. (Stip 188)

418.   During the telephone consultation:

a.   Keith Altman, Esquire, spoke with Ms. Copelin first about her legal matter in Georgia (NT I, 191);

b.   Mr. Altman identified himself "[a]s an attorney who worked for Mr. Lento" (*id.* at 192);

c.   Respondent joined the call approximately 15 minutes later and the total consult lasted approximately 30 minutes (*id.*);

d.   Ms. Copelin explained she did not want to handle the case herself and needed a lawyer to handle it (*id.* at 192-193);

e.   Ms. Copelin advised that the deadline was close of business on February 9, 2021, and Respondent and Mr. Altman agreed that they could submit a response by close of business on February 9th (*id.* at 193, 244);

f.   Ms. Copelin agreed to retain Respondent (*id* at 195);

g.   Ms. Copelin negotiated a $7,500 fee for Respondent's representation, Respondent having initially requested a $15,000 fee claiming he was giving her a break from $30,000 (*id.*);

h.   Respondent agreed to send Ms. Copelin a retainer agreement with an "itemization of what the $7,500 is going to" cover and the "breakdown of" the payments (*id.* at 195); and

i.   Respondent explained that his fee could be more if Ms. Copelin needed him to go to court. (*Id.* at 196)

419.    During the consultation, Respondent and Mr. Altman failed to inform Ms. Copelin that they could not act as her attorney in Georgia and she could only hire Respondent as an "advisor". (NT I, 193, 196, 197, 230)

420.    Respondent's testimony that he informed Ms. Copelin that he would be her "advisor" and "ghostwrite" a letter for her appeal (NT IV, 311) is not credible.

421.    Respondent explained that he charged a $7,500 fee to ghostwrite a letter because "[t]here were approximately 100 pages of documentation as part of the case . . . and being expelled from school can have a lifetime of consequences." (NT IV, 318)

422.    Ms. Copelin would not have agreed to pay $7,500 to Respondent if she knew that he could not provide her with legal representation in Georgia. (NT I, 197)

423.    Respondent attempted to charge an excessive fee.

424.    Respondent informed Ms. Copelin that he was bringing in Mr. Altman to work on her case, but failed to inform Ms. Copelin that Mr. Altman was not licensed to practice law in Georgia. (NT I, 198)

425.    Ms. Copelin testified that Respondent's Answer to the Petition for Discipline, in which:

a.    Respondent denies that Ms. Copelin told him she needed an attorney to handle her school discipline case (ODC-2, ¶ 188(a)/Bates 118), is "a total fabrication." (NT I, 199); and

b.    Respondent claims that during his multiple conversations with Ms. Copelin, he made it clear that he was serving as an advisor (ODC-2, ¶ 209(b)/Bates 125), "is not true." (Id.)

426.    Ms. Copelin's testimony, that a conversation regarding Respondent being an advisor "never came up," was unequivocal and credible. (See NT I, 199)

427.    By email to Ms. Copelin dated February 7, 2021, sent at 7:30 a.m. (ODC-99/Bates 759), Respondent (Stip 190):

84

a. explained that "[w]e can proceed with a payment of $2,500 at this time" and that Ms. Copelin was to make payment of $2,500 on February 14, 2021, and $2,500 on March 7, 2021;

b. inquired whether Ms. Copelin would "prefer [Respondent] using the card on file?"; and

c. stated if Ms. Copelin agreed to proceed, then Respondent's "office can process the payment today and Keith [Altman, Esquire] and I can proceed."

428. During Respondent's conversation with Ms. Copelin on February 7, 2021, Respondent agreed to send her a retainer agreement. (NT I, 200)

429. Respondent failed to send Ms. Copelin a fee agreement on February 7, 2021. (Stip 191)

430. By text message to Respondent sent at 3:37 p.m. on February 7, 2021, Ms. Copelin inquired as to "attorney Keith's last name?" (ODC-100/Bates 760, Stip 192)

431. By email to Respondent dated February 8, 2021, sent at 7:09 a.m., Ms. Copelin (Stip 193; ODC-101/Bates 761):

a. inquired as to the realistic odds of what would happen;

b. explained that she would leave school voluntarily to not have the expulsion documented on her transcript; and

c. requested that Respondent "call so [she] can remit payment."

432. By email to Ms. Copelin dated February 8, 2021, sent at 7:49 a.m. (ODC-101/Bates 761), Respondent replied (Stip 194):

a. it was impossible to provide odds of success, but if Respondent were involved, the "chances of a better outcome increase, if not significantly increase";

b. it would be difficult to avoid a transcript notation, "so the only viable option is to try to maneuver for a suspension or less and go back to school"; and

85

      c.     that his "colleague's name is attorney Keith Altman."

433.   Respondent did not call Ms. Copelin to obtain her payment information. (Stip 196; NT I, 202-203)  Respondent claimed that "I don't call clients, as a matter of practice, to collect money." (NT III, 201)

434.   To the extent Respondent does not call back clients to obtain payment information, Respondent failed to communicate with Ms. Copelin and send an email or text message to Ms. Copelin requesting that she call him back with her payment information.

435.   Respondent did not inform Ms. Copelin that he:

      a.     would not begin working on her letter until he had received payment; (NT IV, 332); and

      b.     would not represent her until she made payment. (*Id.* at 341)

436.   Respondent failed to send a retainer agreement as Ms. Copelin had requested. (NT I, 203)

437.   When Ms. Copelin did not hear back from Respondent on February 8, 2021, as "the deadline was approaching, [Ms. Copelin] took it upon [her]self to go ahead and write" a letter to the college president and "to plead [her] case." (NT I, 203)

438.   Ms. Copelin sent the letter she had written directly to the college president. (NT I, 203; *see also* NT I, 240-241)

439.   At 9:51 a.m. on February 9, 2021, Ms. Copelin called Respondent's office, during which time:

      a.     Ms. Copelin informed Respondent that she had written and sent her own letter to the GSU president (NT I, 204, 210);

      b.     Ms. Copelin explained that she was still willing to pay Respondent's fee to represent her (*id.* at 204-205);

c. Ms. Copelin gave Respondent her credit card information to charge the first $2,500 installment of his fee (ODC-102);

d. Respondent agreed to send a fee agreement to Ms. Copelin (Stip 197); and

e. Respondent told Ms. Copelin "don't worry, he'll get" a letter to the college president by close of business on February 9, 2021. (NT I, 206)

440. At 10:51 a.m. on February 9, 2021, Respondent charged $2,500 to Ms. Copelin's credit card. (ODC-102/Bates 762, Stip 198)

441. Respondent did not call GSU to confirm the hours and the time for close of business. (NT IV, 314)

442. Ms. Copelin explained that although she had written a letter to the college president herself, she wanted Respondent to *also* write a letter on her behalf "[b]ecause I was still giving him an opportunity to represent me. Because I still had a shot, and it was a stronger shot if I had representation than just my letter." (NT I, 204)

443. Ms. Copelin stated that she was "agreeing to pay for the representation" as Respondent "was my attorney. He was going to represent me throughout this whole ordeal." (NT I, 205)

444. Prior to accepting payment from Ms. Copelin, Respondent failed to inform Ms. Copelin that he was not licensed to practice law in Georgia and could not represent her as an attorney. (NT I, 205)

445. Prior to accepting payment from Ms. Copelin, Respondent failed to inform Ms. Copelin that she was hiring him only to act as an "advisor." (NT I, 190, 196, 216)

446. The GSU Code of Conduct provides that an "advisor" may not advocate or participate directly during the investigation and hearing process. (NT IV, 387)

447.    Ms. Copelin would not have agreed to pay Respondent's $7,500 fee if she knew that Respondent was not representing her as an attorney "[b]ecause [she] never looked for anybody other than an attorney.  So I wasn't looking for an advisor." (NT I, 205)

448.    Ms. Copelin's testimony, that she "paid for counsel to represent" her, is credible and unequivocal. (NT I, 230)

449.    Respondent failed to provide Ms. Copelin with a written fee agreement that set forth the basis and rate of his legal fee.

450.    By email exchange between Mr. Altman and Ms. Copelin on February 9, 2021 (Stip 199):

    a.    at 10:32 a.m., Mr. Altman inquired whether Ms. Copelin had submitted a written response to the President of GSU (D-63);

    b.    at 5:10 p.m., Mr. Altman asked Ms. Copelin if she had sent a "letter to the president already?" (ODC-103/Bates 763);

    c.    at 5:46 p.m., Ms. Copelin replied that she sent a letter to "his secretary or whoever the admin person." (id.);

    d.    at 6:00 p.m., Mr. Altman stated that he would "create an additional document from" him (id.);

    e.    at 7:30 p.m., Mr. Altman requested that Ms. Copelin review his letter to the president so he could send it out (id.); and

    f.    Ms. Copelin only had time to review the letter for grammar and spelling. (Id. at 211-212)

451.    Ms. Copelin explained that she was unable to promptly respond to Mr. Altman's email sent at 10:32 a.m. because she was at work and not permitted to have her personal email account on her work computer. (NT I, 207, 210)

452. At 8:05 p.m. on February 9, 2021, Mr. Altman sent an email (ODC-104/Bates 766) with an attached letter to GSU President Becker from Respondent (ODC-105/Bates 767, Stip 200):

    a.    the text of the email stated that it was from "Keith Altman, The Law Office of Keith Altman" and that Mr. Altman is licensed in California and Michigan; and

    b.    the attached letter was on stationery with letterhead from "Lento Law Firm" and signed by Respondent with a footnote indicating Respondent is "[l]icensed in New York, New Jersey, and Pennsylvania."

453. In the text of the letter, Respondent argued that Ms. Copelin should not be expelled because (Stip 201):

    a.    it would "impose a punishment so severe that she will not have an opportunity to earn a degree";

    b.    expulsion "does not serve any useful purpose and appears to be retribution";

    c.    "no rationale was provided [as] to why expulsion was the most appropriate disciplinary option";

    d.    Respondent's review of GSU "policies shows no guidelines for the imposition of such a severe sanction";

    e.    an expulsion "appears to be arbitrary and capricious" and "seems disproportionate to [Ms. Copelin's] misconduct"; and

    f.    a suspension is "an adequate consequence of [Ms. Copelin's] actions."

454. By email to Ms. Copelin sent at 8:06 p.m. on February 9, 2021, Mr. Altman wrote "Forgot to copy you" and attached a copy of his letter to President Becker. (ODC-104/Bates 766, Stip 204)

455. Respondent's letter to GSU:

89

a.     was written on stationery from Lento Law Firm that states Respondent is licensed to practice law in Pennsylvania, New Jersey, and New York;

b.     included Respondent's email address of joseph@StudentDisciplineDefense.com;

c.     put forth legal and substantive arguments as to why Ms. Copelin should be suspended and not expelled from GSU;

d.     was signed "Joseph Lento, Esq."; and

e.     added a "cc" of Respondent's letter to "Keith Altman, Esq."

456.    Respondent's:

a.     law firm website advertises that Respondent practices education law and provides student discipline defense (Stip 208);

b.     email correspondence with Ms. Copelin on February 6, 7, 8, and 9, 2021, omits the fact that Respondent was being retained, for a fee of $7,500, as a non-legal "advisor" for Ms. Copelin's school disciplinary matter;

c.     correspondence to President Becker does not identify himself and Mr. Altman as acting as an "advisor" to Ms. Copelin (NT IV, 369-370); and

d.     correspondence to President Becker does not contain any disclaimer that Respondent is not representing Ms. Copelin in his legal capacity when Respondent's correspondence is written on his law firm's legal stationery, makes legal arguments, and is signed by Respondent with the title "Esq." (NT IV, 370).

457.    Neither Respondent nor Mr. Altman are licensed to practice law in Georgia. (Stip 202)

458.    Respondent engaged in the unauthorized practice of law in Georgia (GA RPC 5.5(a)) by:

a.     taking a fee from Ms. Copelin for providing legal advice, writing a letter on his law firm stationery advocating on her behalf to GSU and depositing the fee in his law firm business operating account (NT IV, 374); and

90

b. "bring[ing] [his] expertise to the table regarding the matter and help[ing] accordingly." (NT III, 206)

459. Respondent agreed that his negotiating on behalf of a student with a university outside of the appeal process "could be" providing legal services. (NT IV, 395-396)

460. Ms. Copelin had not realized that Respondent and Mr. Altman were not members of the Georgia Bar prior to Ms. Copelin's receipt of the letter Respondent and Mr. Altman sent to the GSU college president, wherein Respondent had a footnote setting forth his bar membership and Mr. Altman's signature line set forth his bar membership. (NT I, 213)

461. Ms. Copelin explained that when she read the letter to the GSU president, she:

a. was "confused" because Respondent stated that he practiced "nationwide" and "Georgia wasn't listed" (NT I, 214);

b. was concerned that if GSU would "see the signature, they know these people can't even represent" her (*id.* at 215); and

c. felt it "wasn't honest and they wrote something on [her] behalf and they weren't legally able to represent" her. (*Id.*)

462. By email to Respondent and Mr. Altman sent at 11:29 p.m. on February 9, 2021 (ODC-106, Bates 769), Ms. Copelin replied that:

a. time was "of the essence" and Respondent's "letter was not sent timely";

b. Respondent failed to copy Ms. Copelin on the letter sent to GSU;

c. Respondent failed to advise Ms. Copelin that the letter could not be sent before the end of the business day;

91

d.   Respondent and Mr. Altman were not licensed to practice law in Georgia; and

e.   Respondent failed to send a retainer agreement as Ms. Copelin had requested and Respondent had repeatedly agreed to do.

463.   By reply email to Ms. Copelin with a "cc" to Mr. Altman, sent at 8:37 a.m. on February 10, 2021 (ODC-107/Bates 771), Respondent:

a.   alleged that "we are disturbed by your tone";

b.   claimed the letter to President Becker was sent timely because if the letter "was due at a specific time, they would have needed to specify the time";

c.   blamed Ms. Copelin for waiting "most of the two calendar weeks until [she] reached out to" Respondent;

d.   stated that "[w]e did everything we could given the fact that we were only officially retained yesterday";

e.   wrote that Respondent's "support of [Ms. Copelin] was not intended to be in a legal capacity at this time.  It was as an advisor which you are allowed under the policies of the university";

f.   asserted that "there was insufficient time to get [Ms. Copelin] the retainer yesterday"; and

g.   informed Ms. Copelin that Respondent would only charge her for the first $2,500 because Respondent "completed the letter in support of [her] appeal on an expedited basis."

464.   Respondent's letter of February 10, 2021, was "the first time" that Respondent told Ms. Copelin that he would be acting only as Ms. Copelin's "advisor." (NT I, 216) Ms. Copelin felt that Respondent "was dishonest and that [she] should have been advised before he had taken [her] money." (Id.)

465.   By email reply to Respondent sent at 3:18 p.m. on February 10, 2021 (ODC-107/Bates 770), Ms. Copelin (Stip 209):

92

a. rejected Respondent's claim that he was not hired as Ms. Copelin's attorney because: Ms. Copelin found Respondent's name listed on an internet website as an "education lawyer"; Ms. Copelin called Respondent "for representation"; Respondent contacted GSU on behalf of Ms. Copelin in his "legal capacity"; and if Respondent was not acting in his "legal capacity," then "why would [Respondent] be contacting [her] school writing a letter on [her] behalf past business hours?";

b. explained that she "would never agree to pay $2500 just for a letter"; and

c. advised that she did not authorize payment of $2,500 and instructed Respondent not to charge her credit card.

466. Respondent did not promptly reply to Ms. Copelin's email. (NT I, 217)

467. Thirteen days later, on February 23, 2021, Respondent replied to Ms. Copelin's email and blamed her for what had occurred, claiming (ODC-108/Bates 772):

a. Ms. Copelin "did not retain [Respondent] until the morning that [her] appeal was due-February 9th";

b. Respondent's "original intent" was to ghostwrite an appeal to be submitted by Ms. Copelin as if she had written it, but redrafted the letter under Mr. Altman's and Respondent's name only after Respondent learned that Ms. Copelin had already sent a letter under her name;

c. that Ms. Copelin was "undoubtedly aware" that neither Mr. Altman and Respondent were members of the Georgia Bar and she "never raised any concerns or issues";

d. Ms. Copelin's raising the issue of Respondent's and Mr. Altman's unauthorized practice of law "after the fact smacks of bad faith"; and

e. Respondent was willing to refund $1,000 of the $2,500 charged "in the spirit of good faith."

468. Respondent's February 23, 2021 email was the first time Ms. Copelin learned that Respondent had intended to "ghostwrite" a letter on her behalf and that she

93

"had never heard of such a thing. I did not call a ghostwriter. I did not call Ghostbusters. So I had no idea what he was referring to." (NT I, 217)

469. Ms. Copelin would not have agreed to pay Respondent $2,500 to ghostwrite a letter for her. (NT I, 217-218) Ms. Copelin explained that "initially, I had written a letter in my name and consulted with counsel so that they can go ahead and take this in a legal representation way." (*Id.* at 218)

470. Ms. Copelin rejected Respondent's offer of a $1,000 refund. (Stip 211)

471. Ms. Copelin then filed a complaint with Office of Disciplinary Counsel because she had informed Respondent that she "didn't have the money to spare initially. . . he took advantage of the situation. He preyed upon [her] urgency. . . he just took my money and just blew me off." (NT I, 220)

472. On June 4, 2021, Ms. Copelin filed a Statement of Claim with the Fund alleging that Respondent was "hired as student discipline attorney" and "sent a letter to my school after deadline." (ODC-109/Bates 774, Stip 212)

473. Ms. Copelin explained that she filed a Statement of Claim "because somebody was stealing my money off of false pretenses." (NT I, 223)

474. On June 11, 2021, Kathy Peifer Morgan, Executive Director and Counsel of the Fund, notified Respondent that Ms. Copelin had filed a Statement of Claim with the Fund; on July 7, 2021, Respondent wrote a letter to Ms. Copelin and enclosed a $2,500 check to Ms. Copelin, written from the operating account of Lento Law Firm, LLC and Joseph D. Lento, Esq., with the notation "client refund" in the memo portion of the check; after receipt of notice of Respondent's refund to Ms. Copelin, the Fund dismissed Ms. Copelin's claim against Respondent. (Stip 213)

The Disciplinary Proceeding at No. 80 DB 2022

475. On June 3, 2022, Office of Disciplinary Counsel ("Petitioner") filed a Petition for Discipline against Respondent and charged him with violations of the Rules of Professional Conduct related to the six client matters set forth above.

476. On July 18, 2022, Respondent filed an Answer to the Petition.

477. Due to the anticipated length of the disciplinary hearing, by Order dated August 25, 2022, the Board Chair appointed former Board Member Stewart L. Cohen, Esquire, as Special Master, pursuant to Pa.R.D.E. 206(d), to conduct the hearing and submit a report to the Board.

478. The Special Master held prehearing conferences on November 1, 2022 and January 13, 2023.

479. The disciplinary hearing commenced on January 23, 2023. Petitioner entered exhibits ODC-1 through ODC-136 and 138, into evidence without objection. Petitioner also introduced the parties' Joint Stipulations into evidence. Respondent introduced exhibits, D1 through D-73 into evidence, with the exception of D-6 (last page), D-11, D-28, D-35, D-54, D-55, and D-74. Petitioner called three witnesses: Respondent's former clients Renee Dougalas, John Gardner, and La'Slondi Copelin.

480. Ms. Dougalas, Mr. Gardner, and Ms. Copelin credibly testified.

481. The hearing continued on January 24, 2023. Petitioner presented the testimony of two of Respondent's former employees, Joan Feinstein and Steven Feinstein. Ms. Feinstein and Mr. Feinstein credibly testified.

482. On January 25, 26, and 27, 2023, Respondent testified on his own behalf. Respondent called no additional witnesses.

483. Thereafter, the Special Master found that Petitioner had established at least one violation of the Rules of Professional Conduct.

95

484.    The hearing resumed on March 6, 2023 and March 8, 2023, for the introduction of evidence pursuant to Disciplinary Board Rule § 89.151(b).

*Aggravating factors*

485.    Respondent has a record of attorney discipline in Pennsylvania, New Jersey, and the United States District Court, Eastern District of Pennsylvania (EDPA):

a.    (P-1/002) *Office of Disciplinary Counsel v. Joseph D. Lento,* No. 5 DB 2013 (S. Ct. Order 7/17/2013) (on consent) Respondent received a one-year suspension and a consecutive one-year term of probation with a practice monitor for violating RPC 5.4(a), 7.3(a), 8.4(a), 8.4(c), and 8.4(d);

b.    (P-2/025) *In the Matter of Joseph D. Lento, An Attorney at Law,* No. D-13 September Term 2016, NJ Supreme Court Order (4/26/2017) (reciprocal one-year suspension); and

c.    (P-3/0028) *In the Matter of: Joseph D. Lento,* No. 2:13-mc-00195-PD (EDPA) (reciprocal one-year suspension; and reinstatement petition withdrawn).

486.    In the Pennsylvania suspension matter, Respondent's misconduct involved his wrongful attempts to solicit client referrals by requesting court employees to enter into a "mutually beneficial business arrangement" and refer potential clients to him.

487.    Respondent's conduct in the instant matter betrayed the trust of his clients, who he deceived to retain him to handle their legal matters. (NT I, 109, 141, 152-153, 154-155, 170, 216-218, 220-221, 244-247).

488. Respondent failed to recognize or accept any wrongdoing in his handling of the Gardner, Dougalas, and Copelin matters.

489. Respondent failed to express sincere remorse and recognize the harm his misconduct inflicted on his clients, his former employees, and the legal profession.

490. Respondent failed to accept responsibility and blamed his employees, his clients, and other attorneys for his misconduct. (NT II, 277; NT III, 276; NT V. 22, 27, 34-35, 38; 43-44, 46-47; D-30, -71).

491. From 2015 until 2022, Respondent submitted false PA Attorney Annual Fee forms omitting his suspension in the EDPA. ODC-122/Bates 917 through ODC 128/Bates 925.

492.    Respondent gave evasive answers to questions and his testimony is not credible.  (NT III, 218, 219, 229, 230-233, 238, 249, 250, 253, 256-258, 262-264, 268, 319-321, 380-381, 388-392; NT V, 23-24, 28-29).

*Mitigating Factors*

493.    At the hearing on March 6, 2023, Respondent presented the testimony of four character witnesses: Liam Riley, Esquire; Patricia M. Hoban, Esquire; Jason D. Schiffer, Esquire; and Walter J. McHugh, Esquire. At the hearing on March 8, 2023, Respondent presented the testimony of five additional character witnesses: David M. Simon, Esquire; Gary Garant, Esquire; Soleiman Raie, Esquire; Michael Canavan, Esquire; and Jeremy-Evan Alva, Esquire.

494.    Respondent's character witnesses all testified that Respondent had a good reputation for being truthful, honest and law-abiding.

495.    However, Respondent's character witnesses:

a.  had no recent contacts with Respondent professionally or personally (Hoban, NT VI, 62, 77; Schiffer, NT VI, 89-90; Garant, NT VII, 40, 44);

b. had limited professional contacts with Respondent over the years (Hoban, NT VI, 63-64; McHugh, NT VI, 110; Canavan, NT VII, 103-106, 108);

97

c. did not know that Respondent had a record of attorney discipline (Schiffer, NT VI, 93; Garant, NT VII, 46-47, Canavan, NT VII, 107);

d. did not know the facts of Respondent's misconduct that resulted in Respondent's having a record of attorney discipline (Riley, NT VI, 39; Schiffer, NT VI, 93; Simon, NT VII, 16-17; Canavan, NT VII, 117);

e. did not know the current disciplinary charges against Respondent (Hoban, NT VI, 71-74; Canavan, NT VII, 111-116);

f. agreed that an attorney who takes money from clients for work that cannot be done, files false pleadings, and disregards court orders would be a danger to the public (Hoban, NT VI, 79-80; Schiffer, NT VI, 99; McHugh, NT VI, 123-124; Raie, NT VII, 82).

496.    Respondent admitted his wrongdoing in failing to supervise his employees in the matters of Red Wine Restaurant (NT V, 222, 223), American Club (NT V, 56), and Watsons (NT V, 121-122).

The Procedural History Below

497.    On June 12, 2023, Petitioner submitted a post-hearing brief to the Special Master. Petitioner requested that the Special Master conclude that Respondent violated all of the rules charged in the Petition for Discipline, and recommend to the Board that he be suspended for a period of four years.

498.    On August 11, 2023, Respondent submitted a post-hearing brief to the Special Master. Respondent requested that the Special Master conclude that Petitioner did not meet its burden on all of the charged rule violations and recommend a sanction of a public reprimand with one year of probation and a practice monitor. In the event that the

Special Master concluded that Respondent violated all of the charged rule violations, Respondent requested that the appropriate sanction fall between a public reprimand and a one year suspension.

499.    By Report filed on September 18, 2023, the Special Master concluded that Petitioner met its burden as to all rule violations charged in the Petition for Discipline.[3] The Special Master recommended that the Board impose a suspension for four years.

500.    On November 7, 2023, Respondent filed a Brief on Exceptions and requested oral argument before the Board. Respondent requests that the Board either dismiss the Petition for Discipline, or in the alternative, reduce the Special Master's recommended sanction by at least  30 months, which would result in in an 18 month or less period of suspension.

501.    On December 19, 2023, Petitioner filed a Brief Opposing Exceptions. Petitioner requests that the Board adopt the Special Master's recommended discipline of a four year suspension.

502.    A three-member panel of the Board held oral argument on March 19, 2024.

503.    The Board adjudicated this matter at the meeting on April 10, 2024.


II.        CONCLUSIONS OF LAW

By his conduct as set forth above, Respondent violated the following Rules of Professional Conduct:

1. RPC 1.1 (5 counts) (Gardner, Robreno – Red Wine Restaurant, American Club, Dougalas, Copelin) - A lawyer shall provide competent representation to a client.

---

[3] The Report states 47 rule violations; by the Board's count, there are 48 violations.

Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

2.  RPC 1.2(a) (2 counts) (Dougalas, Copelin) - A lawyer shall abide by a client's decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the client as to how they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

3.  RPC 1.3 (5 counts) Gardner, Robreno – Red Wine Restaurant, American Club, Dougalas, Copelin) - A lawyer shall act with reasonable diligence and promptness in representing a client.

4.  RPC 1.4(a)(3) (2 counts) (Dougalas, Copelin) - A lawyer shall keep the client reasonably informed about the status of the matter.

5.  RPC 1.4(a)(4) (Dougalas) – A lawyer shall promptly comply with reasonable requests for information.

6.  RPC 1.4(b) (2 counts) (Gardner, Dougalas) - A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

7.  RPC 1.5(a) (2 counts) (Gardner, Copelin) - A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

8.  RPC 1.16(d) (3 counts) (Gardner, Dougalas, Copelin) - Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

9.  RPC 5.1(a) (3 counts) (Robreno-Red Wine Restaurant, Watsons, American Club) - A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.

10. RPC 5.1(b) (Robreno-Red Wine Restaurant) - A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

11. RPC 5.1(c)(1) (Robreno – Red Wine Restaurant) - A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved.

12. RPC 5.1(c)(2) (Robreno-Red Wine Restaurant) - A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

13. RPC 5.3(a) (3 counts) (Robreno-Red Wine Restaurant, Watsons, American Club) - A partner and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer.

14. RPC 5.3(c)(1) (2 counts) (Robreno-Red Wine Restaurant, American Club) - A lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved.

15. RPC 5.3(c)(2) (Robreno-Red Wine Restaurant) - A lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and in either case knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

16. RPC 5.5(a) (Copelin) - A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

17. RPC 8.1(a) (American Club) - An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not knowingly make a false statement of material fact.

18. RPC 8.4(a) (5 counts) (Gardner, Robreno-Red Wine Restaurant, Watsons, American Club, Copelin) - It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

19. RPC 8.4(c) (4 counts) (Gardner, American Club, Dougalas, Copelin) - It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

101

20. RPC 8.4(d) (3 counts) (Robreno-Red Wine Restaurant, Watsons, American Club) - It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

III.    DISCUSSION

This matter is before the Board on review of the Special Master's Report, wherein the Master concluded that Respondent violated multiple Rules of Professional Conduct in six matters over the course of two and a half years, and recommended that Respondent be suspended for a period of four years.  Respondent raises exceptions to the Report and recommendation and a Board panel heard argument on the issues.

**Respondent's exceptions**

The crux of Respondent's exceptions is that Petitioner failed to meet its burden on some of the rule violations charged in the Gardner, Red Wine Restaurant, Watsons, and American Club matters[4], and all of the rule violations charged in the Dougalas and Copelin matters. Respondent contends that since his "testimony directly contradicted the vast majority of the allegations contained within the Petition and the proofs offered in support of its allegations were largely dependent on the Complainants' testimony," Petitioner failed to meet its burden. (Respondent's Brief on Exceptions at 2) Respondent further argues that because the Special Master erred in concluding that Petitioner met its burden on all counts, the Master's recommended four year suspension is too harsh and not warranted. It is Petitioner's burden to prove ethical misconduct by a preponderance of clear and satisfactory evidence. *Office of Disciplinary Counsel v. John*

---

[4] In Gardner, 1.3, 1.4(b), 1.5(a), 1.16(d), 8.4(c); in Red Wine Restaurant, 1.1, 1.3; in Watsons, 8.4(d); in American Club, 1.3, 8.1(a), 8.4(c).

102

*Grigsby*, 425 A.2d 730, 732 (Pa. 1981). With this burden in mind, we review the charged rule violations in the context of the evidence of record.

RPC 1.1 and 1.3

RPC 1.1 places a duty on an attorney to provide competent representation to a client. The Rule explains that competent representation requires the attorney to have the legal knowledge, skill, and thoroughness reasonably necessary for the representation. In addition, RPC 1.3 places a duty on an attorney to act with reasonable diligence in representing a client. Respondent failed to act with the necessary competence and diligence in handling the Gardner, Robreno (Red Wine Restaurant), American Club, Dougalas, and Copelin matters.

In the Gardner matter, in August 2018, Mr. Gardner spoke with Respondent about expunging Mr. Gardner's entire criminal record. Respondent failed to act with the competence and diligence necessary for the representation when he failed to ascertain that: (1) Mr. Gardner would not be eligible for expungement of his summary conviction until 2022, as 18 Pa.C.S.A. § 9122(b)(3)(i) required Mr. Gardner to be free of arrest for five years following his January 2017 summary conviction; and (2) *Commonwealth v. Lutz*, prohibited the expungement of Mr. Gardner's misdemeanor charges that were withdrawn as part of his guilty plea agreement. (NT III, 284-285, 288, 327, 330)

Furthermore, until the Luzerne County D.A.'s Office objected to Mr. Gardner's Petition for Expungement, Respondent did not even know that Mr. Gardner's misdemeanor charges were withdrawn pursuant to a guilty plea agreement. (NT III, 252) After learning of the D.A.'s objection, Respondent failed to act with competence and diligence and undertake any research to determine if there was a legal basis for the D.A.'s objection. (NT III, 272, 390-391) Instead, Respondent advised Mr. Gardner that the D.A.'s

103

objection was "disingenuous," prompting Mr. Gardner to retain Respondent for $7,500 for additional representation. (NT I, 140) Respondent collected a $9,000 fee in two installments from his client before ever advising Mr. Gardner that he could not expunge the summary.

In the Red Wine Restaurant cases, Respondent was retained to represent a disabled individual and assigned Mr. Feinstein, his legal associate, to file a complaint under the ADA against Red Wine Restaurant for failing to make the restaurant accessible to a person in a wheelchair. Respondent repeatedly failed to competently and diligently handle the Red Wine Restaurant matters when he: (1) failed to assign substitute counsel to attend the December 20, 2019 prehearing conference after Mr. Feinstein resigned (NT II, 85); (2) failed to confirm there was legal authority under the ADA for bringing a claim based on promoter liability against Alex Torres Production, Inc., and then include the legal authority in the complaint; and (3) failed to supervise and insist that his law firms' attorneys and nonlawyer assistants, complete and file the correct forms and pleadings in the correct jurisdiction. The fact that Respondent was suspended from the Eastern District did not preclude him from reviewing documents and ensuring compliance with court orders and rules.

In the American Club matter, Respondent was retained to represent the plaintiff in a matter that was transferred to Commerce Court in Philadelphia County. Respondent failed to handle the matter with competence and diligence when he: (1) failed to ascertain the legal requirements for filing a *Pro Hac Vice* motion prior to filing three separate deficient motions (NT V, 11); (2) failed to review and correct a *Pro Hac Vice* Motion drafted by his paralegal despite having been provided the opportunity to do so (NT III, 137; NT V, 12-14); (3) signed and filed a Motion for a legal associate's *Pro Hac*

104

*Vice* admission that misrepresented or omitted Respondent's disciplinary history (Stip 125-128); (4) signed and filed a second Motion for *Pro Hac Vice* admission for a legal associate that intentionally failed to include Respondent's disciplinary history in the Eastern District of Pennsylvania (Stip 139-142); (5) signed two *Pro Hac Vice* motions that failed to comply with Pa.R.Civ.P. 1021.1; and (6) through the acts of his legal associate, filed a third *Pro Hac Vice* motion that failed to comply with Pa.R.Civ.P. 1021.1 (Stip 150).

In the Dougalas matter, Respondent was retained to seal or expunge Ms. Dougalas' Pennsylvania and New Jersey criminal convictions. (ODC-80/Bates 709) At the outset of the representation, Ms. Dougalas told Respondent about her convictions for forging prescriptions for controlled substances. Ms. Dougalas sent Respondent copies of the docket entries that showed she was arrested and held for court on thirteen felony charges in Pennsylvania. Respondent failed to act with competence and diligence necessary for the representation when he failed to: (1) properly conduct and take written notes of his intake interview with Ms. Dougalas to determine whether she had any felony convictions; (2) expeditiously order Ms. Dougalas' State Police Background Check after his legal assistant informed him that the docket entries did not reflect the grading of Ms. Dougalas' criminal convictions; (3) promptly ascertain that the Clean Slate Act would not permit Ms. Dougalas to seal her Pennsylvania felony convictions and continued "operating under the impression that [Ms. Dougalas' convictions] don't involve felonies" (NT IV, 223-224); and (4) keep a file copy of pleadings he purportedly filed on behalf of Ms. Dougalas and a copy of Ms. Dougalas' Background Check. (NT IV, 261)

In the Copelin matter, Ms. Copelin received a letter informing her that she had 10 days to submit an appeal of her pending expulsion from GSU to the college president. (NT I, 185) Ms. Copelin called the school and was "advised" that her appeal

105

"needed to be done by end of business" on February 9, 2021. (*Id.* at 226) Ms. Copelin decided that she wanted an attorney to handle her appeal, discovered Respondent's website, and contacted Respondent's office. From the outset, Ms. Copelin made clear that she wanted an attorney. During Ms. Copelin's initial telephone conversation with Respondent on February 4, 2021, Ms. Copelin informed Respondent that her deadline to file an appeal to the GSU college president was "by the end of business day" on February 9, 2012 (*id.* at 226). In a subsequent telephone consult with Respondent and Mr. Altman on February 6, 2021, Ms. Copelin reiterated that her deadline was close of business day on February 9, 2021, and neither Respondent nor Mr. Altman replied that they could not meet this deadline (*id.* at 193, 244). On the February 9, 2021 call Respondent reassured Ms. Copelin, "don't worry, he'll get" a letter to the college president by the close of business on February 9, 2021. (*Id.* at 206) Yet Respondent failed to handle Ms. Copelin's matter with the requisite competence and diligence necessary for the representation when he failed to timely send the appeal of Ms. Copelin's expulsion to the college president by close of business on February 9, 2021, and copy Ms. Copelin on the letter written on her behalf to the college president.

RPC 1.4 and RPC 1.2(a)

RPC 1.4(a)(3) requires that an attorney keep a client reasonably informed about the status of a matter; RPC 1.4(a)(4) requires an attorney to promptly comply with a client's reasonable requests for information; and RPC 1.4(b) requires an attorney to explain a matter to a client to the extent reasonably necessary to enable the client to make informed decisions about the representation. In addition, RPC 1.2(a) requires an attorney to abide by a client's decisions concerning the objectives of the representation

and to consult with the client as to how the objectives are to be pursued. Respondent violated RPC 1.4 and RPC 1.2(a) in the Gardner, Dougalas, and Copelin matters.

In the Gardner matter, Respondent violated RPC 1.4(b) when he failed to explain Mr. Gardner's legal matter to the extent necessary to enable Mr. Gardner to make an informed decision regarding the representation. Respondent failed to inform Mr. Gardner that: (1) his summary Disorderly Conduct conviction could not be expunged until January 2022 because Pennsylvania law requires an individual to be free of arrest or prosecution for five years (NT I, 129); and (2) the District Attorney's Office had objected to Mr. Gardner's expungement of his misdemeanor charges because the charges were withdrawn as part of a guilty plea agreement. (NT I, 288) Contrary to Respondent's claim, Respondent's vague and imprecise form fee agreement referencing expungement of the "applicable charges" failed to inform Mr. Gardner of the legal limitations of Mr. Gardner's seeking an expungement at that time. (NT I, 135; NT III, 264, 380-381) Indeed, Mr. Gardner credibly testified that he understood "applicable charges" to include expungement of "everything that happened that day" he was arrested, and believed he had retained Respondent to do that. (NT I, 134; see also NT I, 144-145) Furthermore, Respondent failed to obtain Mr. Gardner's permission to sign his name to a form expungement petition, have Mr. Gardner review the petition before it was filed, or provide Mr. Gardner with a copy of the Petition after it was filed.

Similarly, in the Dougalas matter, at the outset of Respondent's representation of Ms. Dougalas in February 2020, Ms. Dougalas told Respondent about her Pennsylvania convictions and sent Respondent copies of the docket entries that showed she was arrested and held for court on felony charges. (NT I, 36-38, 96, 97, 335) Respondent violated RPC 1.4(b) when he failed to explain to Ms. Dougalas, to the extent

107

necessary to enable her to make an informed decision regarding the representation, that felony convictions would not be eligible for Pennsylvania Clean Slate limited access as felony convictions were listed as specific exceptions under the Act. (NT I, 41-42) Respondent's failure to explain the limitations of the Clean Slate Act and the necessity of obtaining her State Police records at the outset of the representation also violated RPC 1.2(a), as Respondent could not possibly achieve Ms. Dougalas' objectives to fully seal her criminal record.

Respondent violated RPC 1.4(a)(3) when he failed to keep Ms. Dougalas apprised of the status of his efforts to seal and expunge her criminal record for nearly a year. Respondent failed to advise Ms. Dougalas that his attorney assistant could not complete drafting her petitions because her criminal dockets did not reflect the grading of all her convictions. Despite monthly inquiries from Ms. Dougalas about the status of her legal matter (ODC-84/Bates 719-725), at no time prior to January 28, 2021, did Respondent inform Ms. Dougalas that her Luzerne County felony convictions would not be eligible for sealing under the Clean Slate Act. (Stip 170) Although Respondent received Ms. Dougalas' official criminal history from the Pennsylvania State Police "sometime in December 2020" (NT IV, 234), it was not until January 28, 2021 (Stip 173), over one month after Respondent received the State Police records and almost one year after he was retained, that Respondent informed Ms. Dougalas that he could not seal or expunge her Luzerne County felony convictions. (NT I, 62) Finally, Respondent failed to advise Ms. Dougalas that he had filed on her behalf a Petition for Expungement with a Background Check attached. (NT IV, 250-251)

Respondent also violated RPC 1.4(a)(4) in the Dougalas matter when he failed to: (1) comply with Ms. Dougalas' reasonable requests for information (ODC-

91/Bates 736; NT I, 80); (2) promptly provide Ms. Dougalas with copies of the New Jersey pleadings she had requested (NT I, 80, NT IV, 219); and (3) send Ms. Dougalas copies of any correspondence, pleadings, and records from her Luzerne County legal matter. (NT I, 78-79, 81; NT IV, 250-252, 261)

In the Copelin matter, Ms. Copelin contacted Respondent to provide legal representation for her college discipline case and file a timely appeal of her expulsion to the GSU president. (NT I, 185) From the outset, Ms. Copelin made clear that she wanted an attorney. Respondent failed to inform Ms. Copelin that he could not abide by her objective of having legal representation and could allegedly act as an "advisor" and ghostwrite a letter for her. (NT I, 190, 191, 196, 205, 216) Respondent also failed to comply with Ms. Copelin's request to "call so she can remit payment" for the representation. (Stip 196, 197, NT I, 202-203) Respondent failed to send Ms. Copelin a copy of his Letter of Engagement as she had requested and as Respondent had repeatedly promised. (NT I, 200, 203; Stip 200) Respondent's conduct violated RPC 1.2(a) and RPC 1.4(a)(3).

### RPC 1.5(a), 1.16(d), 8.4(a)

RPC 1.5(a) prohibits an attorney from entering into an agreement for, charging, or collecting an excessive fee. In determining whether a fee is excessive, the Rule lists, among other factors, the time and labor required, novelty of question involved, skill required, and results obtained. RPC 1.16(d) requires an attorney to refund any unearned fee upon the termination of the representation. RPC 8.4(a) prohibits a lawyer from violating or attempting to violate the rules.

In the Gardner matter, in August 2018, Respondent received $1,500 to file a petition for the "expungement of the applicable charges," and in January 2019,

Respondent received an additional $7,500 to file a formal motion with the Court for a contested hearing on Mr. Gardner's expungement. (Stip 4)  Both statutory law and case law prohibited the expungement of Mr. Gardner's January 2017 guilty plea until 2022. (Stip 5) Respondent failed to file the formal motion and Mr. Gardner terminated Respondent's representation four months after paying the $7,500 fee.  Respondent failed to promptly refund any of his unearned fee. Given the time and labor Respondent had expended on this routine matter, as well as the unlikelihood of success under statutory law and case law, Respondent's $7,500 fee was clearly excessive.  It was not until June 2021, after Respondent received notice that Mr. Gardner filed a Statement of Claim with the Lawyers Fund for Client Security, that Respondent refunded a partial fee of $3,500 to Mr. Gardner. (Stip 23, 24, 25) Respondent's conduct in collecting a $7,500 fee, failing to refund his unearned fee upon the termination of the representation, attempting to retain an excessive fee, and belatedly refunding only a portion of his fee violated RPC 1.5(a), 1.16(d), and 8.4(a).

In the Dougalas matter, Respondent received $5,500 from Ms. Dougalas to expunge or seal her criminal record in Pennsylvania and New Jersey. On March 24, 2021, after Respondent informed Ms. Dougalas that he could not expunge or seal her Pennsylvania felony convictions, Ms. Dougalas requested a refund of Respondent's unearned fee and records from her legal matters. (ODC-90/Bates 734) On May 14, 2021, Ms. Dougalas reiterated her request for a refund and her records. (ODC-91/Bates 735) Respondent failed to provide Ms. Dougalas with any records from her Luzerne County matter. (NT I, 81) In addition, Respondent failed to promptly refund his unearned fee. It was not until July 2021, after Respondent received notice that Ms. Dougalas had filed a Statement of Claim with the Lawyers Fund for Client Security, that Respondent refunded

110

$5,500 to Ms. Dougalas. Respondent's conduct violated 1.16(d).

In the Copelin matter, Respondent requested $7,500 to write a letter on behalf of Ms. Copelin to the GSU college president and explained that there may be an additional fee if her matter proceeded to court. (NT I, 196) Respondent failed to inform Ms. Copelin that he could not act as her attorney in Georgia and Ms. Copelin could only retain Respondent to act as an "advisor." (NT I, 193, 196, 197, 230) On the morning of February 9, 2021, Ms. Copelin paid an initial installment of $2,500 (ODC-102/Bates 762), and later that evening, Respondent's legal associate sent an untimely letter signed by Respondent to the GSU president challenging Ms. Copelin's pending expulsion. (ODC-104, -105/Bates 766, 767) The following day, Ms. Copelin terminated Respondent's representation and instructed Respondent not to charge her credit card. (ODC-107/Bates 770); Respondent subsequently offered to refund $1,000. (ODC-108/Bates 108) It was not until July 2021, after Respondent received notice that Ms. Copelin filed a Statement of Claim with the Lawyers Fund for Client Security, that Respondent refunded $2,500 to Ms. Copelin. (Stip 213)

At his disciplinary hearing, Respondent justified his $7,500 fee to ghostwrite a letter because "[t]here were approximately 100 pages of documentation as part of the case. . . .and being expelled from school can have a lifetime of consequences." (NT IV, 318) Respondent's justification is unavailing. Given the limitations regarding representation under the GSU student code, time and labor involved, the lack of novelty and difficulty of the question involved, the skill required to ghostwrite the letter, and the unsuccessful results obtained, Respondent attempted to charge an excessive fee to a client. In addition, Respondent failed to promptly refund his unearned fee upon termination of the representation.  Respondent's conduct violated RPC 1.5(a), 1.16(d),

111

and 8.4(a).

RPC 5.1 and RPC 5.3

Rule 5.1 concerns the responsibilities of managerial and supervisory attorneys. RPC 5.1(a) requires an attorney with managerial authority to make reasonable efforts to ensure that there are measures in effect that give reasonable assurance that the conduct of the firm's attorneys conforms to the RPCs; RPC 5.1(b) requires a supervising attorney to make efforts to ensure that the conduct of other attorneys conforms to the RPCs; and RPC 5.1(c) provides that an attorney shall be responsible for another attorney's conduct if (1) the other attorney either has knowledge of the conduct and ratifies it or (2) knows of the conduct at the time when the conduct could be mitigated/avoided, but fails to take remedial action.

RPC 5.3 concerns the responsibilities of managerial and supervisory lawyers over nonlawyer assistants. RPC 5.3(a) requires an attorney with managerial authority to make reasonable efforts to ensure that there are measures in effect that give reasonable assurance that the conduct of the firm's nonlawyers conforms to the RPCs; RPC 5.3(b) requires an attorney with direct supervisory responsibility over a nonlawyer to make reasonable efforts to ensure that the nonlawyer's conduct is compatible with the professional obligations of the lawyer; and RPC 5.3(c) provides that a lawyer shall be responsible for a nonlawyer's conduct if the lawyer (1) knows about and ratifies the conduct involved or (2) knows of the conduct at the time when the conduct could be mitigated/avoided, but fails to take remedial action.

Respondent was the sole managing partner of Optimum, Lento Law Group, and Lento Law Firm. Respondent had direct supervisory authority over attorneys who worked for the firms. (NT IV, 384; Stip 80) In addition, Respondent had direct supervisory

112

authority over nonlawyer employees at his law firms.  (NT V, 64, 66, 67; Stip 80) In managing his law firms and supervising his attorney and nonlawyer employees, Respondent conceded that he repeatedly violated the mandates of both RPC 5.1 and RPC 5.3 in the Red Wine Restaurant, Watsons, and American Club matters. (*See* Red Wine Restaurant matter, NT III, 134; Watsons matter, NT V, 121-122; American Club matter, NT III, 146, NT V, 56)  Respondent's failure to manage and supervise his lawyer and nonlawyer assistants resulted in the violation of multiple ethical rules.

In the Red Wine Restaurant matter, Respondent originally assigned Mr. Feinstein to draft the complaint.  Judge Robreno dismissed the complaint filed by Mr. Feinstein in *Red Wine Restaurant I* and ordered that "[i]f the complaint is refiled, it shall include legal authority" on promoter liability. (ODC-29/Bates 232).   In Respondent's Answer to the Rule to Show Cause, Respondent acknowledged that he "will provide a legal basis" should Respondent refile the complaint. (ODC-31/Bates 258)

Following the departure of Mr. Feinstein, Respondent assigned the Red Wine Restaurant case to Ms. Feinstein, who was not admitted in the Eastern District.  Mr. Lento encouraged her to seek admission after repeatedly trying, without success, to associate with an experienced counsel. Ms. Feinstein was given a document to sign and required to file the complaint, which did not comply with Judge Robreno's order.  (NT II, 149; Stip 56)  The *Red Wine Restaurant II* complaint was identical to the complaint previously dismissed by Judge Robreno and failed to contain the required legal authority for suing the concert promoter under the ADA. (ODC-34/Bates 273)  Respondent violated RPC 5.1(b) when he failed to make reasonable efforts and supervise:  (1) Mr. Feinstein's drafting of the original *Red Wine Restaurant* complaint and confirm that Mr. Feinstein had reasonably concluded that there was a legally supportable basis for bringing a claim

under the ADA against Alex Torres Production, Inc. (NT III, 43); (2) Ms. Feinstein by failing to advise her of the legal and factual background of the *Red Wine Restaurant I* case prior to Ms. Feinstein's signing a complaint identical to the one had been dismissed; and (3) Ms. Feinstein to ensure that she had reasonably concluded that there was a legally supportable basis for bringing a claim under the ADA against Alex Torres Production, Inc.

Furthermore, Respondent violated RPC 5.1(c)(1) and (2) as he knew about the deficiencies in the *Red Wine Restaurant I* complaint, but failed to ensure that Ms. Feinstein included legal authority on promoter liability in the *Red Wine Restaurant NJ* and *Red Wine Restaurant II* complaints at a time when the consequences of filing the complaints could be avoided or mitigated. Indeed, Respondent failed to review the Red Wine Restaurant complaints or ensure that another attorney reviewed the complaints before they were filed. The totality of Respondent's handling of the Red Wine Restaurant cases violated RPC 5.1(a), in that Respondent's conduct demonstrated that he failed to have measures in effect to give reasonable assurance that the conduct of attorneys in his law firm would conform to the RPCs.

In the Watsons matter, Respondent also violated RPC 5.1(a). As the managing partner at Optimum with managerial authority over attorney employees, Respondent failed to make reasonable efforts to ensure that attorneys in his law firm: (1) routinely gave him or another attorney at the firm drafts of complaints and pleadings to review before they were filed with the court (NT II, 23, 137, 43-44); (2) supervised the filing of complaints and ensured that a complaint filed in the First Judicial District against residents of Delaware County was properly served by the Delaware County sheriff who had been deputized by the sheriff of the First Judicial District as required by the rules (NT V, 62-63, 81-81; (3) reviewed and proofread documents prior to filing the documents with

114

the court (NT II, 107); (4) maintained an accurate case management system that would provide necessary information, including who filed a complaint, who arranged service of process, and whether Notice of Intent to Take Default Judgment was timely mailed (NT V, 73, 76, 77, 86); and (5) refrained from engaging in conduct that needlessly expended the court system's limited resources.

In the American Club matter, Respondent also violated RPC 5.1(a). After Judge Djerassi dismissed Respondent's two *Pro Hac Vice* motions, for among other issues, failing to comply with Pa.R.Civ.P. 1012.1, Respondent withdrew from the case and assigned his legal associate to file a *Pro Hac Vice* motion. (NT V, 52) Respondent failed to make reasonable efforts to ensure that the associate's motion—the third *Pro Hac Vice* motion filed in the American Club matter—complied with Pa.R.Civ.P. 1012.1 and Judge Djerassi's orders. (NT V, 54) As a result, Judge Djerassi denied the *Pro Hac Vice* motion.

Moreover, Respondent violated RPC 5.3(a) when he failed to have measures in effect to give reasonable assurance that his nonlawyer assistants would: (1) file the Red Wine Restaurant complaint in the correct federal court, receive approval from the assigned attorney prior to filing a complaint with the federal court, properly complete the forms and cover sheets for filing a complaint in the federal court, and accurately complete and file the request for a refund of Respondent's filing fee; (2) in the Watsons matter, provide Mr. Feinstein with drafts of documents to proofread and review prior to filing the documents (NT II, 107), upload a copy of the 10-day Notice to the CLIO system (NT II, 107; NT V, 92-93); and (3) in the American Club matter, draft and file a Motion for *Pro Hac Vice* Admission that did not falsely state Respondent's disciplinary history.

Respondent also violated RPC 5.3(c)(1) in the American Club matter when

115

he failed to review and correct the *Pro Hac Vice* motion drafted by his paralegal, which falsely stated Respondent declared under penalty of perjury that "I presently am not, and have never been, the subject of any disbarment or suspension proceeding before this or any Court." (NT III, 137; NT V, 12-14)  Respondent's failure to review and correct the motion filed in his name after he received it from Ms. Stone resulted in filing a false pleading with the Court. (Stip 125, 128)

Finally, in the Red Wine Restaurant matter, Respondent violated RPC 5.3(c)(1) in ordering that the identical complaint be refiled in federal court without having reviewed the complaint before it was filed (NT V, 216), and violated RPC 5.3(c)(2) when knowing that the complaint was going to be refiled, Respondent failed to take remedial action to ensure that the lawyers and the staff who prepared the forms and pleadings fully understood the legal basis for Judge Robreno's dismissal of the *Red Wine Restaurant I* complaint so that the consequences of the complaint's prior dismissal could be avoided.

RPC 5.5(a)

PA RPC 5.5(a) and Georgia RPC 5.5(a) employ identical language prohibiting an attorney from practicing law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction or assisting another in doing so.[5]  In addition, RPC 8.5(a) provides that an attorney admitted to practice law in this jurisdiction is subject to the disciplinary authority of this jurisdiction regardless of where the lawyer's conduct occurs.[6]  In the Copelin matter, Respondent violated PA RPC 5.5(a).

---

[5] Georgia RPC 5.5(a) provides that a lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.  The Georgia Code, § 15-19-51 (a), also prohibits any person other than a duly licensed attorney in Georgia, to furnish advice or legal services of any kind.

[6] RPC 8.5(a) provides that a "lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs. A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to

116

Neither Respondent nor Mr. Altman are members of the Georgia Bar. (Stip 202) Respondent received a $2,500 fee from Ms. Copelin, a citizen of Georgia, to provide advice and write a letter on her behalf to a university in Georgia regarding her expulsion, and deposited the fee for furnishing this advice and legal services in his Pennsylvania law firm's operating account. (NT IV, 374) On February 9, 2021, Mr. Altman sent an email to the GSU president stating that the email was from "The Law Office of Keith Altman." (ODC-104/Bates 766, ODC-105/Bates 767) The email attached a letter written on stationery with the letterhead "Lento Law Firm," signed by Respondent with the title "Esq." after his name, included a footnote stating that Respondent is licensed to practice law in New York, New Jersey, and Pennsylvania, and contained substantive legal arguments in support of Ms. Copelin's appeal from her pending expulsion. (Stip. 200, 201, 207)

Respondent's correspondence to the GSU President did not state that he and Mr. Altman were acting as an "advisor" to Ms. Copelin. (NT IV, 369-370) Nor does Respondent's correspondence contain any disclaimer that he was not acting in his legal capacity. In fact, Respondent was providing legal advice and services. Respondent offered no credible evidence that he took this fee or was acting in any capacity other than as an attorney. He engaged in the unauthorized practice of law in Georgia and assisted Mr. Altman in doing so. Respondent's conduct violated RPC 5.5(a)(1) and 8.4(a).

RPC 8.1(a)

RPC 8.1(a) prohibits an attorney from knowingly making a false statement of material fact in connection with a bar admission application. In the American Club matter, Respondent signed a May 26, 2020 Verification to a Motion for *Pro Hac Vice*

---

provide any legal services in this jurisdiction. A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct."

Admission that falsely stated Respondent had "never been" the subject of a suspension proceeding. (ODC-62/Bates 515) After the court dismissed the Motion without prejudice to a refiling that would include disclosure of Respondent's disciplinary history, on August 14, 2020, Respondent signed and filed a second motion for *Pro Hac Vice* Admission. (Stip 130, 140) In his second *Pro Hac Vice* motion, Respondent knowingly and intentionally failed to disclose his disciplinary history in the Eastern District of Pennsylvania. (Stip 137, 139) Respondent's conduct violated RPC 8.1(a).

RPC 8.4(c)

RPC 8.4(c) prohibits an attorney from engaging in conduct involving deceit or misrepresentation. An attorney's conduct need only be reckless to violate RPC 8.4(c). *See Office of Disciplinary Counsel v. Anonymous Attorney A,* 714 A.2d 404 (Pa. 1998) (A violation of RPC 8.4(c) can be established by an attorney's reckless disregard of truth or falsity). Respondent engaged in deceitful conduct in the Gardner, American Club, Dougalas, and Copelin matters.

In the Gardner matter, Respondent provided Mr. Gardner with vague fee agreements that referenced the "expungement of applicable charges" without defining what charges he would seek to expunge. (NT III, 273, 277-281) Mr. Gardner was misled and believed he was retaining Respondent in August 2019, for a fee of $1,500, to expunge Mr. Gardner's entire criminal record, which included Mr. Gardner's January 2017 summary conviction and withdrawn misdemeanor charges. (NT I, 145, 170) Respondent knew or should have known that Pennsylvania law required an individual to be free of arrest or prosecution for five years following a summary conviction and that established Pennsylvania case law prohibited the expungement of Mr. Gardner's misdemeanor charges that were withdrawn as part of a guilty plea agreement. Mr. Gardner credibly

118

explained that had Respondent informed him at the outset that his conviction could not be expunged for five years from the date of his guilty plea, Mr. Gardner would "absolutely not" have retained Respondent (NT I, 129) and would have waited until 2022 to expunge his entire criminal record as he had "no choice." (*Id.* at 130)

Respondent engaged in similar deceit in December 2018 following his receipt of the D.A. Office's objection to Mr. Gardner's Expungement Petition. Respondent stated that the DA's "argument is disingenuous" and "may/most likely can be defeated." (ODC-9/Bates 000152), Respondent's misleading opinion was offered without the benefit of any legal research or factual support (NT III, 231, 251, 314-315, 328-29, 340), was deceitful, and intended to and did cause Mr. Gardner to pay Respondent an additional $7,500 to file a formal motion with the Court. (NT I, 140, 142-43)[7] This statement was made with reckless disregard for the facts and the law.

In the American Club matter, Respondent misrepresented his record of attorney discipline in two separate motions for another attorney's *Pro Hac Vice* admission. After Respondent filed the first *Pro Hac Vice* motion, he engaged in deceit and misrepresentation when he requested his legal assistant to inform the court and all parties that the false statements about his disciplinary history were a "clerical error" (D-30) and had his assistant file a Certification claiming the false statements were due to her "inadvertence." (ODC-64/Bates 599) In fact, the false statements about Respondent's disciplinary record were a result of Respondent's admitted failure to review the first *Pro Hac Vice* motion before it was filed. Respondent then engaged in deceit and misrepresentation in his second *Pro Hac Vice* motion when he knowingly and intentionally

---

[7] Mr. Gardner testified that he "felt used, lied to. I felt like he stole my money." (NT I, 152)

failed to reveal his discipline in the EDPA (ODC-68/Bates 634), even though the court ordered the "disclosure of movant's disciplinary history" upon any refiling. (Stip 136)

In the Dougalas matter, Respondent deceived Ms. Dougalas to retain him to seal her criminal record for a fee of $5,500, when in fact, Pennsylvania's Clean Slate Act (ODC-81, -82/Bates 711, 713) patently excluded the sealing of her thirteen felony convictions. At the time Ms. Dougalas contacted Respondent in February 2020, Ms. Dougalas knew the difference between a felony and misdemeanor conviction, knew the schedule of the drug for which she had forged prescriptions, and knew that she had been convicted of thirteen felony charges in Luzerne County. (NT I, 34) Ms. Dougalas wanted to seal her criminal record "because" it "follow[ed] [her] around anywhere" and contacted Respondent because she was "confused" as to whether she qualified for sealing under Pennsylvania's Clean Slate Act. (Id. at 35-36)

Respondent failed to advise Ms. Dougalas that her criminal dockets did not reflect the grading of her criminal convictions (NT III, 164), inquire whether Ms. Dougalas knew if she had been convicted of any of the felonies for which she was arrested and held for court (ODC-133/Bates 936-37), ask Ms. Dougalas the schedule of drug for which she had forged prescriptions, explain the limitations of the Clean Slate Act, and inform Ms. Dougalas that he needed to obtain official confirmation of the grading of her convictions. (NT I, 41-42) Instead of obtaining this critical information, Respondent provided Ms. Dougalas with a vague Letter of Engagement promising to seal "3 applicable cases" and expunge "2 applicable cases" for a $5,500 fee. (ODC-80/Bates 709) Ms. Dougalas explained that "[b]ased upon the docket that [Ms. Dougalas] had sent [Respondent]," she assumed that the "three applicable" cases referred to her misdemeanor cases and the "two applicable" cases referred to her felony cases. (NT I, 57) Ms. Dougalas signed the

120

Engagement Letter, paid $2,500, and agreed to pay the balance of the fee upon request. (Stip 164; NT I, 64) Ms. Dougalas testified that had Respondent initially informed her that her felony convictions did not "qualify for anything," it would have been the "end of the conversation right there." (NT I, 113)

One month after being retained, Respondent's assistant notified Respondent of the need to obtain the grading of Ms. Dougalas' convictions in order to complete the petitions to seal and expunge Ms. Dougalas' record. (D-40-42) Rather than contacting Ms. Dougalas, advising her that the dockets were unclear regarding the grading of her offense (NT I, 67, 100), and obtaining information about her convictions (NT IV, 210), Respondent waited until October 2020, after being paid in full, to order the State Police Background Check. (NT III, 183; NT IV, 119, 212-213) Had Respondent advised Ms. Dougalas that her felony convictions could not be sealed, Ms. Dougalas would not have paid $5,500 and "could have put her money somewhere else." (NT I, 63; Stip 174) Ms. Dougalas testified that she felt "lied to and grifted." (NT I, 72)

In the Copelin matter, Respondent engaged in a pattern of conduct involving deceit and misrepresentation regarding his ability to act as Ms. Copelin's attorney and represent her in Georgia, when: (1) Respondent signed his February 4, 2021 text message to Ms. Copelin, "Attorney Joseph D. Lento, Lento Law Firm, Helping Students Nationwide" (ODC-95/Bates 752); (2) during Respondent's February 4, 2021 conversation with Ms. Copelin, in response to Ms. Copelin's statement that she wanted a lawyer, Respondent replied that he "helps students nationwide" and has "helped plenty of students in Georgia" (NT I, 190); (3) Respondent signed his February 4, 2021 email to Ms. Copelin, "Joseph D. Lento, Esquire, Attorney & Counselor at Law, Lento Law Firm, Helping Clients Nationwide" (ODC-96/Bates 755); (4) during Ms. Copelin's February 6,

2021 telephone consult with Mr. Altman and Respondent, Mr. Altman identified himself as an attorney who worked for Respondent (NT I, 92, 198), Ms. Copelin explained that she did not want to handle the case herself and wanted an attorney (*id.* at 192-193), Respondent stated his fee could be more if Ms. Copelin needed him to go to court (*id.* at 196), and Respondent and Mr. Altman failed to inform Ms. Copelin that they could not act as an attorney in Georgia and could only act as her advisor (*id.* at 193, 196, 197, 205, 230); and (5) Respondent failed to explain to Ms. Copelin, in any of his oral conversations or written communication, that he could not be her attorney in Georgia and could only act as her advisor. (NT I, 190; FOF 449, 450, 461(b))

Ms. Copelin explained that although she had written a letter to the college president herself, she wanted Respondent to write a letter on her behalf because "it was a stronger shot if I had representation than just my letter." (NT I, 205) Ms. Copelin was "never looking for anybody other than an attorney" and "wasn't looking for an advisor." (NT I, 205) Ms. Copelin was also not interested in retaining Respondent to be a "ghostwriter." (NT I, 217) Ms. Copelin made clear that she would not have agreed to pay $7,500 to Respondent if she knew that Respondent could not provide her with legal representation in Georgia and had only intended to ghostwrite a letter for her. (NT I, 97, 217-218) The sum of Respondent's omissions and misrepresentations deceived Ms. Copelin to retain Respondent.

Respondent's conduct in these matters violated RPC 8.4(c).

RPC 8.4(d)

RPC 8.4(d) prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice. Conduct is deemed prejudicial when it unnecessarily expends the limited time and resources of the court system. *See Office of Disciplinary*

122

*Counsel v. James P. Miller*, No. 52 DB 2022 (D. Bd. Rpt. 9/7/2023, p. 36-37) (S. Ct. Order 11/20/2023) (Miller's conduct prejudiced the administration of justice, as he created additional work for the Erie County court system and forced the court to schedule multiple hearings to address Miller's contemptuous behavior). Respondent's conduct in the Red Wine Restaurant matter, Watsons matter, and American Club matter repeatedly violated RPC 8.4(d).

In the Red Wine Restaurant matter, Respondent's conduct unnecessarily expended the time and resources of the federal court when Respondent: (1) failed to substitute Mr. Feinstein's appearance at the prehearing conference in the Red Wine Restaurant case or request a continuance to find substitute counsel, resulting in Judge Robreno's holding a prehearing conference, dismissing the complaint (Stip 48), entering a Rule to Show Cause Order and holding a hearing, and referring Respondent to Office of Disciplinary Counsel (Stip 51); (2) Respondent's legal assistant incorrectly filed the Red Wine Restaurant case in New Jersey and filed incorrect forms accompanying the case, resulting in the withdrawal of the complaint and unnecessary correspondence with the court; (3) Respondent failed to review the *Red Wine Restaurant II* complaint before it was filed to ensure that it complied with Judge Robreno's Order to include the law on promoter liability and failed to ensure that the coversheet accompanying the *Red Wine Restaurant II* complaint reflected that the complaint had been previously filed, resulting in Judge Robreno issuing a Rule to Show Cause Order, holding a hearing, and referring the matter to Office of Disciplinary Counsel.

In the Watsons matter, through the conduct of Respondent's lawyer and nonlawyer assistants, Respondent unnecessarily expended the time and resources of the Court of Common Pleas when Respondent's nonlawyer assistants filed a Praecipe to

Enter Default Judgment that contained inconsistent dates the Notice of Intent to Take Default was served (Stip 109), which resulted in the Watsons filing a Petition Strike, the Court's issuance of a Rule to Show Cause Order, Mr. Feinstein's filing a Response to the Petition, the Court holding a Rule to Show Cause hearing, and the Court dismissing the complaint against the Watsons.

In the American Club matter, the actions of Respondent, Respondent's associate attorney, and Respondent's legal assistant unnecessarily expended the limited time and resources of the Court of Common Pleas when: (1) Respondent's office filed three flawed *Pro Hac Vice* motions; (2) opposing counsel filed responses to Respondent's flawed motions; and (3) the court reviewed the parties' pleadings and entered orders dismissing each of the *Pro Hac Vice* motions.

On this record, we find Respondent's exceptions to be unfounded. Our independent review of the Joint Stipulations of Fact, Petitioner's and Respondent's exhibits, the testimony of Petitioner's witnesses, and Respondent's own testimony, informs our conclusion that the Special Master properly found that the totality of the evidence established Respondent's violations of all rule violations charged in the six matters.

The Special Master found Petitioner's witnesses credible. Ms. Dougalas, Ms. Copelin and Mr. Gardner credibly testified as to how Respondent misled them to pay him legal fees for work that Respondent could not or did not perform. Ms. Feinstein and Mr. Feinstein credibly testified regarding Respondent's failure to supervise his attorney and non-attorney employees, their efforts to discuss with Respondent the shortcomings in his law office management, Respondent's failure to undertake remedial measures to address these shortcomings, and the negative consequences of Respondent's

124

management of his clients' cases. In contrast, the Special Master found Respondent to be not credible.

The Board gives great deference to the Master's credibility determinations, as he had ample opportunity to assess the witnesses. *See Office of Disciplinary Counsel v. Joseph Q. Mirarchi*, No. 56 DB 2016 (D. Bd. Rpt. 5/6/2018, p. 67) (S. Ct. Order 3/18/2019). While there were contradictions between Respondent's version of events and the version of Respondent's former clients and former employees—Respondent described this as "he said" "she said" (Respondent's Brief on Exceptions, p. 8; N.T. oral argument 3/19/2024, p. 12)—upon our independent review, we find no basis to disturb the Master's findings. Moreover, the documentary evidence corroborates the testimony of Petitioner's witnesses. On this record, we conclude that the Master did not err in his conclusions of law.

## Appropriate discipline

Having determined that Respondent engaged in serious professional misconduct, we turn next to the appropriate quantum of discipline to be imposed. In looking at the general considerations governing the imposition of final discipline, it is well-established that disciplinary sanctions serve the dual purpose of protecting the public from unfit attorneys and maintaining the integrity of the legal system. *Office of Disciplinary Counsel v. John Keller*, 506 A.2d 872, 875 (Pa. 1986). Another compelling goal of the disciplinary system is deterrence. *In re Dennis Iulo*, 766 A.2d 335, 338, 339 (Pa. 2001). The Board also recognizes that the recommended discipline must be tailored to reflect facts and circumstances unique to the case, including circumstances that are aggravating or mitigating. *Office of Disciplinary Counsel v. Anthony C. Cappuccio*, 48 A.3d 1231, 1238 (Pa. 2012). And importantly, while there is no per se discipline in Pennsylvania, the Board

125

is mindful of precedent and the need for consistency in discipline. *Office of Disciplinary Counsel v. Robert Lucarini*, 472 A.2d 186, 189-91 (Pa. 1983).

        1.    Aggravating factors

This record reveals aggravating factors that weigh in favor of severe discipline.

        a.   *Record of prior discipline*

Respondent's prior discipline constitutes a weighty aggravating factor. *See Office of Disciplinary Counsel v. Michael Eric Adler*, No. 88 DB 2022 (D. Bd. Rpt. 11/6/2023, p. 32) (S. Ct. Order 1/23/2024). By Order dated July 17, 2013, the Court suspended Respondent on consent for a period of one year and imposed a consecutive one year term of probation with a practice monitor. Respondent's misconduct occurred in the latter part of 2011 through early 2012, approximately three years after his admission to the bar in Pennsylvania, and involved his wrongful attempts to solicit client referrals by requesting court employees to enter into a "mutually beneficial business arrangement" and refer potential clients to him. Respondent's prior misconduct and resulting discipline are significant for two reasons: 1) the prior wrongful acts reflect Respondent's attempts to seek professional employment outside the boundaries of the conduct rules, similar to his instant efforts in obtaining employment from clients without regard to ethical rules and with profit his driving motivation; and 2) the disciplinary sanction did not have the intended deterrent effect upon him, as Respondent's probationary period ended in 2015 and his misconduct in the instant matter started in  2018, revealing that the sanction had no appreciable beneficial effect on Respondent's subsequent actions. Considering these concerns, we find it necessary that the sanction imposed for Respondent's instant misconduct be of

126

significant weight, recognizing that the prior suspension and probationary period failed to impress upon him the need to evaluate his actions and change his unethical ways of practicing law.

> b.  *Failure to recognize wrongdoing in certain matters and express remorse*

The record demonstrates that Respondent failed to acknowledge and appreciate his wrongdoing in the Gardner, Dougalas, and Copelin matters, and exhibited an overall lack of sincere remorse for the harm his conduct inflicted on any of his clients. Respondent's lack of genuine remorse compels a heavier disciplinary sanction, as the absence of remorse is an aggravating factor. *See Office of Disciplinary Counsel v. Cynthia Baldwin*, 225 A.3d 817, 858-59 (Pa. 2020).  Respondent's failure to express any remorse correlates with his inability to accept that he committed wrongdoing and inflicted harm on his clients.  As well, Respondent's failure to acknowledge the harm he inflicted upon the legal profession and the court system is yet more aggravation. *See Office of Disciplinary Counsel v. William H. Lynch*, No. 70 DB 2020 (D. Bd. Rpt. 10/21/2021, p. 28) (S. Ct. Order 1/6/2022).

> c.  *Respondent's lack of integrity*

The record demonstrates Respondent's lack of integrity in a variety of ways. Respondent placed blame on his clients and employees in an attempt to deflect responsibility, and offered evasive, dubious and incredible testimony on many points regarding his representation of clients and management of his law practice. The impact of Respondent's lack of integrity caused harm to his clients, as shown by the testimony of Mr. Gardner, who  felt "lied to and used" (NT I, 152), and Ms. Dougalas, who felt "lied

127

to and grifted." (NT I, 72) Additionally, Respondent submitted false PA Annual Attorney Registration Fee Forms from 2015 to 2022, on which forms he omitted his suspension from the Eastern District of Pennsylvania, providing yet another example of his unwillingness or inability to adhere to rules.

2.    Mitigating factors

Upon review of this record, we identity factors of a mitigating nature, as set forth below. We conclude, however, that the weight accorded to these factors does not counter the significant aggravating factors as outlined above.

a.    Acceptance of responsibility in certain matters

Respondent recognized his wrongdoing in failing to supervise his employees in the Red Wine Restaurant, Watsons, and American Club matters. Mitigation is appropriate where a respondent demonstrates acceptance of responsibility. See Office of Disciplinary Counsel v. Robert G. Young, No. 115 DB 2019 (D. Bd. Rpt. 11/30/2020, p. 32) (S. Ct. Order 3/16/2021). However, the weight in mitigation is reduced due to our conclusion that in general, Respondent failed to express credible remorse for the harm he inflicted upon his clients, his colleagues, and the legal profession.

b.    Character evidence

Respondent presented the testimony of nine character witnesses. Although these witnesses credibly testified that Respondent was a truthful, honest and law abiding individual, we accord little weight to this testimony, as it revealed that these witnesses had no recent contacts with Respondent professionally or personally, did not know the current disciplinary charges against Respondent, and did not know that Respondent had a record of attorney discipline. See Office of Disciplinary Counsel v. Valerie Andrine

128

*Hibbert*, No. 215 DB 2019 (D. Bd. Rpt. 2/17/2021, p. 38) (S. Ct. Order 4/27/2021) (overall weight and significance of character evidence is undermined where a character witness has little knowledge of the underlying disciplinary charges).

### 3.    Support for a five year term of suspension

Here, the Special Master recommends a suspension for four years, adopting Petitioner's recommendation, while Respondent advocates for a suspension of 18 months or less. Initially, we address the Master's use of a "building block" approach to determine the appropriate sanction, whereby he examined each of the rule violations and decisional law pertinent to the violations and assessed appropriate discipline for the discrete acts of misconduct before reaching the end result of a four year suspension.[8] Respectfully, we disagree with this approach, as in our view it fails to account for the totality of the circumstances and does not capture the essence of Respondent's attitude and approach to his law practice that permeated his actions in each of the six matters.

As amply demonstrated by the evidence presented over seven days of hearing, during a two and a half year period, Respondent, a previously suspended lawyer, repeatedly failed to represent his clients and manage his law practice in accordance with ethical standards. He engaged in a wide range of misconduct involving: entering into vague fee agreements with clients for legal work that he could not or did not perform through his incompetence, lack of diligence and communication deficiencies; repeatedly filing incorrect or plainly false pleadings in state and federal courts, most egregiously in regard to his motion in support of another attorney's pro hoc vice admission, where Respondent deceitfully concealed his suspension in the Eastern District; and failing to

---

[8]  Petitioner employed this approach, as set forth in its Brief to the Special Master.

129

properly manage and supervise his lawyer and nonlawyer employees. Disturbingly, Respondent failed to recognize any wrongdoing for his conduct in the Dougalas, Copelin and Gardner matters and blamed his clients for not understanding the limitations in his representation and his vague fee agreements. Further, Respondent blamed his law associates and nonlawyer employees for not following his instructions or not knowing applicable court rules, which resulted in the law firm's filing multiple incorrect pleadings in the Red Wine Restaurant, American Club and Watsons matters.

The facts of this matter make plain that in the six matters at issue, Respondent placed profit over professionalism. He employed a predatory style of taking on client representation, failing to ascertain whether the client's goals could be accomplished, and nevertheless accepting legal fees.[9] Respondent would either pass off the matter to employees without supervising the work to ensure that it was handled properly, or himself fail to do the work for which he and his firm had been retained. Respondent's explanations of how he practices law and manages his law firms reveal his nonchalance and ineptitude. By his own admission, Respondent did not take written notes of his conversations with clients, failed to keep a copy of documents that he sent to court, had vague and misleading engagement letters, failed to have another attorney review pleadings and motions before they were filed in court, was unfamiliar with procedural rules and established case law, and relied on his office manager to handle the operation of his law firms.

---

[9] The Gardner and Dougalas matters exemplify this approach. In these matters, Respondent's clients did not become aware that their requested action could not be accomplished until long after Respondent took their money. Mr. Gardner paid Respondent a first installment in August 2018 and a second installment in January 2019 for a total of $9,000 before learning in May 2019 that his expungement request could not be accomplished. Ms. Dougalas retained Respondent in 2020 and paid him $5,500 before he finally advised her in March 2021 that he could not expunge or seal her Pennsylvania felony convictions. In each of these matters, Respondent failed to undertake simple research to ascertain the viability of the requested actions.

Respondent's theory of practicing law is laid bare by his testimony that he used a "pragmatic" approach to his law practice, explaining that "certain things may not be done as may be required." (NT IV, 145, 158) The record demonstrates that in fact, many "things" were not done as required to comply with the rules of court or ethical rules. Such a confounding statement of his professional approach highlights Respondent's choice to operate a law practice outside the bounds of the rules and underscores his lack of ethical compass, revealing him to be a danger to the public and to the integrity of the legal profession. Respondent bore responsibility for the client matters that came to his firm. Here, he wholly abdicated that obligation and in doing so, seemingly forgot that while the practice of law is a business, the fundamental core of that business is the client. Upon this record, we find no evidence that Respondent had genuine concern for his clients.

Having thoroughly reviewed the record, in light of the serious nature of the violations discussed in this Report and the breadth of the misconduct, coupled with the weighty aggravating factors and less significant mitigation, for the following reasons we recommend that the Court suspend Respondent from the practice of law for a period of five years.

The recommended five year period of suspension is supported by the case law. "As is often the case with attorney disciplinary matters, there is no case precedent that is precisely on all fours..." *Cappuccio*, 48 A.3d at 1240. While our survey of prior matters did not reveal a case that squares with the instant matter, in reviewing the decisional law, we find cases that provide a benchmark to determine the severity of discipline.

Case precedent suggests that a lengthy suspension is appropriate in matters where the respondent-attorney engages in pervasive misconduct in multiple client

131

matters and there are significant aggravating factors. In the matter of *Office of Disciplinary Counsel v. James P. Miller*, No. 52 DB 2022 (D. Bd. Rpt. 9/7/2023) (S. Ct. Order 11/20/2023), the Court suspended Miller for four years. The underlying facts demonstrated that Miller, in his capacity as conflicts counsel for Erie County, repeatedly failed to properly represent multiple clients, some of whom were juveniles incarcerated in adult prison, by failing to communicate, failing to act with diligence and promptness to move matters to their conclusion, failing to adhere to deadlines, and failing to follow court orders. Miller also failed to respond to Office of Disciplinary Counsel's requests for information. In aggravation, the Board noted Miller's "grievous" neglect of juvenile defendants as well as his continued procrastination after the court become involved. Miller had no prior history of discipline; however, the Board found that the nature of the repeated neglect and failure to comply with court orders was significantly serious to warrant a lengthy suspension.

In the matter of *Office of Disciplinary Counsel v. Christopher John Basner*, No. 80 DB 2014 (D. Bd. Rpt. 10/16/2015) (S. Ct. Order 12/17/2015), the Court suspended Basner for a period of five years for his misconduct in eleven matters involving neglect, incompetence, failure to communicate with clients, dishonesty, and conduct prejudicial to the administration of justice. Basner displayed a repeated lack of professionalism, which included failing to follow court rules and procedures, filing last minute pre-trial motions, filing meritless briefs, appeals, motions and petitions in various courts, and failing to appear for court, including at jury selection, trial, Megan's Law hearings, sentencing, and contempt proceedings against himself and clients in multiple courts. Basner also failed to refund a fee to one client. Basner had no prior history of discipline.

132

The Board found that Basner, similar to the instant Respondent, had "little or no understanding of the law, lacks appreciation for the need to comply with court orders, appears unable to understand instructions from judges, and consistently reflects poorly upon the legal profession." D. Bd. Rpt., p. 43. In making its recommendation to the Court, the Board concluded that "[a] suspension of five years is warranted to call appropriate attention to [Basner's] pervasive neglect and incompetence, and his repeated habit of ignoring the rules governing the courts of this Commonwealth and the disciplinary system." Although Basner committed misconduct in more matters than Respondent, the Board's conclusion in *Basner* applies here with equal force, recognizing that Respondent is a repeat offender who has previously been suspended for misconduct that stemmed from his choice to place profit over professionalism.

Upon this record, we conclude that Respondent is not fit to practice law. The serious and troubling misconduct established in this record compels a lengthy suspension in order to protect the public, preserve the integrity of the profession and the courts, and deter other practitioners from engaging in similar misconduct. We recommend that Respondent be suspended for a period of five years.

133

IV.    RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the Respondent, Joseph D. Lento, be Suspended for five years from the practice of law in this Commonwealth.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the Respondent.

Respectfully submitted,

THE DISCIPLINARY BOARD OF THE
SUPREME COURT OF PENNSYLVANIA

By:_____
Joshua M. Bloom, Member

Date: 7-1-24

134