# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LENTO LAW GROUP PC 1814 RT 70 STE 321 Cherry Hill, NJ 08003 and LENTO LAW FIRM 1650 Market Street, Suite 3600 Philadelphia, Pennsylvania 19103 v. KRIS EMMANUEL ESTRADA 2163 Corktree Lane San Jose, CA 95132 *Defendant.* | CASE NO.: 25-2763 CIVIL ACTION **JURY DEMAND REQUESTED** |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS RULE 12 MOTION TO DISMISS

**Lawrence A. Katz**
**LLG National**
**PO Box 1054**
**Bellmawr, NJ 08031**
**Phone: 856.652.2000**
**Fax: 856.375.1010**
**Email:  Lawrence.Katz@LLGNational.Com**

**TABLE OF CONTENTS**

INTRODUCTION    1

STANDARD OF REVIEW    1

STATEMENT OF FACTS    2

    General Facts    2

    Defendant's Defamatory Social Media Posts    3

ARGUMENT    14

I.    Definition of Defamation/Defamatory    14

II.    Plaintiffs' Second Amended Complaint Pleads All Elements Necessary To Establish Their Defamation Claims    17

    1.  The defamatory character of the communication    14

    2.  The Defendant published the statements    18

    3.  The defamatory statements apply to the Plaintiffs    19

    4.  The understanding by the recipient of its defamatory meaning    19

    5.  The understanding by the recipient of it as intended to be applied to the plaintiff.    20

    6.  Special harm resulting to the plaintiff from its publication    20

    7.  Abuse of a conditionally privileged occasion    20

III.    Plaintiffs' Second Amended Complaint Pleads All Elements Necessary To Establish Trade Libel    21

IV.    Fees Are Inappropriate Because Plaintiffs Have Properly Plead Defamation    22

CONCLUSION    23

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Group, LLC*
     783 F.3d 1328 (D.C. Cir. 2015) ………………………………………………………23

*Am. Future Sys., Inc. v. Better Bus. Bureau*
592 Pa. 66, 923 A.2d 389 (Pa. 2007) ……………………………………………………16

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ……………………………………………………………………..02

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ………………………………………………………………..2, 24

*Bentlejewski v. Werner Enters., Inc.,*
No. 2:13-cv-1385, 2015 WL 4111476 (W.D. Pa. July 8, 2015), aff'd, 654 F. App'x 77 (3d Cir. 2016) …………………………………………………………………………...16, 17

*Bera v. Consol. Freightways, Inc.,*
421 A.2d 831 (Pa. Super. Ct. 1980) …………………………………………………..16

*Brophy v. Phila. Newspapers, Inc.,*
422 A.2d 625 (Pa. Super. Ct. 1980) …………………………………………………15, 18

*Brinich v. Jencka,*
757 A.2d 388 (Pa. Super. Ct. 2000) …………………………………………………..15

*In re Robert W. Mance,*
980 A.2d 1196 (D.C. 2009) ……………………………………………………...6, 10

*Joseph v. Scranton Times L.P.,*
959 A.2d 322 (Pa. Super. Ct. 2008) …………………………………………………..15

*Joseph v. Scranton Times L.P.,*
89 A.3d 251 (Pa. Super. Ct. 2014) ………………………………………...…………16

*Joseph v. Scranton Times L.P.,*
634 Pa. 35, 129 A.3d 404 (2015) …………………………………………………..20

*Klocke v. Watson,*
936 F.3d 240 (5th Cir. 2019) …………………………………………………………23

*La Liberte v. Reid,*
966 F.3d 79 (2d Cir. 2020) …………………………………………………………....23

*Miketic v. Baron,*
675 A.2d 324 (Pa. Super. Ct. 1996) …………………………………………..…16

*Moore v. Cobb-Nettleton,*
889 A.2d 1262 (Pa. Super. Ct. 2005) …………………………………………..16, 20

*Norton v. Glenn,*
580 Pa. 212, 860 A.2d 48 (2004) …………………………………….…………21, 24

*Parexel Int'l Corp. v. Feliciano,*
No. 04-3798, 2008 WL 2704569 (E.D. Pa. July 3, 2008) ………………………………….15

*Simon v. FIA Card Servs., N.A.,*
732 F.3d 259 (3d Cir. 2013) …………………………………………………..2, 24

*Sprague v. Porter,*
No. 1649 EDA 2013, 2014 WL 10803063 (Pa. Super. Ct. Aug. 26, 2014) ……………………..16

*Synygy, Inc. v. ZS Assocs., Inc.,*
110 F. Supp. 3d 602 (E.D. Pa. 2015) …………………………………………...15, 17

*Vivian v. Blank Rome LLP,*
2024 PA Super 118, 318 A.3d 890 (Pa. Super. Ct. 2024), rearg. denied, appeal denied, 332 A.3d 1180 (Pa. 2025) …………………………………………………………………….19

*Walker v. Grand Cent. Sanitation, Inc.,*
430 Pa. Super. 236, 634 A.2d 237 (Pa. Super. Ct. 1993) ………………………………..15, 17, 19

**Statutes**

42 Pa.C.S.A. § 8343 …………………………………………………………...14, 16

42 Pa.C.S.A. § 8340.16 …………………………………………………….…22

42 Pa.C.S.A. § 8320.1 …………………………………………………………...22

**Other Authorities**

Restatement (Second) of Torts § 570(c) …………………………………………..…………15

## INTRODUCTION

Plaintiffs, a Pennsylvania and a New Jersey law firm, have filed their Second Amended Complaint (SAC) against the defendant. The SAC alleges that the defendant posted a series of social media posts and comments that were untrue, defamatory, and resulted in damage to their reputation. As the SAC pleads each element of the causes of action, Defendant's Rule 12 Motion should be dismissed.

Because of the weakness of his motion, Defendant begins his brief by attempting to distract the Court by raising irrelevant character issues. These comments should be ignored. First, the defendant notes that Mr. Lento has been suspended by the Pennsylvania Supreme Court for five years. However, in this lawsuit, the plaintiffs are two law firms, not Mr. Lento personally. Furthermore, none of the allegations resulting in Mr. Lento's suspension were based on lawsuits against clients who defamed the law firms. Second, the fact that the law firms have filed similar lawsuits against other clients is irrelevant. The presence of these other lawsuits reveals nothing about this lawsuit. The law permits a defamed entity to seek legal redress. Accordingly, Defendant's attempts at character assassination are inappropriate, irrelevant, and should be ignored.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. * * * Two working principles underlie our decision in *Twombly.* First, the tenet that *a court must accept as true all of the allegations contained in a complaint* is inapplicable to legal conclusions. Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id., at* 555, 127 S.Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation' (internal quotation marks omitted)). * * * Second, only a complaint that states a *plausible claim* for relief survives a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)(most internal citations omitted)(emphasis added) "

As the United States Court of Appeals for the Third Circuit has explained, "Under Rule 12(b)(6), a motion to dismiss may be granted only if, *accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff*, a court concludes that those allegations 'could not raise a claim of entitlement to relief.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)." *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 264 (3d Cir. 2013)(emphasis added).

<u>**STATEMENT OF FACTS**</u>

When accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the relevant facts are as follows:

**<u>General Facts</u>**

<u>In</u> August 2024, Defendant Kris Emmanuel Estrada ("Defendant" or "Estrada") retained Plaintiffs for two limited-scope matters: (1) a university-level disciplinary engagement concerning American University in Washington, D.C., and (2) a criminal defense engagement for related allegations pending in Washington, D.C. Superior Court. Defendant executed separate Fee Agreements and paid $15,000 for the school-level engagement and $5,000 for the criminal matter. (SAC, ¶ 8) The university matter was non-litigation in nature and structured as an education advisory engagement only. Mr. Thomas Terrill was assigned to oversee this matter. Services

included liaising with the university's general counsel, coordinating a withdrawal and tuition reimbursement, obtaining an incomplete grade, seeking a medical leave of absence, assisting with communication drafts, and facilitating a delay in the student conduct process. (SAC, ¶ 9) The criminal matter was handled by Terrell Ratliff, whose court appearance required pro hac vice admission. Estrada was expressly informed that Ratliff could not enter an appearance until admitted. This was explained during a November 8, 2024 conference call between Estrada, his mother, Mr. Lento, Mr. Terrill, Mr. Ratliff, and Mr. Groff  (SAC, ¶ 10)

In April 2025, Defendant began publishing a campaign of online reviews containing materially false, defamatory statements targeting Plaintiffs, their attorneys, and staff across more than a dozen platforms. In these reviews, Defendant republished the same false claims using slightly altered language across different jurisdictions. (SAC, ¶ 11)

**Defendant's Defamatory Social Media Posts**

On April 19, 2025, Defendant gave  Plaintiffs a one-star review and posted on Awo, "After paying $5,000 for court representation, Mr. Lento and his firm failed to represent me by missing three court dates. Mr. Lento also included a media article about my ongoing case on his website without asking for my consent. I also sent Mr. Lento and his firm emails asking for updates on the status of Mr. Terrell Ratliff entering his appearance for my case, and **I never received any clear responses**. I eventually had a conference call with Mr. Lento and Mr. John E. Groff, who informed me they would draft a statement for the court and also email me the following day with an update. Yet, this never happened, and **my follow-up emails were upsettingly ignored**.  If they could not appear for me in DC Superior Court because they needed a DC lawyer for support, then I wish they would have informed me about this in advance, especially considering that an office address in Washington DC is listed on their website.  (SAC ¶ 12, Exhibit. A.2)  This post contains false

statements or implications.  Contrary to the post,  Defendant's emails were neither ignored nor were unclear responses provided.  Furthermore, the post implies that Plaintiffs do not actually have an office in Washington, DC, which was untrue, because Plaintiffs do maintain a DC office and it has a sign on it.  (SAC, ¶ 13)

On April 19, 2025, Defendant posted on Awo, "In August 2024, I paid $5,000 to Mr. Terrell Ratliff and the Lento Law Firm for representation in Washington DC Superior Court. Mr. Ratliff assured me in texts and calls that he would take on my case and spoke about his past experience working with prosecutors. Thinking I was in good hands, Mr. Ratliff then missed three court dates in September, October, and November 2024. **He failed to provide me with regular updates on the progress of entering an appearance for my case. Mr. Ratliff also failed to provide a reason as to why it was taking months to enter into my case**, nor did he provide any details or statement for me to provide to the Court explaining why I keep asking to extend my case for another date. It's upsetting because I genuinely believed Mr. Ratliff would help me in my case."  (SAC, ¶ 14, Exhibit A.3)  However, Defendant was advised that Mr. Ratliff needed to obtain a local counsel to move his pro hoc vice appearance, and this was the reason for the delays and Ratliff's inability to appear at the hearings, requiring postponements.  This post is false, misleading, and creates a false impression that Ratliff never explained the reason he could not attend the hearings and the reason for the necessary postponements.  The inaccuracies paint Plaintiffs in a false light.  (SAC, ¶ 15)

Defendant also posted the following on the Lento Google business site: "In August 2024, I retained the Lento Law Group who assigned Mr. Terrell Ratliff for representation in Washington DC Superior Court, even though he was not barred there. Mr. Ratliff assured me in texts and calls that he would take on my case. Thinking I was in good hands, Mr. Ratliff then missed three court dates in September, October, and November 2024. **The Lento Law Group failed to provide me**

**with regular updates on the progress of my case**, rather it was the other way around. They failed to draft a statement for me to provide to the Court explaining why I keep asking to extend my case for another date, which Mr. John Edward Groff, Jr. told me they would do. This experience was upsetting because I genuinely believed Mr. Lento and the Lento Law Group would help me in my case." (SAC, ¶ 16, Exhibit A.4) However, Defendant was advised that Mr. Ratliff needed to obtain a local counsel to move his pro hoc vice appearance, and this was the reason for the delays and Ratliff's inability to appear at the hearings, requiring postponements. This post is false, misleading, and creates a false impression that Ratliff never explained the reason he could not attend the hearings and the reason for the necessary postponements. The inaccuracies paint Plaintiffs in a false light. (SAC, ¶ 17)

Defendant posted similarly on another social media site as follows: "I am very disappointed with the Lento Law Group. I spent a total of $15,000 for services with Mr. Thomas Terrill, a New York State attorney and University of Miami faculty member who was handling my matter in Washington DC. First, I could not locate their physical office as listed in Regus - Coral Springs - Heron Bay. Second, non-refundable fees are precluded by the Rules of Professional Conduct in Washington DC, yet the Lento Law Group was charging me with non-refundable fees for services rendered in Washington DC. Also, **Tom failed to realize that my matter did not fall under Title IX policy, but rather a Non-Title IX policy for which I was not given any right to due process by reviewing evidence and/or any reports**. Further, the Lento Law Group published a news article about my case on their website without my permission. It's frustrating because I trusted them to be experienced in student defense, but they proved the opposite to me based on **their lack of organization** in my opinion. They even refused to issue any refund of the $15,000 and **failed to answer formal emails sent to them** asking for such refunds when

5

confronted with the DC Rules of Professional Conduct (In re Robert W. Mance). * * * None of my statements contain false allegations, nor is it my intention to harass and defame Mr. Lento and/or his firm. Rather, what I write here is an accurate account of my experience with Mr. Lento and the Lento Law Group that I wish to share here and is also fully supported by evidence I have." (SAC, ¶ 18, Exhibit A.5) The caveat in this post that it was not made with the intention of harassing or defaming the Plaintiffs, recognizes that Defendant understood the defamatory nature of his post and was trying to circumvent the post's unambiguous language. It was untrue that Mr. Thomas Terrill did not understand under which policies Defendant's matters were covered. Such a statement falsely implies that Mr. Terrill was not professionally competent. Such a statement is, per se, defamatory. Likewise, referring to the Plaintiffs as disorganized suggests a lack of professionalism. These statements paint Plaintiffs in a false light. (SAC, ¶ 19)

Defendant also posted on Plaintiffs' student defense internet page: "I hired the Lento Law Firm for representation in Washington, DC. They missed three court dates and **failed to respond to any of my emails asking for updates**. I also do not believe they have any partner attorneys in their firm who are barred in Washington, DC. I also could not find their physical law firm office at the Washington, DC address listed." (SAC, ¶ 20, Exhibit A.6) This post is misleading as it implies that court dates were missed without reason or explanation. It fails to explain the need for a local counsel and pro hoc admission and that Defendant was advised to seek a postponement because pro hoc status had not yet been obtained. Furthermore, Defendant was never informed that the Firm had a DC barred attorney. The statement implies misrepresentation. Finally, Plaintiffs did have an office in DC, and the statement that Defendant could not locate it implies misrepresentation of its existence. These statements paint Plaintiffs in a false light. (SAC, ¶ 21)

On the Lento Law Firm Manhattan webpage, Defendant posted: "I am disappointed with the Lento Law Firm. I spent a total of $15,000 for services with Mr. Thomas Terrill, a New York State attorney who was handling my matter in Washington DC. First, **I could not locate their NYC office in Hudson Yards**. Second, non-refundable fees are precluded by the Rules of Professional Conduct in Washington, DC, yet the Lento Law Firm was charging me so for services rendered in Washington, DC. Also, Tom failed to produce any results for my disciplinary matter. **He failed to realize that my matter did not fall under Title IX policy, but rather a Non-Title IX policy for which I was not given any right to due process by reviewing evidence and/or any reports**. Further, the Lento Law Firm published a news article about my case on their website without my permission. By f**ailing to read through specific University policy**, operating under retainer fees that are precluded in Washington DC, and practicing law by legally advising me in a jurisdiction that Tom Terrill is not licensed to do so, Mr. Lento and the Lento Law Firm ultimately disappointed me greatly." (SAC, ¶ 22, Exhibit A.7) This post is misleading and paints the Plaintiffs in a false light. The statement that Mr. Terrill "failed to produce any results" implies that he was unprofessional. The statement is misleading as it fails to explain all of the efforts Mr. Terrill made on Defendant's behalf. It further implies that a positive result was guaranteed, which it was not. In fact, Mr. Terrill did review the University's rules. Finally, as an educational advisor, Mr. Terrill did not have to be barred in DC as his educational advice was generic and applied to any jurisdiction.

On another Lento firm webpage, Defendant posted: "I am disappointed with the Lento Law Firm. I spent a total of $15,000 for services with Mr. Thomas Terrill, a New York State attorney who was handling my matter in Washington DC. First, **I could not locate their office in the Chrysler Building**. Second, non-refundable fees are precluded by the Rules of Professional

Conduct in Washington, DC, yet the Lento Law Firm was charging me so for services rendered in Washington, DC. Also, Tom failed to produce any results for my disciplinary matter. **He failed to realize that my matter did not fall under Title IX policy, but rather a Non-Title IX policy for which I was not given any right to due process by reviewing evidence and/or any reports**. Further, the Lento Law Firm published a news article about my case on their website without my permission. By **failing to read through specific University policy**, operating under retainer fees that are precluded in Washington DC, and practicing law by legally advising me in a jurisdiction that Tom Terrill is not licensed to do so, Mr. Lento and the Lento Law Firm ultimately disappointed me greatly." (SAC, ¶ 24, Exhibit A.8) As in Defendant's other posts, he painted Plaintiffs in a false light. He implied that Plaintiffs did not have a physical office, while they did. Furthermore, the statement that Mr. Terrill "failed to produce any results" implies that he was unprofessional. The statement is misleading as it fails to explain all of the efforts Mr. Terrill made on Defendant's behalf. It further implies that a positive result was guaranteed, which it was not. In fact, Mr. Terrill did review the University's rules. Finally, as an educational advisor, Mr. Terrill did not have to be barred in DC as his educational advice was generic and applied to any jurisdiction. (SAC 25)

On yet another webpage, Defendant continued his campaign of misrepresentation against the Plaintiffs, posting, "I am very disappointed with the Lento Law Firm. I spent a total of $15,000 for services with Mr. Thomas Terrill, a New York State attorney and University of Miami faculty member who was handling my matter in Washington DC. First, **I could not locate their physical office as listed in Waterford Corporate Park next to MIA**. Second, non-refundable fees are precluded by the Rules of Professional Conduct in Washington DC, yet the Lento Law Firm was charging me with non-refundable fees for services rendered in Washington DC. Also, **Tom failed**

**to produce any results for my disciplinary matter. He failed to realize that my matter did not fall under Title IX policy, but rather a Non-Title IX policy for which I was not given any right to due process by reviewing evidence and/or any reports**. (SAC, ¶ 26) As in Defendant's other posts, he painted Plaintiffs in a false light. He implied that Plaintiffs did not have a physical office while they did. Furthermore, the statement that Mr. Terrill "failed to produce any results" implies that he was unprofessional. The statement is misleading as it fails to explain all of the efforts Mr. Terrill made on Defendant's behalf. It further implies that a positive result was guaranteed, which it was not. In fact, Mr. Terrill did review the University's rules. Finally, as an educational advisor, Mr. Terrill did not have to be barred in DC as his educational advice was generic and applied to any jurisdiction. (SAC, 27)

On another webpage, Defendant posted: "I am very disappointed with the Lento Law Firm. I am a resident of San Jose, California; yet, **I could not locate their office** at Oyster Point located in South San Francisco, which is closest to my place of residence. I spent a total of $15,000 for services with Mr. Thomas Terrill, a New York State attorney who was handling my matter in Washington DC. Non-refundable fees are precluded by the Rules of Professional Conduct in Washington DC, yet the Lento Law Firm was charging me with non-refundable fees for services rendered in Washington DC. Also, **Tom failed to produce any results for my disciplinary matter. He failed to realize that my matter did not fall under Title IX policy, but rather a Non-Title IX policy for which I was not given any right to due process by reviewing evidence and/or any reports**. Further, the Lento Law Firm published a news article about my case on their website without my permission. **By failing to read through appropriate and relevant University policy**, operating under retainer fees that are not allowed in Washington DC, and **unethically practicing law** by legally advising me in a jurisdiction that Tom Terrill is not licensed

to do so, Mr. Lento and the Lento Law Firm were a disappointment. It's frustrating because I trusted them to be experienced in student defense, but they proved the opposite to me based on their **lack of organization** in my opinion. They even refused to issue any refund of the $15,000 and **failed to answer formal emails** sent to them asking for such refunds when confronted with the DC Rules of Professional Conduct (In re Robert W. Mance)." (SAC, ¶28, Exhibit A.10) In this post, for the first time, Defendant per se defames the Plaintiffs by referring to them as unethical. As in Defendant's other posts, he painted Plaintiffs in a false light. The statement that Mr. Terrill "failed to produce any results" implies that he was unprofessional. The statement is misleading as it fails to explain all of the efforts Mr. Terrill made on Defendant's behalf. It further implies that a positive result was guaranteed, which it was not. In fact, Mr. Terrill did review the University's rules. The term disorganized also implies unprofessionalism. Finally, as an educational advisor, Mr. Terrill did not have to be barred in DC as his educational advice was generic and applied to any jurisdiction. (SAC, ¶ 29)

On May 8, 2025, Defendant posted on Mr. Lento's Justia webpage, "I had a very negative, **unprofessional**, and unsatisfactory experience with Mr. Joseph Lento. In August 2024, I had two private phone calls with Mr. Joseph Lento, who assured me that he would be able to take my cases and provide legal representation. I later paid him a total of $20,000 for legal services in Washington DC. He charged me flat, non-refundable fees, which is already not allowed under the DC Ethics Rules of Professional Conduct (RPC), which is where both my matters took place. **He also did not make it clear to me, at any point, that he was not barred to practice law in Washington DC**. Because I was not kept informed and up to date, I sent numerous emails to Mr. Lento over the course of a few months, which were **left unanswered**. I finally had another (in retrospect, unproductive) call in November 2024 with Mr. Joseph Lento; he did not communicate and

participate in the call as much as I expected. Further, as requested, Mr. Lento made a comment to the media regarding my case; but, Mr. Lento proceeded to publish the article with sensitive details about my case on all his websites, something that I never consented to. Some things I wish I could have done differently during this process is conduct better research on who I retain for legal services, such as seeing which states attorneys like Mr. Lento are barred in, and if attorneys like Mr. Lento have any current and/or previous disciplinary history with their State Bar." (SAC, ¶30, Exhibit A.12) The specific referral to Plaintiffs as "unprofessional" is defamatory per se. Furthermore, it is untrue that Plaintiffs did not advise Defendant that Mr. Lento was not barred in Washington, DC. Potential clients are informed of the local counsel and pro hoc processes. (SAC, ¶ 31)

On April 20, 2025, Defendant posted on the Toprated Local website, "I had a very negative, **unethical**, and poor experience with Mr. Joseph Lento and the Lento Law Group. In August 2024, I retained and paid the Lento Law Group a total of $20,000 for their services in both a University matter and a legal matter in Washington DC. They charge flat, non-refundable fees, which is already not allowed under the DC Rules of Professional Conduct, which is where both my matters took place. For both matters, I was assigned Mr. Thomas Terrill (a New York-based attorney) and Mr. Terrell Ratliff (a Pennsylvania-based attorney), both of whom are not licensed to practice law in DC. **Mr. Terrill did not deliver any results for me other than advising me to not do anything**. Mr. Ratliff presents another very disappointing experience: he assured me he would be on my case and represent me in court. But, Terrell Ratliff missed three DC court dates for me in September, October, and November. Mr. Ratliff also **failed to respond to any of my texts, calls, and emails asking for a status** on when he can appear for me in court. When Mr. Ratliff failed to reply, I reached out to two Community Specialists at the Lento Law Group: Stephanie Morales

11

and Angelita "Angie" Camacho Adames. Stephanie and Angie both told me they would keep me updated; Angie even told me on the phone "not to appear in court" for my next date, which is entirely unethical advice since she is not a licensed attorney, and I would have faced penalties by the court if I failed to appear. After numerous emails being left unanswered, I finally had a conference call with Joseph Lento, Tom Terrill, and Terrell Ratliff. John E. Groff, the "Firm Administrator" who is not a licensed attorney in the United States, was also present in this call. Mr. Groff stated the Lento Law Group will "provide a statement [to the court]," in addition to promising he would "reach out tonight to an organization that I belong to that may be able to give us some assistance." Even though he promised he would send me an email with a statement for the court and an update on the status of my case, John Groff failed to follow up on his promise and remained unresponsive to my emails asking for a follow-up. I showed up to court having to tell my judge that the Lento Law Group and Mr. Terrell Ratliff once again have failed at entering their appearance with no explanation as to why. What I write is a genuine review backed by recordings of phone calls, numerous emails (and lack of replies), and text messages. None of my statements contain false allegations, nor is it my intention to harass and defame Mr. Lento and/or his firm. Rather, what I write here on Top Rated Local is an accurate account of my experience with Mr. Lento and his firm that is fully supported by evidence I have. I respectfully ask Mr. Lento to provide a professional and thorough response to my review for all to see, rather than privately threaten legal action against me (a young college student). Some things I wish I could have done differently during this process is conduct better research on who I retain for legal services, such as seeing which states attorneys are barred in, and If they have any current and/or previous disciplinary history with their State Bar." (SAC, ¶ 32, Exhibit A.14) The caveat in this post that it was not made with the intention of harassing or defaming the Plaintiffs, recognizes that

Defendant understood the defamatory nature of his post and was trying to circumvent the post's unambiguous language. Defendant was explained about the process of obtaining local counsel and pro hoc vice admission and why Mr. Ratliff had been unable to appear in Washington, DC. By failing to explain the context of the events, Defendant's post painted Plaintiffs in a false light and was misleading. (SAC, ¶ 33)

On April 19, 2025, Defendant posted an almost identical post as that discussed in ¶ 32. It contained identical or similar caveats and allegations as used in several of the posting previously discussed. (SAC, ¶ 34, Exhibit A.15) This post also contained per se defamatory language and misrepresentations and misleading statements contained in several prior postings. (SAC, ¶ 35)

On January 3, 2025, and again on April 20, 2025, Estrada sent mass emails to a list of other current or former clients and uninvolved third parties, stating:

> "I've retained legal counsel who agrees that the best course of action is to file a bar complaint… Terrell engaged in unauthorized practice of law… the Lento firm's fee agreement is super, super vague… we've formally requested my payment get returned due to major ethical concerns…"

These emails were widely circulated and later became part of other legal proceedings, further amplifying the defamatory campaign and damaging Plaintiffs' reputation. The allegations about Mr. Ratliff were inaccurate. (SAC, ¶¶ 36, 37)

In summary, through no less than 11 social media posts, Defendant repeatedly made the following defamatory statements[1]:

- Lawyers employed by the Plaintiffs never responded to emails;

- Lawyers employed by the Plaintiffs did not provide updates of his cases;

---

[1] The actual statements within each social media comment or posting are highlighted in the previous paragraphs.

- Lawyers employed by the Plaintiffs failed to explain to him why his case was taking so long;

- Mr. Terrill, one of Plaintiffs' employees, failed to understand the intricacies of Title IX;

- Mr. Terrill failed to review the University's policies;

- The Plaintiffs did not have offices where they said they were located;

- The Plaintiffs were disorganized, and

- The Plaintiffs and their employees were unprofessional and unethical.

Each of the statements, individually and certainly when taken collectively, accuses the Plaintiffs of and portrays them as unprofessional, unethical, failing to understand the law, and failing to perform the research and review necessary to represent the Defendant. In one post Defendant specifically called the Plaintiffs unprofessional and in two others, specifically called the Plaintiffs unethical. The accusations discussed above can be proven false and are clearly damaging to Plaintiffs' professional reputation. In fact, the volume of Defendant's defamatory posts evidences a deliberate campaign to defame Plaintiffs, to have current clients discharge the Plaintiffs, and to deter new clients from retaining the Plaintiffs.

## ARGUMENT

### I.    Definition of Defamation/Defamatory

Pennsylvania statutes define the elements of a claim for defamation. Title 42, Pa.C.S.A. § 8343 provides:

> In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.

14

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

"Statements by a defendant imputing to the plaintiff ... conduct incompatible with the plaintiff's business constitute slander per se.' Restatement (Second) of Torts § 570(c), *quoted in Brinich v. Jencka,* 757 A.2d 388, 397 (Pa.Super.Ct. 2000). In other words, a statement is defamatory per se when 'the speaker imputes to another conduct, characteristics, or a condition that would adversely affect [it] in [its] lawful business or trade....' *Walker v. Grand Cent. Sanitation, Inc.,* 430 Pa.Super. 236, 634 A.2d 237, 241 (Pa.Super.Ct. 1993); *see also Parexel Int'l Corp. v. Feliciano,* No. 04–CV–3798, 2008 WL 2704569, at *3 (E.D.Pa. July 3, 2008) ('A statement imputing business misconduct may be defamation per se if it ascribes to another's conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business.') (citations and internal quotations and alteration omitted). In *Joseph v. Scranton Times L.P.,* 959 A.2d 322, 344 (Pa.Super.Ct. 2008), the Superior Court held that '[w]ith words that are actionable per se, only general damages, i.e., proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both, must be proven; special damages, i.e., out-of-pocket expenses borne by the plaintiff due to the defamation, need not be proven.; 'A plaintiff does not have to prove special harm when the words constitute defamation per se.' *Parexel,* 2008 WL 2704569, at *3; *see also Walker,* 634 A.2d at 244 (same)." *Synygy, Inc. v. ZS Assocs., Inc.,* 110 F. Supp. 3d 602, 613 (E.D. Pa. 2015).

"Pennsylvania tort law defines libel as 'a maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule, or injure him in his business or profession.' *Brophy v. Phila. Newspapers Inc.,* 422 A.2d 625, 628 (Pa.Super.Ct. 1980) (internal quotation omitted). An action in defamation 'is based on a violation

15

of the fundamental right of an individual to enjoy a reputation unimpaired by false and defamatory attacks.'" *Bera v. Consol. Freightways, Inc.,* 421 A.2d 831, 833 (Pa.Super.Ct. 1980). *Sprague v. Porter,* No. 1649 EDA 2013, 2014 WL 10803063, at *10 (Pa. Super. Ct. Aug. 26, 2014).

"The Superior Court of Pennsylvania in *Joseph v. Scranton Times, L.P.,* 89 A.3d 251, 272 (Pa.Super.Ct. 2014), held that 'presumed damages do indeed remain available upon a showing of actual malice.' The Court explained 'that, because Pennsylvania provides the utmost protection of reputational interests, and awarding presumed damages upon a showing of actual malice is permissible under the First Amendment, such damages remain available under Pennsylvania law.'" *Id.*, 110 F. Supp. 3d at 614.

"Pennsylvania law shields the publisher of defamatory statements from liability if the statement was made subject to a privilege, and the privilege was not abused.' *Moore v. Cobb–Nettleton,* 889 A.2d 1262, 1268 (Pa.Super. 2005). A conditional privilege applies 'if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know the information conveyed.' *Am. Future Sys., Inc. v. Better Bus. Bureau,* 592 Pa. 66, 923 A.2d 389, 393 (Pa. 2007). The defendant has the burden of proving the privileged character of the defamatory statement. 42 Pa. Con. Stat. Ann.. § 8343(b). If a defendant carries its burden to show that a communication is conditionally privileged, the burden shifts to the plaintiff to establish that the defendant abused its conditional privilege. *Miketic v. Baron,* 450 Pa.Super. 91, 675 A.2d 324, 329 (Pa.Super. 1996). An abuse of privilege occurs if 'the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.'" *Moore v. Cobb–Nettleton,* 889 A.2d at 1269." *Bentlejewski v.*

16

*Werner Enters., Inc.,* No. 2:13CV1385, 2015 WL 4111476, at *3 (W.D. Pa. July 8, 2015), *aff'd*

*sub nom. Bentlejewski v. Werner Enters. Inc*, 654 F. App'x 77 (3d Cir. 2016). To establish an

abuse of a privilege, "knowledge or reckless disregard as to falsity is necessary. . ." *Bentlejewski*

*v. Werner Enters., Inc.,* No. 2:13CV1385, 2015 WL 4111476, at *6 (W.D. Pa. July 8, 2015), *aff'd*

*sub nom. Bentlejewski v. Werner Enters. Inc*, 654 F. App'x 77 (3d Cir. 2016).

**II.**     **Plaintiffs' Second Amended Complaint Pleads All Elements Necessary To   Establish Their Defamation Claims**

Plaintiffs' Second Amended Complaint pleads all elements necessary to   establish their

defamation claims. Therefore, Defendant's Rule 12 Motion should be denied.

    1.   The defamatory character of the communication

"A statement is defamatory per se when 'the speaker imputes to another conduct,

characteristics, or a condition that would adversely affect [it] in [its] lawful business or

trade....'"*Walker,* 430 Pa.Super. at 236, 634 A.2d at 241. In other words, defamatory   statements

ascribe to another's conduct, characteristics or a condition that would adversely affect his fitness

for the proper conduct of his lawful business." *Synygy, Inc.*, 110 F. Supp. 3d at 613.

The SAC, ¶¶ 12-34, set forth the details of no less than 11 comments and social media

posts made by the Defendant. Within those posts/comments are the following statements:

- Lawyers employed by the Plaintiffs never responded to emails;

- Lawyers employed by the Plaintiffs did not provide updates of his cases;

- Lawyers employed by the Plaintiffs failed to explain to him why his case was taking so long;

- Mr. Terrill, one of Plaintiffs' employees, failed to understand the intricacies of Title IX;

- Mr. Terrill failed to review the University's policies;

- The Plaintiffs did not have offices  where they said they were located;

- The Plaintiffs were disorganized, and

- The Plaintiffs and their employees were unprofessional and unethical.

"A maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule, or injure him in his business or profession." *Brophy,* 422 A.2d at 628.  Each of the statements individually, and certainly collectively, ascribes to Plaintiffs and their employees' conduct, characteristics. or a condition that would adversely affect their fitness for the proper conduct of their lawful business,  i.e., the practice of law.  Each blacken the Plaintiffs' professional reputation.  A professional law firm, and one which someone would trust with their litigation or legal issues, does not fail to  respond to emails; does not fail to provide updates to a client about their cases; does not fail to explain delays in cases; does not misrepresent the location of their offices; and is not disorganized.  A professional law firm does not retain attorneys who do not understand the intricacies of the statute upon which relief is sought, and who do not review the relevant documents.  A law firm referred to as unprofessional and unethical are to be subject to contempt or ridicule and injure said firms in their business or profession.

There is but one conclusion as to the nature of the statements contained in Defendant's 11 social media posts --- they are defamatory.

2. <u>The Defendant published the statements</u>

Defendant never challenges that he made social media posts and comment in which  the defamatory statements exist.  In fact, on page one of its Brief, the defendant tacitly admits that he is responsible for the posts.  He writes, "Mr. Estrada's statements that Plaintiffs find offensive

simply express the opinion of an unsatisfied client or are undisputed facts . . ." (Defendant's Brief at 2)

3. <u>The defamatory statements apply to the Plaintiffs</u>

There is no doubt that the statements apply to the Plaintiffs and their attorneys. The posts were placed on, *inter alia*, Lento's various internet pages. They specifically refer to Mr. Lento, the Lento law firm, and attorneys and others employed by the Plaintiffs.

4. <u>The understanding by the recipient of its defamatory meaning</u>

Although opinions cannot give rise to defamation, untrue statements upon which they are based do give rise to defamation. Therefore, Defendant's use of caveats and language to make certain that his statements are known to be his opinions, does not preclude a defamation lawsuit where those opinions are based on untrue statements of fact. *Walker v. Grand Cent. Sanitation, Inc.*, 430 Pa. Super. 236, 244, 634 A.2d 237, 241 (1993).

While it is admitted that Defendant's social media comments and posts contain opinions, because those opinions are based on several untrue statements of fact, the defamatory meaning is clearly relayed. A reasonable reader will recognize the defamatory statements. A reasonable reader would conclude that the Plaintiffs should not be hired for legal services.

Furthermore, Defendant's attempts to insulate himself from liability by including in his posts caveats that the post only contains his opinion, are meaningless. "There is no wholesale defamation exemption for anything that might be labeled opinion . . ." *Vivian v. Blank Rome, LLP*, 2024 PA Super 118, 318 A.3d 890, 900 (2024), *reargument denied* (Aug. 14, 2024), *appeal denied*, 332 A.3d 1180 (Pa. 2025).

19

5. <u>The understanding by the recipient of it as intended to be applied to the plaintiff</u>.

There is no doubt that any person reading the posts/comments would know that they apply to the Plaintiffs and their attorneys. The posts were placed on, *inter alia*, Lento's various internet pages. They specifically refer to Mr. Lento, the Lento law firm, and attorneys and others employed by the Plaintiffs. It defies logic and reason to believe that anyone reading these posts, on primarily Lento webpages, would not clearly understand that the Defendant's posts/comments applied to the Plaintiffs.

6. <u>Special harm resulting to the plaintiff from its publication</u>

Paragraph 59 of the SAC specifically plead, "Special damages have been pled in this Complaint, including the diversion of firm resources to counteract reputational harm, the cost of professional takedown services, reputational repair, and the loss of prospective and existing client relationships.

7. <u>Abuse of a conditionally privileged occasion</u>

"An abuse of privilege occurs if 'the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.'" *Moore,* 889 A.2d at 1269." "[A]ctual malice requires at a minimum that statements were made with a reckless disregard for the truth." *Joseph v. Scranton Times L.P.*, 634 Pa. 35, 90, 129 A.3d 404, 437 (2015).

SAC ¶ 58 states, "No conditional privilege applies to Defendant's statements. Defendant acted with malice or reckless disregard for the truth in repeatedly publishing false, defamatory, and unverified factual allegations." SAC ¶ 71 provides, "Defendant acted with actual malice

and/or reckless disregard for the truth. He was informed of the limits of representation (including pro hac vice issues), the scope of his educational advisory contract, and the facts surrounding billing and communication. Nevertheless, he repeatedly misrepresented those facts as part of a campaign to punish Plaintiffs for not refunding his full fee." SAC ¶¶ 12-39, discussed in depth in the Statement of Facts, pleads in detail the defamatory nature of the social media posts and the factual statement they contained that were untrue.

Because the Defendant, as pleaded, knew many of the statements he posted were untrue and inaccurate, their posting constituted an abuse of any privilege, rendering the Defendant liable to damages for defamation. He knew they were false because he was personally involved in the transactions discussed, and therefore knew that much of what he described was untrue.

Significantly, "whether abuse of the privilege has occurred is a question for the jury." *Norton v. Glenn*, 580 Pa. 212, 236, 860 A.2d 48, 62 (2004). Thus, as whether the Defendant abused any privilege he had to post protected speech is a jury question, dismissal at this stage in this case is inappropriate.

Accordingly, the Defendant's Rule 12 Motion to Dismiss as it relates to the defamation claims should be denied.

### III. Plaintiffs' Second Amended Complaint Pleads All Elements Necessary To Establish Trade Libel

The Defendant correctly states that to state a claim for trade libel a plaintiff must allege: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity.

Plaintiffs have properly pleaded these elements and facts supporting them.

As discussed in the preceding section, Section II, the SAC ¶¶ 12-39, pleaded in detail which portions of the Defendant's 11 social media posts were untrue and/or inaccurate and why. Second, it is undeniable that the intent of Defendant's post was to discourage others from retaining the Plaintiffs. Had the Defendant not intended or desired to deter others from retaining the Plaintiffs, he would not have repeatedly posted on a wide variety of webpages that the Plaintiffs were unprofessional and unethical. Third, Plaintiffs have pleaded pecuniary loss. (See, SAC ¶¶ 59, 60, 72) Fourth, as discussed in Section II, under the malice section, since Defendant falsely wrote about his personal dealings with Plaintiffs, or so distorted the truth and took the events so out of context that the statements were effectively untrue, it is obvious that he had actual knowledge that he was lying because he knew what the truth was, but did not present that truth in his posts and comments.

## IV. <u>Fees Are Inappropriate Because Plaintiffs Have Properly Plead Defamation</u>

Defendant is not entitled to any attorney's fees for two reasons.

First, under the Pennsylvania Anti-Slapp law, the Defendant is not entitled to attorneys' fees unless they prevail in the special motion for dismissal of a judgment on a cause of action of the Complaint. For the reasons set forth above, the Defendant's Rule 12 Motion to Dismiss should be denied, and therefore, he is not entitled to attorney fees.

Second, the Pennsylvania Anti-Slapp law permits a defendant to file a "special motion for dismissal of or judgment on a cause of action . . ." 42 Pa.C.S.A. § 8340.16. It further provides, "A party that prevails in an action under this section is entitled to recover from the non-prevailing party under subsection (a)(1) all of the following: (1) Attorney fees, court costs and expenses of litigation in the underlying action." 42 PA.C.S.A. 8320.1(b). However, the Defendant did not file

22

a "special motion for dismissal" pursuant to the Pennsylvania Ant-Slapp Law. The Defendant filed its motion under Rule 12 of the Federal Rules of Civil Procedure. The Second Circuit Court of Appeals addressed this issue in *La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020). In *La Liberte*, the Court of Appeals held:

> Finally, Reid and amici curiae contend that she is entitled to attorneys' fees under the anti-SLAPP statute based on the district court's separate Rule 12(b)(6) dismissal. We disagree. "The Act does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6)*." Abbas*, 783 F.3d at 1337 n.5; see also Klocke, 936 F.3d at 247 n.6. ("Suffice to say that because [Texas's anti-SLAPP statute] does not apply in federal court, the district court erred by awarding fees and sanctions pursuant to it.").

> California's anti-SLAPP statute likewise awards attorneys' fees *only* to "a prevailing defendant *on a special motion to strike*." Cal. Civ. Pro. Code § 425.16(c)(1) (emphasis added). So Reid cannot recover attorneys' fees based on the district court's Rule 12(b)(6) dismissal (which was nevertheless erroneous, as we explain below in Points III and IV). Nor may she recover them under the anti-SLAPP statute if she later prevails by other means.

*La Liberte,* 966 F.3d at 88–89 (underlining added; italics in original).

Defendant did not file the special motion pursuant to the Pennsylvania Anti-Slapp Act, but it filed a Rule 12 Motion pursuant to the Federal Rules of Civil Procedure. Under the reasoning of *La Liberte*, the attorney's fees provision of the Pennsylvania act does not apply where a Rule 12 Motion is the basis for the dismissal. Accordingly, Defendant is not entitled to any counsel fees or expenses.

## **CONCLUSION**

As the United States Court of Appeals for the Third Circuit has explained, "Under Rule 12(b)(6), a motion to dismiss may be granted only if, *accepting the well-pleaded allegations in the*

*complaint as true and viewing them in the light most favorable to the plaintiff*, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)." *Simon*, 732 F.3d at 264. Furthermore, while it is for the Court to decide whether the Defendant's statements were privileged speech, only a jury can decide whether the Defendant abused that privilege. *Norton v. Glenn*, 580 Pa. 212, 236, 860 A.2d 48, 62 (2004).

Applying these standards, Plaintiffs' Second Amended Complaint establishes each element of the tort of defamation, as codified in Pennsylvania, and trade libel. This lawsuit should proceed. During discovery, the parties can explore the issues in more detail to fill in the activities, knowledge, intent, etc., not known during this early pleading stage.

For all of the reasons set forth above, Defendant's Rule 12 Motion to Dismiss should be denied.

Respectfully submitted,

LLG NATIONAL

BY: *s/ Lawrence A. Katz, Esq.*
LAWRENCE A. KATZ
PO Box 1054
Bellmawr, NJ 08031
Phone: 856.652.2000
Fax: 856.375.1010
Email: Lawrence.Katz@LLGNational.Com

<u>VERIFICATION</u>

Lawrence A. Katz, Esquire, counsel for Plaintiff(s), does hereby verify that the facts set forth in the foregoing pleading are true and correct to the best of his knowledge, information and belief.

                                         \_\_\_\_s/ Lawrence A. Katz_____

                                             LAWRENCE A. KATZ

<u>CERTIFICATE OF SERVICE</u>

The foregoing document, that was electronically filed, was electronically served **on the Court's e-file distribution list**.

                                         \_\_\_\_s/ Lawrence A. Katz_____

                                             LAWRENCE A. KATZ